1
2
3
4
5
6
7
8                    UNITED STATES DISTRICT COURT

9                   SOUTHERN DISTRICT OF CALIFORNIA

10

11   SAN DIEGO COMIC CONVENTION, a        Case No.:  14-cv-1865 AJB (JMA)
     California non-profit corporation,
12                                         **ORDER:**
                                Plaintiff,
13                                         **(1) DENYING DEFENDANTS'**
     v.                                    **MOTION FOR SUMMARY**
14                                         **JUDGMENT;**
     DAN FARR PRODUCTIONS, a Utah
15   limited liability company; DANIEL     **(2) GRANTING IN PART AND**
     FARR, an individual; and BRYAN        **DENYING IN PART PLAINTIFF'S**
16   BRANDENBURG, an individual,           **MOTION FOR SUMMARY**
                                           **JUDGMENT;**
17                              Defendants.
                                           **(3) DENYING DEFENDANTS'**
18                                         **MOTION TO EXCLUDE;**

19
                                           **(4) GRANTING PLAINTIFF'S**
20                                         **MOTION TO EXCLUDE; AND**

21
                                           **(5) GRANTING DEFENDANTS AND**
22                                         **PLAINTIFF'S REQUESTS FOR**
                                           **JUDICIAL NOTICE**
23

24
                                           (Doc. Nos. 91, 95, 97, 106, 216, 218.)
25

26

27

28

                                         1

Pending before the Court are both Plaintiff San Diego Comic Convention ("Plaintiff") and Defendants Dan Farr Productions, Daniel Farr, and Bryan Brandenburg's (collectively referred to as "Defendants") motions for summary judgment, motions to exclude expert testimony, and requests for judicial notice. Pursuant to Civil Local Rule 7.1.d.1, the Court finds the matters suitable for decision on the papers and without oral argument. As explained more fully below, the Court **DENIES** Defendants' motion to exclude, (Doc. No. 106), **GRANTS** Plaintiff's motions to exclude, (Doc. No. 91), **GRANTS** Defendants and Plaintiff's requests for judicial notice, (Doc. Nos. 95-1, 216-1), **DENIES** Defendants' motions for summary judgment, (Doc. Nos. 216, 218), and **GRANTS IN PART AND DENIES IN PART** Plaintiff's motion for summary judgment, (Doc. Nos. 95, 97).

## BACKGROUND

The contours of this case revolve around Defendants' use of the unhyphenated form of Plaintiff's trademark "Comic-Con." (Doc. No. 97 at 10.)[1] Since 1970, Plaintiff, a non-profit organization, has held the Comic-Con Convention in San Diego, California celebrating comic art, books, and other aspects of the popular arts. (*Id.* at 9.) Since this initial event, the San Diego Comic-Con event has grown in popularity with attendance exceeding over 135,000 attendees in July of 2016. (*Id.*) However, though Plaintiff may be the largest gathering of comic fans, it was not the first. (Doc. No. 95-10 at 41.) Nevertheless, Plaintiff contends that it is due to the extraordinary amount of time, effort, and expense invested by it that the San Diego Comic Convention and its brand have become the premier comic book and popular arts convention in the world. (Doc. No. 97 at 9; Doc. No. 234-2 at 12–13.)

To protect its brand, Plaintiff applied and now holds four trademark registrations with the United States Patent and Trademark Office ("USPTO"): (1) COMIC-CON; (2)

---

[1] All pinpoint cites are in reference to the CM/ECF page number and not the number on the document.

COMIC CON INTERNATIONAL; (3) for the word-plus-design mark[2] that Plaintiff uses to advertise its products; and (4) for the word mark ANAHEIM COMIC-CON.[3] (Doc. No. 1 ¶ 13; Doc. No. 244 at 11.)

Defendants Bryan Brandenburg and Daniel Farr are co-founders of Defendant Dan Farr Productions ("DFP"), a limited liability company. (Doc. No. 234-2 at 7; Doc. No. 244 at 12.) In September of 2013, through DFP, Defendants held the inaugural Salt Lake Comic Con ("SLCC"). (Herrera Decl. Ex. 5 ("Farr Depo.") 11:4–9, Doc. No. 95-7.) SLCC is a three-day fan event featuring the best in movies, television shows, gaming, sci-fi, fantasy, and comic books. (Doc. No. 244 at 12.) Since 2013, SLCC has held their convention every year. (Farr Depo. at 11:7–9.) Additionally, beginning in 2014, SLCC also holds the Salt Lake Comic Con FanXperience in March or April of every year. (*Id*. at 11:10–15; Doc. No. 97 at 11.) As evidenced below, the logo Defendants employ to advertise their event uses the unhyphenated form of Plaintiff's trademark "Comic-Con," with a geographic identifier preceding it.

 

(Doc. No. 97 at 11.)

In sum, Plaintiff asserts that beginning in early 2013, Defendants made the decision to capitalize on the goodwill of Plaintiff's brand by advertising and holding SLCC. (Doc. No. 1 ¶ 16.) As a result, Defendants' use of Plaintiff's marks was intended to suggest,

---



[2]

[3] The marks are registered with the USPTO as U.S. Service Mark Registration Numbers 3,221,808; 3,219,568; 2,218,236; and 4,425,806. (Doc. No. 97 at 10.)

mislead, and confuse consumers into believing that SLCC was associated with, authorized by, or endorsed by Plaintiff. (*Id.* ¶ 18.) Further, Plaintiff asserts that Defendants' advertising methods provide additional support for their claims, including Defendants' campaign that stated "Comic-Con is coming to Utah." (*Id.* ¶ 27.)

On August 7, 2014, Plaintiff filed its complaint against Defendants asserting causes of action for (1) federal trademark infringement; and (2) false designation of origin. (Doc. No. 1.) On September 22, 2014, Defendants filed their answer to the complaint with a counterclaim against Plaintiff. (Doc. No. 16.) On June 23, 2017, the last day for dispositive motions to be filed, both parties filed the present matters, their motions for summary judgment, motions to exclude, and requests for judicial notice.[4] (Doc. Nos. 91, 95, 97, 106, 216, 218.)

## **LEGAL STANDARD**

Summary judgment is appropriate under Federal Rule of Civil Procedure 56 if the moving party demonstrates the absence of a genuine issue of material fact and entitlement to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A fact is material when, under the governing substantive law, it could affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is genuine if a reasonable jury could return a verdict for the nonmoving party. *Id.*

A party seeking summary judgment bears the initial burden of establishing the absence of a genuine issue of material fact. *Celotex Corp.*, 477 U.S. at 323. The moving party can satisfy this burden in two ways: (1) by presenting evidence that negates an essential element of the nonmoving party's case; or (2) by demonstrating the nonmoving party failed to establish an essential element of the nonmoving party's case on which the

---

[4] The Court notes that Defendants filed two separate motions for summary judgment that totaled forty-four pages in length in violation of Civil Local Rule 7.1.h. However, the Court permitted this violation and granted Plaintiff's request to file an opposition that also exceeded the page lengths designated by the local rules so that they could properly respond. (Doc. No. 119 at 3.)

nonmoving party bears the burden of proving at trial. *Id.* at 322–23. "Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

Once the moving party establishes the absence of a genuine issue of material fact, the burden shifts to the nonmoving party to set forth facts showing a genuine issue of a disputed fact remains. *Celotex Corp.*, 477 U.S. at 330. When ruling on a summary judgment motion, the court must view all inferences drawn from the underlying facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## DISCUSSION

### A.    Defendants and Plaintiff's Requests for Judicial Notice

Defendants request the Court judicially notice dictionary definitions and USPTO records. (Doc. No. 216-1 at 2–3.) Similarly, Plaintiff requests the Court take judicial notice of its four USPTO trademark registrations. (Doc. No. 95-1.)

Under Federal Rule of Evidence 201, a court may judicially notice a fact that "is not subject to reasonable dispute" as it is "generally known within the trial court's territorial jurisdiction" or because it can be "accurately and readily determined from sources whose accuracy cannot be reasonably questioned." Fed. R. Evid. 201(b)(1)–(2).

Here, the Court finds judicial notice of the requested documents appropriate. First, it is well-established that a court can consider dictionary definitions when determining the "plain, unambiguous, and common meanings of terms." *United States v. Wealth and Tax Advisory Servs., Inc.*, 526 F.3d 528, 530 (9th Cir. 2008); *see also Best Buy Stores, L.P. v. Manteca Lifestyle Ctr., LLC*, 859 F. Supp. 2d 1138, 1145 (E.D. Cal. 2012) (same). Thus, the definitions produced by Defendants are suitable for judicial notice.

As to the USPTO records, undisputed matters of public record are generally judicially noticeable. *See Lee v. City of Los Angeles*, 250 F.3d 668, 689–90 (9th Cir. 2001). Thus, for the purpose of demonstrating that the filings, applications, and actions occurred on certain dates and that Plaintiff's four marks are indeed registered with the USPTO, all

5

of which are undisputed facts, the Court finds the USPTO records listed judicially noticeable. However, to the extent that Defendants seek to claim that their trademark applications for Salt Lake Comic Con illustrate that Plaintiff's marks are generic, these contested questions cannot be answered solely in reference to the information within these judicially noticeable documents. *See Caveman Foods, LLC v. Lester*, No. C 12-1587 RS, 2013 WL 12172626, at *2 (N.D. Cal. Feb. 14, 2013) ("The strength of the [] mark is the central disputed question of this litigation and an inappropriate subject for judicial notice.").

Accordingly, for the purposes described above, the Court **GRANTS** Defendants and Plaintiff's requests for judicial notice. *See Pollution Denim & Co. v. Pollution Clothing Co.*, 547 F. Supp. 2d 1132, 1135 n.11 (C.D. Cal. 2007) (taking judicial notice of the facts from online records maintained by the USPTO).

## B.   Motions to Exclude

Both Plaintiff and Defendants filed motions to exclude specific experts. (Doc. Nos. 91, 106.) Plaintiff seeks to exclude the reports and testimony of Jeffrey P. Kaplan and Clarke B. Nelson, (Doc. No. 91), and Defendants seek to exclude the expert report and survey of Matthew G. Ezell, (Doc. No. 106-1).

Federal Rule of Evidence 702 governs the admissibility of expert testimony. Pursuant to Rule 702:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. "The party offering the expert bears the burden of establishing that Rule 702 is satisfied." *Sundance Image Tech., Inc. v. Cone Editions Press, Ltd.*, No. 02 CV 2258

JM (AJB), 2007 WL 935703, at *4 (S.D. Cal. Mar. 7, 2007).

Moreover, prior to admitting expert testimony, the trial court must make a "preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592–93 (1993). Thus, the trial court acts as the "gatekeeper to exclude speculative or irrelevant expert opinion." *Sargon Enter., Inc. v. Univ. of S. Cal.*, 55 Cal. 4th 747, 770 (2012). In sum a Rule 702 analysis is a two-step assessment that requires consideration of whether (1) the reasoning or methodology underlying the testimony is scientifically valid (the reliability prong); and (2) whether the reasoning or methodology properly can be applied to the facts in issue (the relevancy prong). *Daubert*, 509 U.S. at 592–93.

i.     Defendants' Motion to Exclude Plaintiff's Expert Matthew G. Ezell

Matthew Ezell was retained by Plaintiff to conduct a "Teflon" survey[5] to address the issue of the primary significance of Comic-Con to the relevant public. (Doc. No. 106-1 at 5–6; Doc. No. 169 at 2.) Mr. Ezell's Teflon survey revealed that 82% of the participants understood Comic-Con as a brand name, and not as a common generic name. (Doc. No. 106-3 at 11; Doc. No. 169 at 2.)

Defendants seek to exclude Mr. Ezell's testimony and survey as irrelevant. (Doc. No. 106-1 at 5–8.) More specifically, Defendants argue that surveys measuring consumer perception only matter in genericide cases. (*Id.* at 6.) Thus, as Defendants contend that this is not a genericide case, but is instead a case where the trademark was allegedly generic prior to Plaintiff's first use, i.e., genericness *ab initio*, consumer surveys are not necessary.[6] (*Id.* at 7–8.) To support this argument, Defendants point the Court to *Horizon Mills Corp.*

---

[5] A Teflon survey asks respondents to classify a series of words as either brand names or common names after a brief lesson explaining the difference between the two. (Doc. No. 106-1 at 5–6.)

[6] As discussed *infra* p. 16–17, the Court declines to analyze Defendants' generic *ab initio* arguments as they are unsubstantiated and unsupported by dispositive case law.

7

*v. QVC, Inc.*, 161 F. Supp. 2d 208 (S.D.N.Y. 2001), *Schwan's IP, LLC v. Kraft Pizza Co.*, 460 F.3d 971 (8th Cir. 2006), *Hunt Masters, Inc. v. Landry's Seafood Rest., Inc.*, 240 F.3d 251 (4th Cir. 2001), and *Miller Brewing Co. v. Jos. Schlitz Brewing Co.*, 605 F.2d 990 (7th Cir. 1979). (*Id.* at 7.)

For clarity, the Court first expounds that a mark is the victim of genericide when the "majority of the relevant public appropriates a trademark term as the name of a product (or service) . . . ." *Freecycle Network, Inc. v. Oey*, 505 F.3d 898, 905 (9th Cir. 2007) (citation omitted). For example, formerly trademarked terms such as "aspirin," "escalator," or "cellophane" only identified the brand or producer during the period of its initial use, however after the passage of time, they were appropriated by the public and soon became the generic name of the product. *Id*. On the other hand, non-genericness or generic *ab initio* is when a mark is generic before a producer began using it as a trademark to advertise their products or services. *See Schwan's IP, LLC v. Kraft Pizza Co.*, 460 F.3d 971, 974 (8th Cir. 2006).

In its opposition, Plaintiff argues that it provided the consumer survey in direct response to Defendants' own admissions that this is indeed a genericide case. (Doc. No. 169 at 2.) In fact, Defendants pled as an affirmative defense that Plaintiff's claims are barred because the trademarks at issue are generic. (*Id.*; Doc. No. 16 at 8.) Thus, as Defendants' own pleadings as well as the majority of the evidence proffered relate to a defense of genericide, Plaintiff's assert that Mr. Ezell's survey is relevant. (Doc. No. 169 at 4–6.) After a careful review of the moving papers, the applicable law, and Mr. Ezell's opinion and survey, the Court agrees with Plaintiff.

The Ninth Circuit focuses on the who-are-you/what-are-you test when determining genericness ("the primary significance test"). *Official Airline Guides, Inc. v. Goss*, 6 F.3d 1385, 1391 (9th Cir. 1993) (quoting 1 J. McCarthy, *Trademarks and Unfair Competition* § 12.01 (3d ed. 1992)). Thus, a non-generic mark answers the buyer's questions "'Who are you? Where do you come from?' 'Who vouches for you?' But the [generic] name of a product answers the question 'What are you?'" *Id*.

8

Most importantly, the Court notes that case law makes clear that courts in this district rely heavily upon consumer surveys in determining genericness. *See Elliott v. Google*, 860 F.3d 1151, 1160 (9th Cir. 2017) (finding that the court appropriately considered consumer surveys in determining the genericness of the mark "Google"); *see also Premier Nutrition, Inc. v. Organic Food Bar, Inc.*, 327 F. App'x 723, 724 (9th Cir. 2009) (using a survey provided by defendant as well as other direct and circumstantial evidence to conclude that "Organic Food Bar" is a generic term); *Stuhlbarg Int'l. Sales Co., Inc. v. John D. Brush and Co., Inc.*, 240 F.3d 832, 840 (9th Cir. 2001) ("To counter this evidence, [defendant] submitted excerpts from a consumer survey purportedly showing forty-four percent consumer awareness to the term 'Fire-Safe.'"). Specifically, the Teflon survey design has been "accepted and given weight by the courts and is frequently cited." *Premier Nutrition, Inc. v. Organic Food Bar, Inc.*, No. SACV 06-0827 AG (RNBx), 2008 WL 1913163, at *9 (C.D. Cal. Mar. 27, 2008) ("Premier Nutrition II").

Here, it is clear that Plaintiff's consumer survey is pertinent in deciphering how consumers understand the trademark "Comic-Con." The Court notes that despite Defendants' attempt to focus the Court's attention solely on their generic *ab initio* contentions, the Court cannot ignore the fact that (1) the majority of the evidence proffered by Defendants in support of their motion for summary judgment revolves around proving that Plaintiff's mark is presently generic, (Doc. No. 244 at 9, 13, 15); (2) that Defendants' own expert was hired to offer the opinion that Plaintiff's trademark is currently generic, (Doc. No. 91-2 at 3); (3) that Defendants' counterclaim pleads that one of its defenses is genericide, (Doc. No. 16 at 8); and (4) that Defendants clearly state in their own moving papers and briefs that they are arguing a theory of defense based on genericide, (Doc. No. 200 at 2). Consequently, as Defendants argue genericide, and the Ninth Circuit primarily employs the primary significance test to determine the genericness of a mark, it is readily apparent that Mr. Ezell's survey is highly relevant to the present matter. *See In re Silicone Gel Breast Implants Prods. Liab. Litig.*, 318 F. Supp. 2d 879, 893–94 (C.D. Cal. 2004) (holding that a court under Rule 702 must make an inquiry into whether an expert's opinion

would be useful or helpful to the trier of fact).

The Court recognizes that in an effort to combat Plaintiff's opposition, Defendants in their reply brief fleetingly argue that even in terms of genericide, Mr. Ezell's report should be excluded as it tries to measure the primary significance of Comic-Con now instead of when Plaintiff started using it in 1970 or when the lawsuit was initiated nearly three years ago. (Doc. No. 200 at 6.) However, not only do Defendants fail to provide case law to support this argument, but its reasoning is obtuse.

A Teflon survey, like the one used here, asks consumers to categorize different words as either brand names or common names. This is then used to prove that "the primary significance of the term in the minds of the consuming public is not the product but the producer." *Kellogg Co. v. Nat'l Biscuit Co.*, 305 U.S. 111, 118 (1938). Thus, in contrast to Defendants' assertions, Teflon surveys analyze the mindset of the consumer at the time they take the survey. *See Elliott*, 860 F.3d at 1160 n.7 (using a Teflon survey to ask consumers whether they believed "Google" was at that time a brand name); *see also Intel Corp. v. Adv. Micro Devices, Inc.*, 756 F. Supp. 1292, 1297 (N.D. Cal. 1991) (holding that the Teflon Survey was properly conducted as it showed that 72% of the public regard at that point in time found that the phrase was generic). As Defendants offer no case law to refute this conclusion and only devote a single sentence to arguing this point, this argument is meritless.

Accordingly, it is unquestionable that Mr. Ezell's testimony is extremely pertinent to helping the trier of fact determine whether Plaintiff's trademark is allegedly generic. Thus, the Court **DENIES** Defendants' motion to exclude Mr. Ezell. *Daubert v. Merrell Dow Pharm., Inc.*, 43 F.3d 1311, 1315 (9th Cir. 1995) (Daubert II) (holding that a court must ensure that "the proposed expert testimony is 'relevant to the task at hand'") (quotation omitted).

Finally, though the Court need not reach this issue, the Court notes that it finds the case law Defendants employ to argue the irrelevance of the Teflon survey under a non-genericide theory unpersuasive. First, the Court notes that in *Horizon Mills*, the court never

definitively concluded that consumer surveys were irrelevant to genericide cases. 161 F. Supp. 2d at 220. Instead, the court only highlighted that the defendants in that case argued this point. *Id.* at 220 n.16. Moreover, Defendants use of *Schwan's IP* is baseless. The court in *Schwan's* found that as "Brick Oven" was commonly used before either party began labeling their frozen pizzas, a survey measuring consumer perceptions would be inconsequential. 460 F.3d at 976. This is not the case here. Defendants have not produced documents that demonstrate that "Comic-Con" was frequently or ordinarily used pre 1970s to refer to the specific type of event at issue in the present matter, nor that the majority of consumers used the phrase to generally refer to comic book conventions.

Most importantly, the fundamental issue with all of Defendants' cases is that they are holdings from other circuits and are thus not dispositive. Accordingly, Defendants' case law as a whole fails to persuade the Court of the irrelevance of the Teflon survey in a non-genericide case.

   ii.    Plaintiff's Motion to Exclude the Reports of Jeffrey P. Kaplan and Clarke B. Nelson

       a.    *Jeffrey Kaplan*

Plaintiff attacks Mr. Kaplan's opinion as irrelevant. (Doc. No. 234.) Specifically, Plaintiff contends that he fails to address the primary significance test, that his reports are based on insufficient data, and that his opinion fails to assist the trier of fact as he offers nothing beyond common knowledge. (*See generally* id.)

Defendants offer the expert testimony of Jeffrey Kaplan to provide linguistic evidence to support the opinion that the phrase "comic con" is generic. (Doc. No. 91-2 at 3.) In sum, Mr. Kaplan's report is broken down into several sections: (1) an analysis on the naturally occurring discourses of "comic con" on websites, news stories, magazines, and blogs, (*Id.* at 5); (2) arguing that as the phrase comic con can be used in a plural form this highlights that it is a common noun, (*Id.* at 8); (3) asserting that as comic con is not capitalized in all instances, this provides further proof that it is a common noun, (*Id.* at 19 –20); and (4) the ubiquitous use of "comic con" by more than 102 comic cons as the name

of independent comic cons demonstrates genericness, (*Id.* at 23). Based upon all of his research, Mr. Kaplan then concludes that "comic con" has the characteristics of a common noun and is thus generic. (*Id.* at 25.)

The Court first briefly highlights that from the face of Mr. Kaplan's report, it does not appear that his testimony is relevant to the crux of Defendants' arguments. Defendants' entire motion for summary judgment and its motion to exclude Plaintiff's expert argue that "Comic-Con" was generic <u>before Plaintiff's first use in 1970</u>. (Doc. No. 106-1 at 5; Doc. No. 244 at 18 (emphasis added).) In contrast, Mr. Kaplan was employed to offer linguistic evidence supporting his opinion that the expression "'comic con' was generic at the <u>time the above-captioned law suit was filed</u>, and is <u>currently generic</u> . . . ." (Doc. No. 91-2 at 3 (emphasis added).) Thus, it is unclear how Mr. Kaplan's report would assist the trier of fact in determining that the mark was generic before 1970. *See Kennedy v. Collagen Corp.*, 161 F.3d 1226, 1230 (9th Cir. 1998) (finding that relevancy requires opinions that would assist the trier of fact in reaching a conclusion necessary to the case).

Next, and most importantly, the Court finds that Defendants have failed to establish that Mr. Kaplan's opinions are sufficiently reliable so as to be admissible. *See Kumho Tire Co. Ltd. v. Carmichael*, 526 U.S. 137, 137 (1999) ("Rule 702 imposes a special obligation upon a trial judge to ensure that scientific testimony is not only relevant, but reliable."). Here, within a footnote, Mr. Kaplan states that some of the materials he bases his opinions on were provided him by counsel for Defendants. (Doc. No. 91-2 at 5.) However, this is a gross misrepresentation. Based on the page spans provided by Mr. Kaplan, of the 2,300 documents he reviewed, only around 400 pages were materials he found through his own independent research whilst over 1,800 pages of documents were given to him by counsel for Defendants. (*Id.*)

The Court is unable to ignore the fact that the foundation of Mr. Kaplan's conclusions was generated from a narrow field of documents, most of which were provided to him by Defendants. Thus, his opinions are not based on "sufficient facts or data," nor do his opinions accurately depict how consumers presently understand the phrase "Comic-

12

Con." For example, within his report, Mr. Kaplan states that "[i]n the materials reviewed, there is only one occurrence of 'comic con' capitalized . . . with a lower case initial 'c' on 'comic' and an upper case initial 'c' on 'Con . . . .'" (*Id.* at 20.) However, the Court is unpersuaded that this conclusion could be reliably drawn from the constricted and somewhat biased world view that Mr. Kaplan basis his opinion on. Fed. R. Evid. 702(b); *Kumho Tire Co.*, 526 U.S. at 142 (holding that a district court has broad latitude in deciding how to measure reliability and in making the ultimate reliability determination); *see also In re Canvas Specialty, Inc.*, 261 B.R. 12, 20 (C.D. Cal. 2001) ("[The expert must obtain the right kind of data to support the conclusions drawn.").

Further evidence of unreliability is the fact that Mr. Kaplan's report fails to explain the reasoning or methodology behind his opinions. In *Daubert*, the Supreme Court outlined factors relevant to the reliability prong, including (1) whether the theory can be and has been tested; (2) whether it has been subjected to peer review; (3) the known or potential rate of error; and (4) whether the theory or methodology employed is generally accepted in the relevant scientific community. 509 U.S. at 593–94. Here, Mr. Kaplan's opinion lacks an explanation as to what methodology he uses, why he chose to employ the factors he did, or whether the linguistic tests and principles he employed have been used by others to determine genericness. Thus, the Court has no way to judge Mr. Kaplan's reasoning or determine the dependability of his opinions. *See Diviero v. Uniroyal Goodrich Tire Co.*, 114 F.3d 851, 853 (9th Cir. 1997) (holding that expert testimony is "unreliable and inadmissible" when an expert fails to "satisfactorily [] explain the reasoning behind his opinions," rendering his opinions "unsubstantiated and subjective").[7]

Accordingly, the Court **GRANTS** Plaintiff's motion to exclude the expert report of Mr. Kaplan.

///

---

[7] For these same reasons, the Court also finds Mr. Kaplan's supplemental report similarly unreliable and thus inadmissible. (*See generally* Doc. No. 91-3.)

### b.   Clarke Nelson

Defendants retained █████████ to rebut the damages opinions proffered by Plaintiff's expert ███████████. (Doc. No. 234 at 16–23.) Plaintiff moves to exclude Mr. Nelson arguing that his testimony is based on insufficient facts, an unreliable methodology, and is not tied to the facts of the case. (*Id*. at 18.)

The Lanham Act provides that an owner of a registered mark may recover from an infringer (1) profits; (2) any damages sustained by the plaintiff; and (3) costs of the action. *Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1145 (9th Cir. 1997). Specifically, a plaintiff need only prove the defendant's sales only, "leaving to the defendant to prove all elements of cost or deduction claimed." *Maier Brewing Co. v. Fleischmann Distilling Corp.*, 390 F.2d 117, 123 (9th Cir. 1968) (internal quotation marks omitted).

Plaintiff's expert Dr. Kennedy argues that ████████████████████ ██████████████████████████████████████████████████████ ██████████████████████████████████████████████████████ ██████████████████████████████████████████████████████ ██████████████████████████████████████████████████████ ██████████████████████████████████████████████████████ ███████████████████████████████ To refute Dr. Kennedy's testimony, based upon 15 U.S.C. § 1117(a), Defendants employed Clarke Nelson to prove deductible expenses ████████████████████ (*See generally* Doc. No. 234-2.)

After a review of Mr. Nelson's report and submissions, the Court finds that Defendants have failed to establish that Mr. Nelson is a reliable expert. █████ ██████████████████████████████████████████████████████ ██████████████████████████████████████████████████████ ██████████████████████████████████████████████████████ ██████████████████████████████████████████████████████ ██████████████████████████████████████████████████████

14

1 █████████████████████████████████████████████

2 █████████████████████████████████████████████

3 ████████████████████████ In total, ██████████████████████

4 ██████ considerations, Mr. Nelson summarily states that in his opinion that █████████

5 █████████████████████████████████ [ (*Id.* at 58.)

This leap from Mr. Nelson's analysis of a variety of qualitative considerations to a specific percentage is fundamentally lacking in any explanation as to what methodology, principles, or calculation he used to come to this number and is thus inherently unreliable. *See Kennedy*, 161 F.3d at 1230 (holding that a district court may properly exclude expert testimony if the court concludes too great an "analytical gap exists between the existing data and the expert's conclusion"). For instance, the Court does not know why Mr. Nelson chose to focus on the considerations he did, why the factors he chose were important, nor how much each of these factors were weighted in coming to his conclusion. Without this information, the Court is unable to determine how Mr. Nelson formed his opinions nor has Mr. Nelson demonstrated that he has a proven methodology that he can give to the jury so that they can "make a rational decision." *See Sargon Enter.*, 55 Cal. 4th at 763.

Compare the present matter with *Ralston v. Mortg. Investors Grp., Inc.*, No. 08-536-JF (PSG), 2011 WL 6002640, at *9 (N.D. Cal. Nov. 30, 2011). In *Ralston*, the defendant moved to exclude testimony of plaintiff's damages expert on the grounds that his report offered "nothing more than a simplistic spreadsheet amortization table that lacks justification for its assumptions, and furthermore offers only conclusory assurances that missing functionality can be added with ease." *Id.* However, after a review of the methodology, the court disagreed with defendants and found that the two tables provided a structure or framework that could be used to analyze the actual loan data eventually provided to plaintiffs. *Id.*

Unlike the expert in *Ralston*, Mr. Nelson does not provide a damages model that lacks certain variables or calculations. Rather, Mr. Nelson provides no damages model at all. Thus, though the methodologies Mr. Nelson describes "may very well be capable of

calculating damages in this action, [Mr. Nelson] has made no showing that this is the case." *In re ConAgra Foods, Inc.*, 302 F.R.D. 537, 552 (C.D. Cal. 2014). Thus, Plaintiff's motion to exclude the expert testimony of Clarke Nelson is **GRANTED**. *See DSU Med. Corp. v. JMS Co., Ltd.*, 296 F. Supp. 2d 1140, 1148 (N.D. Cal 2003) (holding that in the damages context, an expert's methodology is reliable if the grounds used by that expert to calculate damages were legally acceptable).

## C.  Plaintiff and Defendants' Motions for Summary Judgment

As Plaintiff and Defendants' requests for summary judgment both involve Defendants' counterclaim defenses of genericness and abandonment, the Court will analyze these motions together.

First, the Court turns to Plaintiff's motion for summary judgment on Defendants' counterclaim of genericness. (Doc. Nos. 95, 97.) Plaintiff's main assertion is that Defendants cannot meet their burden to establish genericness as a matter of law, especially in light of the fact that Plaintiff's marks are presumed valid and non-generic. (Doc. No. 97 at 15.) In opposition, Defendants assert that (1) Plaintiff's genericide arguments and evidence have no bearing on genericness *ab initio*; (2) Plaintiff's attempt to discredit Defendants' evidence of genericide fails; and (3) Plaintiff's own evidence relating to genericide is insufficient to warrant summary judgment. (Doc. No. 246 at 11–18.)

### i.  Generic *Ab Initio*

As a threshold matter, the Court highlights that it takes issue with Defendants' genericness *ab initio* arguments. Currently, Defendants' motion for summary judgment, motion to exclude, and the evidence proffered fluctuates between two different defense theories: genericness *ab initio* and genericide. (*Compare* Doc. No. 244 at 15, 18 *with* id. at 23–25.)

Unfortunately for Defendants, the Ninth Circuit has not recognized a genericness *ab initio* theory of defense. Instead, the Ninth Circuit very clearly states that there are only five categories of trademarks: (1) generic; (2) descriptive; (3) suggestive; (4) arbitrary; and (5) fanciful. *KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.*, 408 F.3d 596, 602

16

(9th Cir. 2005). No case law from this circuit separates genericness into two different types nor have Defendants provided the Court with Ninth Circuit precedent that adopts their arguments. Accordingly, as there is no dispositive basis or Ninth Circuit jurisprudence to accept an argument revolving around a generic *ab initio* defense, the Court **GRANTS** Plaintiff's motion for summary judgment on this contention.

For Defendants' benefit, the Court highlights that even if it were to entertain a generic *ab initio* argument, the evidence produced by Defendants would fail to satisfy their burden. Here, to support the theory that Plaintiff's mark was generic prior to its first use in 1970, Defendants set forth evidence that suggests that "Comic-Con" was used regularly pre-1970. For example, Defendants present a book titled "The 1964 New York Comicon: The True Story Behind the World's First Comic Convention," (Doc. No. 246 at 13), as well as articles about the "COMICON" that was held in 1969 at the Waverley Hotel in London, (Doc. No. 222-48 at 5; Doc. No. 244 at 8), and articles on the 1964 "New York COMICON," and 1966 New York "Benson" Con, (Doc. No. 222-29 at 5; Doc. No. 222-43 at 2). Furthermore, Defendants also assert that semantic evidence including the Oxford English Dictionary ("OED") demonstrate that the term Comic-Con is generic. (Doc. No. 244 at 19.)

As a whole, Defendants' foregoing evidence is insubstantial in carrying their burden. First, the Court notes that the OED states that the definition of "con" is a "new entry" from the OED's third edition from September of 2002. (Doc. No. 218-10 at 2.) Thus, it has no relevance to establishing an understanding of the term Comic-Con pre-1970. Moreover, courts have held that dictionary definitions are "weak evidence that [a plaintiff's] term [is] generic." *Premier Nutrition*, 475 F. Supp. 2d at 1001–03. Furthermore, courts have routinely rejected the breaking down of phrases into their individual and often generic parts. *See Comm. for Idaho's High Desert, Inc. v. Yost*, 92 F.3d 814, 821 (9th Cir. 1996) ("The district court was clearly correct in evaluating the genericness of the name as a whole, rather than looking to its constituent parts individually . . . The relevant question therefore is whether the entire name [] is generic."); *see also Cal. Cooler, Inc. v. Loretto*

*Winery, Ltd.*, 774 F.2d 1451, 1455 (9th Cir. 1985) ("[Plaintiff's] mark is a composite term, and its validity is not judged by an examination of its parts. Rather, the validity of a trademark is to be determined by viewing the trademark as a whole.").

Most importantly, to defeat Plaintiff's motion for summary judgment, Defendants must demonstrate that the primary significance behind the term "Comic-Con," before Plaintiff's first use, was to refer to comic conventions in general, and not to Plaintiff's comic convention. *Krav Maga Ass'n of Am. v. Yanilov*, 464 F. Supp. 2d 981, 988–89 (C.D. Cal. 2006); *see also KP Permanent Make-Up, Inc.*, 408 F.3d at 604 (holding that to determine whether a term has become generic, a court looks to whether "consumers understand the word to refer only to a particular producer's goods or whether the consumer understands the word to refer to the goods themselves"). Unfortunately, Defendants' evidence fails to do so.

Based on the foregoing, even if the Court were to allow Defendants to argue a genericness *ab initio* theory, their evidence would have failed to establish the absence of a genuine issue of material fact as to whether Plaintiff's trademark was generic *ab initio*. Accordingly, their motion for summary judgment as to this defense is **DENIED**.

ii.    Genericide

Plaintiff contends that as its marks are presumed valid, the burden of proving genericness shifts to Defendants and Defendants cannot satisfy their burden of proof as a matter of law. (Doc. No. 97 at 15.) Defendants contend that they have "riches" of evidence that demonstrates that Plaintiff's trademark is the victim of genericide, including that Plaintiff's own employees, competitors, and the media use the phrase "comic con" in a generic sense. (Doc. No. 165 at 22; Doc. No. 244 at 13, 15; Doc. No. 244-3 at 22–23; Doc. No. 246 at 14.)

It is undisputed that Plaintiff's trademark is registered with the USPTO. (Doc. Nos. 95-3–6.) Thus, there exists a "strong presumption of validity." *Coca-Cola Co. v. Overland Inc.*, 692 F.2d 1250, 1254 (9th Cir. 1982). Specifically, "[t]he general presumption of validity resulting from federal registration includes the specific presumption that the

18

trademark is not generic." *Id*. Consequently, as a registered trademark is "given the prima facie or presumptive advantage on the issue of validity," the burden of production then shifts to the defendant to prove otherwise. *Tie Tech, Inc. v. Kinedyne Corp.*, 296 F.3d 778, 783 (9th Cir. 2002).

To overcome this presumption, all inferences from the facts must be drawn most favorably to the non-moving party. *KP Permanent Make-Up*, 408 F.3d at 604. Most importantly, on a motion for summary judgment, the issue is generally viewed as "an intensely factual issue," whereas if the challenger "can demonstrate through law, undisputed facts, or a combination thereof that the mark is invalid, the evidentiary bubble bursts and the [trademark holder] cannot survive summary judgment." *Tie Tech*, 296 F.3d at 783.

After a careful review of the parties' moving papers, the applicable law, and the evidence on the record, the Court finds that Defendants have satisfied their burden of demonstrating a genuine issue of material fact as to genericide.

"Federal courts [] view usage of [a] term by competitors in the industry as strong evidence of how the public perceives them." *Classic Foods Int'l Corp. v. Kettle Foods, Inc.*, 468 F. Supp. 2d 1181, 1190 (C.D. Cal. 2007). "The more members of the public see a term used by competitors in the field, the less likely they will be to identify the term with one particular producer." *Id*. Here, Defendants produce evidence that demonstrates that "comic cons" are held in nearly every state of the United States including New York Comic Con, Amazing Arizona Comic Con, Emerald City Comic Con, and Tampa Bay Comic Con. (Doc. No. 223-1 at 39, 101, 129, 160.) This evidence of over 100 competitors using the unhyphenated form of Plaintiff's trademark strongly suggests that the mark is generic. Consequently, this is persuasive evidence of genericide. *See CG Roxane LLC v. Fiji Water Co. LLC*, 569 F. Supp. 2d 1019, 1027 (N.D. Cal. 2008) (holding that a competitors use of a mark is compelling evidence of genericness as it reflects how the public identifies the term).

Next, Defendants provide copious amounts of news articles that they argue use

"comic con" in a generic sense. (Doc. No. 244 at 15.) These include news article titles that state (1) "New Yorkers get their nerd on at Comic Con," (Doc. No. 222-48 at 43); (2) "5 ways Comicon benefits Phoenix," (*Id.* at 36); (3) "Jam-Packed Comic Con Takes Over New York City," (*Id.* at 40); (4) "Comic Cons business update[,]" (*Id.* at 48); and (5) a magazine article that stated, "San Diego and New York City have long been home to the nation's biggest comic conventions, known as "Comic-Con," (*Id.* at 68).[8]

Media usage of a particular term in the popular press is strong evidence of how the public perceives the term as the media "is often considered to have its finger on the pulse of the general public . . . ." *Classic Foods*, 468 F. Supp. 2d at 1189. In the Ninth Circuit in *Surgicenters*, the court relied on extensive media evidence to hold that the term "Surgicenter" was generic. *Surgicenters of Am., Inc. v. Med. Dental Surgeries*, 601 F.2d 1011, 1013, 1017 (9th Cir. 1979). In considering usage by the media, the evidence weighs in favor of Defendants. Here, Defendants have provided several examples of the media using Plaintiff's mark to describe comic fan conventions in general, and not to describe Plaintiff's convention in particular. *CG Roxane LLC*, 569 F. Supp. 2d at 1028–29 ("If consumers repeatedly encounter a term used generically in the media, they will be much more likely to use the term generically themselves.") (citation omitted). Thus, this is further evidence in favor of genericide.

Based on the foregoing, the Court finds that Defendants have satisfied their burden in demonstrating a dispute of material fact as to whether Plaintiff's mark is the victim of genericide. Accordingly, Plaintiff's motion for summary judgment on this defense is **DENIED**.

Defendants also move for summary judgment on the same grounds. However, even though the Court finds that Defendants satisfied their burden of demonstrating a dispute of

---

[8] The Court notes that of the 4,000 documents produced by Defendants, many of the documents are repetitive, or the same articles are produced twice. (*See generally* Doc. No. 222-48.) Moreover, a wide range of the documents are nondescript empty pages. (*Id.*) Defendants are cautioned that this type of document dumping is prohibited at trial.

material fact as to genericide, their evidence as a whole does not demonstrate that they are entitled to judgment as a matter of law on this issue. This conclusion is reinforced by Plaintiff's submission of its consumer survey that demonstrates that over 80% of consumers believed "Comic-Con" to be a brand name and not a generic name. (Doc. No. 106-3 at 11; Doc. No. 169 at 2.) Accordingly, the Court also **DENIES** Defendants' motion for summary judgment based on a theory of genericide.

### iii.   Abandonment

Plaintiff asserts that Defendants have come forward with no evidence that it has abandoned its rights to the Comic-Con marks.[9] (Doc. No. 97 at 20.) In opposition, Defendants retort that it basis its abandonment defense on Plaintiff's failure to police its mark, which has resulted in its widespread use by competitors for identical services. (Doc. No. 246 at 19.)

The Court agrees with Plaintiff that so far as Defendants seek to argue abandonment based on third party use, summary judgment in Plaintiff's favor is warranted. The Court highlights that in their reply brief, Defendants state that they do "base[] [their] abandonment defense, in part, on [Plaintiff's] decades-long tolerance of third-party uses," or in other words, Plaintiff's "failure to police" its mark. (*Id*.) However, the Lanham Act only provides two ways for a trademark to be abandoned, namely, through (1) nonuse, or (2) the mark becoming generic. *See* 15 U.S.C. § 1127. Specifically, in a case where a defendant is not claiming non-use of the trademark, "a mark shall be deemed 'abandoned' . . . when any course of conduct of the owner, including acts of omission as well as commission causes the mark to become . . . generic . . . or otherwise to lose its significance

---

[9] The Court notes that Defendants' opposition states that it basis its motion for summary judgment on two abandonment theories: (1) naked licensing; and (2) failure to police. (Doc. No. 246 at 18.) Plaintiff in its motion only requests summary judgment based on Defendants' contentions of abandonment through third party use and abandonment through withdrawal of Plaintiff's application to register the mark "comic con." (Doc. No. 97 at 20–23.)

as a mark." *Adidas-Am., Inc. v. Payless Shoesource, Inc.*, 546 F. Supp. 2d 1029, 1076 (D. Ore. 2008) (citing 15 U.S.C. § 1127).

Thus, despite Defendants' attempt to argue abandonment through third party use or failure to police, these arguments are unquestionably meritless as Defendants have not proven that Plaintiff's mark is generic. *See Prudential Ins. Co. of Am. v. Gibraltar Fin. Corp.*, 694 F.2d 1150, 1156 (9th Cir. 1982) ("Abandonment of a trademark, being in the nature of forfeiture, must be strictly proved."). Accordingly, Plaintiff's motion for summary judgment on this factor is **GRANTED**. *See Century 21 Real Estate Corp. v. Sandlin*, 846 F.2d 1175, 1181 (9th Cir. 1988) (holding that evidence of other potential infringers is "irrelevant" to a suit against a particular infringer); *see also McCarthy* § 17:17 (holding that a plaintiff's failure to sue potentially infringing third parties is a relevant factor as to the *strength of the mark*, but "[a]bandonment . . . requires proof that the mark has lost all significance as an indication of origin. That is, the mark is completely without signs of life").

### iv.    Under the Lanham Act, Triable Issues of Fact Remain

The remainder of Plaintiff's motion is devoted to arguing that the Court should grant Plaintiff's summary judgment motion as to Defendants' liability under the Lanham Act. (Doc. No. 97 at 23–31.)

To establish trademark infringement under the Lanham Act, the plaintiff must show the defendant is "using a mark confusingly similar to [the plaintiff's] valid, protectable trademark . . . ." *Brookfield Commc'ns, Inc. v. W. Coast Entm't Corp.*, 174 F.3d 1036, 1046 (9th Cir. 1999). To determine the likelihood of confusion, courts in the Ninth Circuit refer to the eight-factor "Sleekcraft Test." *GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1205 (9th Cir. 2000). These factors include (1) similarity of the marks; (2) the relatedness of the two companies' goods or services; (3) the marketing channels used; (4) the strength of the mark; (5) defendant's intent in selecting its mark; (6) evidence of actual confusion; (7) the likelihood of expansion into other markets; and (8) the degree of care likely to be exercised by purchasers. *Id*. In cases such as this one that involve the internet, the three

most important *Sleekcraft* factors are the similarity of the marks, relatedness of the goods or services, and the simultaneous use of the same marketing channels. *Id.*; *Network Automation, Inc. v. Adv. Sys. Concepts, Inc.*, 638 F.3d 1137, 1141 (9th Cir. 2011). Thus, the Court will devote its time to analyzing these three factors.

### a.   Similarity of the Marks

 

"In considering the degree of similarity between the two marks, courts should analyze each mark within the context of other identifying features." *Surfvivor Media, Inc. v. Survivor Prod.*, 406 F.3d 625, 633 (9th Cir. 2005). Plaintiff asserts that Defendants' mark is virtually identical to the "Comic-Con" mark. (Doc. No. 97 at 24.) In response, Defendants assert that Plaintiff's mark is so weak and diluted that the presence of a distinguishing geographic descriptor "Salt Lake" eliminates any potential for confusion. (Doc. No. 246 at 26.)

Here, in viewing Plaintiff and Defendants' marks in their entirety, the Court finds that there are a variety of similarities: both use the marks within a square shape, both marks use the phrase "Comic Con," which is identical in sound, sight, and meaning, and the phrase "Comic Con" is the prominent slogan within both marks. *See Entrepreneur Media, Inc. v. Smith*, 279 F.3d 1135, 1144 (9th Cir. 2002) (suggesting the examination of marks in their entirety including asking whether the marks are similar in sight, sound, and meaning).

While a fact-finder may conclude that the blatant use of the phrase "Comic Con" renders the marks nearly identical, the Court notes that this does not alleviate the existence of the fact that both marks use varying fonts and colors, and that Defendants utilize "Salt Lake" before the phrase "Comic Con." Accordingly, there still exists a dispute of material fact concerning the two marks and whether they are so similar that they cause confusion amongst consumers. Thus, this factor weighs against Plaintiff.

### b.    Relatedness of the Goods

The standard for deciding whether the parties' goods or services are "related" is whether customers are "likely to associate" the two product lines. *Surfvivor Media*, 406 F.3d at 633 (citation omitted). Additionally, "the more closely related the goods are, the more likely consumers will be confused by similar marks." *Entrepreneur Media*, 279 F.3d at 1147; *see also E & J Gallo Winery v. Gallo Cattle Co.*, 967 F.2d 1280, 1291 (9th Cir. 1992) ("Where goods are related or complementary, the danger of consumer confusion is heightened."). In addressing this factor, the Court's focus is "on whether the consuming public is likely to somehow associate [Defendants' SLCC] with [Plaintiff's SDCC event]." *Brookfield Commc'ns*, 174 F.3d at 1056.

Plaintiff argues that Defendants and it offer, promote, produce, and provide the very same goods and services. (Doc. No. 97 at 25.) Defendants retort that using the sliding scale approach, given the descriptive and highly diluted nature of Comic-Con, relatedness of services does not favor confusion. (Doc. No. 246 at 29–30.)

Here, both of the services at issue are indeed complementary of each other. The Court notes that Plaintiff's convention is a three day fan event that showcases and celebrates comic art and comic books, and various other aspects of the popular arts such as graphic arts, science fiction, films, television, fantasy films, and literature. (Doc. No. 1 ¶ 11; Doc. No. 97 at 9.) Similarly, Defendants' event is also a three day fan convention featuring the best in movies, television shows, gaming, sci fi, fantasy, and comic books. (Doc. No. 244 at 12.) Based on the foregoing, it is clear that both events, though taking place in different cities, are basically interchangeable. Accordingly, a jury could reasonably conclude that the "proximity of the goods" factor favors Plaintiff. *AMF Inc. v. Sleekcraft Boats*, 299 F.2d 341, 348 n.10 (9th Cir. 1979) ("Related goods are those products which would be reasonably thought by the buying public to come from the same source if sold under the same mark.") (internal quotation marks and citation omitted), *abrogated on other grounds by Mattel Inc. v. Walking Mountain Prod.*, 353 F.3d 792 (9th Cir. 2003). ///

### c.     The Marketing Channels Used

We must determine whether the parties distribute their goods in the same marketing channels. *See Entrepreneur Media*, 279 F.3d at 1151. Here, both parties use the internet and social media to reach potential customers. (Doc. No. 97 at 25–26; Farr Depo. at 48:2–7; Herrera Decl. Ex. 6 ("Brandenburg Depo.") 29:2–30, Doc. No. 95-8.) However, it is well established that it "would be the rare commercial retailer that did not advertise online . . . ." *Network Automation*, 638 F.3d at 1151; *Playboy Enter., Inc. v. Netscape Comm. Corp.*, 354 F.3d 1020, 1028 (9th Cir. 2004) ("Given the broad use of the Internet today, the same could be said for countless companies. Thus, this factor merits little weight."). Accordingly, as a shared marketing channel does not shed much light on the likelihood of consumer confusion, this factor weighs neutrally. *Network Automation, Inc.*, 638 F.3d at 1151.

Here, based upon the foregoing analysis, a reasonable jury could not find that there is an absence of material fact as to the likelihood of confusion between Plaintiff's mark and Defendants' use of "Comic Con" to advertise their event. Accordingly, Plaintiff's motion for summary judgment is **DENIED**.

### v.     Joint and Several Liability

Plaintiff asserts that as Defendants Dan Farr and Bryan Brandenburg made the decision together to name their event "Salt Lake Comic Con," they are jointly and severally liable for any trademark infringement and false designation liability. (Doc. No. 97 at 32.)

"A corporate officer or director is, in general, personally liable for all torts which he authorizes or directs or in which he participates, notwithstanding that he acted as an agent of the corporation and not on his own behalf." *Comm. for Idaho's High Desert, Inc.*, 92 F.3d at 823 (citation omitted). This principle has been applied to trademark infringement generally. *Id*. at 824. At this point, as Plaintiff has not established that as a matter of law infringement has occurred, the Court refrains from making a finding as to this argument. Accordingly, the Court **DENIES** Plaintiff's motion for summary judgment as to joint and several liability.

**D.     Defendants' Motion for Summary Judgment**

In addition to Defendants' requests for summary judgment based on their counterclaim of genericide, Defendants also seek a motion for summary judgment based on theories of abandonment and estoppel. (Doc. No. 218.) Specifically, Defendants assert that Plaintiff has abandoned any trademark rights by engaging in naked licensing and that Plaintiff is estopped by its own conduct from asserting that Defendants' use of Comic Con infringes on their trademark. (*See generally* Doc. No. 245.)

   i. Genuine Issues of Disputed Fact as to Abandonment Remain

Defendants contend that Plaintiff had a license agreement with Reed Exhibitions ("Reed"), which allowed Reed to produce New York Comic-Con ("NYCC"). (Doc. No. 245 at 21.) However, according to Defendants, Plaintiff's granted Reed this license, but then failed to adequately control the quality of NYCC to Plaintiff's detriment. (*Id*. at 24.) Plaintiff vehemently denies that any license agreement exists between it and Reed. (Doc. No. 173 at 12.)

"It is well-established that a trademark owner may grant a license and remain protected provided quality control of the goods and services sold under the trademark by the licensee is maintained." *Barcamerica Int'l. USA Trust v. Tyfield Importers, Inc.*, 289 F.3d 589, 595 (9th Cir. 2002) (citing *Moore Bus. Forms, Inc. v. Ryu*, 960 F.2d 486, 489 (5th Cir. 1992) (internal quotation marks omitted)). But "[u]ncontrolled or 'naked' licensing may result in the trademark ceasing to function as a symbol of quality and controlled source." *McCarthy on Trademarks and Unfair Competition* § 18:48, at 18–79 (4th ed. 2001). Such abandonment "is purely an 'involuntary' forfeiture of trademark rights," for it need not be shown that the trademark owner had any subjective intent to abandon the mark. *Id*. § 18:48, at 18–79. Accordingly, the proponent of a naked license theory "faces a stringent standard" of proof. *Moore,* 960 F.2d at 489.

Here, the allegations that lead Defendants to believe that a license agreement exists between Plaintiff and Reed are as follows. ████████████████████

████████████████████████████████████████████████



Based on the foregoing, Defendants wish to fashion a license agreement between Reed and Plaintiff. However, after a careful review of the record and an analysis of both parties' moving papers, the Court finds that Defendants have failed to meet the "stringent" standard required to prove abandonment of trademark rights. *Monster, Inc. v. Dolby Laboratories Licensing Corp.*, 920 F. Supp. 2d 1066, 1076 (N.D. Cal. 2013) (citing *FreecycleSunnyvale v. Freecycle Network*, 626 F.3d 509, 514 (9th Cir. 2010)).

Here, all the Court is presented with is various communications between Plaintiff and Reed. Though the letters go to discussions revolving around a settlement, Defendants do not provide evidence that an agreement was ever made. The Court notes that Defendants point to several internal communications between SDCC employees to demonstrate that Plaintiff and NYCC had a license agreement. However, the Court finds that Defendants have mischaracterized the evidence. For example, Defendants state that Ms. Fae Desmond wrote to Public Relations Director David Glanzer stating:

█████████████████████████

██████████████████ Unlike, Defendants' interpretation, taking this email in context, the Court notes that the foregoing statement was sent in an email to Mr. Glanzer with the subject line █████████████████████████████████████████ included ██████████████████████████████████████ ████████████████ (Doc. No. 238-3 at 2; Doc. No. 238-4 at 3.) Thus, this does not establish the existence of an agreement, ██████████████████████████ █████████████████████████████████████

Furthermore, Defendants have not provided any case law to support the idea that Plaintiff's silence can be construed as acceptance. "Whether express or implied, a license is a contract governed by ordinary principles of state contract law." *Foad Consulting Grp., Inc. v. Azzalino*, 270 F.3d 821, 828 n.11 (9th Cir. 2001). Most relevant for the Court's purposes is that "[s]ilence in the face of an offer is not an acceptance, unless there is a relationship between the parties or a previous course of dealing pursuant to which silence would be understood as acceptance." *S. Cal. Acoustics Co. v. C.V. Holder, Inc.*, 79 Cal. 2d 719, 722 (1969). Defendants argue that acceptance may be inferred from inaction in the face of a duty to act and from retention of a benefit offered. (Doc. No. 247 at 23.) However, neither situation is present here as Plaintiff had no "duty" to act and retained no benefit from the offer as most of the terms were never agreed to. Thus, as the record fails to provide any evidence that Reed and Plaintiff ever agreed to other contracts through silence, Defendants have not satisfied their burden in demonstrating that they are entitled to judgment as a matter of law on their theory of abandonment.

Moreover, ████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ███████████████████████████

1   Without more, it is clear that Defendants have failed to satisfy their burden on

2   summary judgment by providing evidence of a naked license that satisfies the "stringent"

3   standard established in this circuit. Accordingly, Defendants' motion for summary

4   judgment based on its defense of abandonment through a naked license is **DENIED**.

5       ii.    <u>Plaintiff is Not Estopped from Arguing Infringement</u>

6   Defendants contend that Plaintiff's longstanding tolerance of other companies using

7   the unhyphenated form of their trademark "Comic-Con" estops it from now contending

8   that Defendants' use of the unhyphenated form "comic con" infringes on their federally

9   registered trademark. (Doc. No. 245 at 25–30.) Plaintiff denies that they are estopped from

10   asserting trademark infringement claims against Defendants. (Doc. No. 173 at 19.)

11   Equitable estoppel "[r]ests firmly upon a foundation of conscience and fair dealing."

12   *City of Long Beach v. Mansell*, 3 Cal. 3d 462, 488 (1970). The elements of equitable

13   estoppel are "(1) the party to be estopped must be apprised of the facts; (2) he must intend

14   that his conduct shall be acted upon, or must so act that the party asserting the estoppel has

15   a right to believe it was so intended; (3) the other party must be ignorant of the true state

16   of facts; and (4) he must rely upon the conduct to his injury." *Schafer v. City of Los Angeles*,

17   237 Cal. App. 4th 1250, 1261 (2015) (citing *Strong v. Cty. of Santa Cruz*, 15 Cal. 3d 720,

18   725 (1975)). The Court reviews the factual findings regarding the existence of equitable

19   estoppel "under the substantial evidence test." *Schafer*, 237 Cal. App. 4th at 1263.

1 ███████████████████████████████████████████████████████

2 ████████████

3      Applying these facts to the elements of equitable estoppel, the Court finds that where

4 Defendants' arguments fail is that they have not proven that they relied upon Plaintiff's

5 actions to their injury. The Court notes that the settlement negotiations with CCC were

6 never matters of public record. (Doc. No. 173 at 22.) In fact, Defendants admit that they

7 were not privy to any of Plaintiff's communications with CCC. (Doc. No. 245 at 28.) Thus,

8 the Court is at a loss as to how Defendants can claim that they reasonably relied on these

9 negotiations when it came time to choose the name of their event. *See Waller v. Truck Ins.*

10 *Exch., Inc.*, 11 Cal. 4th 1, 35 (1995) (holding that the detrimental reliance must be

11 reasonable).

12      The Court notes that Defendants attempt to argue that Plaintiff's public actions

13 including (1) Plaintiff's withdrawal of their application for the trademark COMIC CON

14 and the subsequent registration of COMIC-CON; (2) Reed's longstanding use of "New

15 York Comic Con," and (3) the use of "comic con" by others caused Defendants to believe

16 that their use of Comic Con would be acceptable. (Doc. No. 245 at 28.) The Court

17 disagrees. The very nature of settlement agreements is their confidential character. Thus,

18 it is far-fetched for Defendants to have reasonably believed that Plaintiff was not in

19 settlement agreements with various other comic conventions, that they were not policing

20 their mark, or that its withdrawal of its application for "Comic Con" was aimed at

21 informing other companies that they could use the mark "comic con" without the threat of

22 litigation. Consequently, the Court finds that there are disputed facts that support more than

23 one reasonable conclusion in regards to equitable estoppel. *See Schafer*, 237 Cal. App. 4th

24 at 1263 ("The existence of equitable estoppel generally is a factual question for the trier of

25 fact to decide, unless the facts are undisputed and can support only one reasonable

26 conclusion as a matter of law.").

27      Accordingly, as Defendants have not satisfied their burden and cannot prove each

28 element of equitable estoppel, this defense must fail. *Am. Casualty Co. v. Baker*, 22 F.3d

880, 892 (9th Cir. 1994) ("Where any one of the elements of equitable estoppel is absent, the claim must fail.") (citation omitted). Thus, Defendants' motion for summary judgment as to this defense is **DENIED**.

**E.     Motion to Strike Under Federal Rule of Civil Procedure 12(f)**

On a final note, the Court articulates that it takes issue with the alleged "undisputed facts" section of Defendants' motion for summary judgment based on abandonment. Within this section, Defendants list Plaintiff's trademarks and then delve into allegations surrounding ███████████████████████████ and Plaintiff's purportedly "fraudulent registration of the hyphenated form Comic-Con." (Doc. No. 245 8–13.) It is unquestionably clear that these arguments are anything but "undisputed facts," but are actually highly contested allegations.

Moreover, the Court is unsure as to how the fraud allegations within the "undisputed facts" section is relevant to Defendants' motion for summary judgment. Defendants clearly state that the Court should summarily adjudicate Plaintiff's infringement claims on two grounds: (1) based on Plaintiff's alleged naked license with New York Comic Con; and (2) based on theories of judicial estoppel. (Doc. No. 245 at 7.) Nowhere do Defendants argue a defense sounding in fraud.

Consequently, the Court finds the three pages devoted to Ms. Fae Desmond and her testimony before the USPTO not only immaterial but also impertinent. *See Fantasy, Inc. v. Fogerty*, 984 F.2d 1524, 1527 (9th Cir. 1993) ("Immaterial matter is that which has no essential or important relationship to the claim for relief or the defenses being pleaded.") (internal quotation marks omitted), *reversed on other grounds by* 510 U.S. 517 (1994); *see also Whittlestone, Inc. v. Handi-Craft Co.*, 618 F.3d 970, 974 (9th Cir. 2010) ("Impertinent matter consists of statements that do not pertain, and are not necessary, to the issues in question . . . .") (citation omitted). Furthermore, the fraud allegations are not only a baseless attack on Plaintiff unsupported by the record, but they are also in complete disregard of the Court's previous order. The Court reminds Defendants that the Court denied their motion to amend their pleadings to assert the allegations that Plaintiff's trademarks were procured

31

in fraud. (*See generally* Doc. No. 202.)

Consequently, finding that Defendants have used their motion to improperly inject irrelevant and scandalous allegations into their motion, the Court finds a motion to strike warranted. For these reasons, the Court **STRIKES** page 7 lines 13–16, page 10 lines 17–26, page 11–12 in their entirety, and lines 1–2 on page 13 of CM/ECF document number 245. *See* Fed. R. Civ. P. 12(f)(1) (a court may act on a motion to strike "on its own"); *see also Sliger v. Prospect Mortg., LLC*, 789 F. Supp. 2d 1212, 1216 (E.D. Cal. 2011) ("The court, however, may make appropriate orders to strike under the rule at any time on its own initiative.").

## **CONCLUSION**

As explained more fully above, the Court **DENIES** Defendants' motion to exclude, (Doc. No. 106), **GRANTS** Plaintiff's motion to exclude, (Doc. No. 91), **DENIES** Defendants' motions for summary judgment, (Doc. Nos. 216, 218), **GRANTS IN PART AND DENIES IN PART** Plaintiff's motion for summary judgment, (Doc. Nos. 95, 97), and **GRANTS** both parties' requests for judicial notice, (Doc. Nos. 95-1, 216-1).

**IT IS SO ORDERED**.

Dated:  September 12, 2017

Hon. Anthony J. Battaglia
United States District Judge