1  Michael I. Katz (CA State Bar No. 181,728)
2    mkatz@mabr.com
   L. Rex Sears (CA State Bar No. 294,533)
3    rsears@mabr.com
   MASCHOFF BRENNAN LAYCOCK
4    GILMORE ISRAELSEN & WRIGHT, PLLC
5  20 Pacifica, Suite 1130
   Irvine, California 92618
6  Telephone:  (949) 202-1900
7  Facsimile:   (949) 453-1104

8  Charles J. Veverka (*pro hac vice*, UT State Bar No. 7,110)
    cveverka@mabr.com
9  MASCHOFF BRENNAN LAYCOCK
10   GILMORE ISRAELSEN & WRIGHT, PLLC
   1389 Center Drive, Suite 300
11 Park City, Utah 84098
12 Telephone: (435) 252-1360
   Facsimile:   (435) 252-1361
13

14 Attorneys for Defendants and Counterclaimants DAN FARR PRODUCTIONS, LLC,
   DANIEL FARR, and BRYAN BRANDENBURG

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| SAN DIEGO COMIC CONVENTION, a California nonprofit corporation,<br><br>Plaintiff,<br>v.<br><br>DAN FARR PRODUCTIONS, a Utah limited liability company; and DANIEL FARR and BRYAN BRANDENBURG, individuals,<br><br>Defendants.<br><br>**AND RELATED COUNTERCLAIMS** | Case No. 14-cv-1865-AJB-JMA<br><br>**DEFENDANTS' NOTICE OF MOTION AND MOTION FOR JUDGMENT AS A MATTER OF LAW ON LIKELIHOOD OF CONFUSION OR, ALTERNATIVELY, DAMAGES**<br><br>Date:  December 4, 2017<br>Time:  8:30 a.m.<br>Courtroom: 4A (4th Floor Schwartz)<br>Judge: Hon. Anthony J. Battaglia |

# TABLE OF CONTENTS

I. JUDGMENT THAT CONFUSION IS NOT LIKELY SHOULD BE ENTERED AS A MATTER OF LAW .................................................................. 1

    A. Evidence *Disproving* Confusion .................................................................. 2

    B. SDCC Has Not Introduced Sufficient Evidence of a Likelihood of Confusion with the Word Mark COMIC-CON .............................................. 4

        1. SDCC Has Not Shown that COMIC-CON Is Strong ......................... 4

        2. Because COMIC-CON Is Weak, Similarity of Services Matters Less .................................................................................................. 5

        3. SDCC Has Not Shown How COMIC-CON Is Used in the Marketplace ...................................................................................... 6

        4. The Empirical Evidence Affirmatively Disproves Confusion ........... 7

        5. Shared Reliance on Internet Marketing Is Inconsequential ............... 7

        6. Price and Sophistication Tell Against Confusion .............................. 7

        7. SDCC Closed its Evidence Without Presenting Evidence of Defendants' Intent ............................................................................. 8

    C. SDCC Has Not Introduced Sufficient Evidence of a Likelihood of Confusion with its Eye Logo ........................................................................ 9

    D. SDCC Has Not Introduced Sufficient Evidence of a Likelihood of Confusion with the Word Mark COMIC CON INTERNATIONAL ......... 10

II. JUDGMENT OF NO CORRECTIVE ADVERTISING DAMAGES SHOULD BE ENTERED AS A MATTER OF LAW ........................................... 11

    A. SDCC's Corrective Advertising Claim Fails Because the Reluctance of Potential Licensees Is Not Harm for which Remedy is Available under the Lanham Act ................................................................................ 12

    B. SDCC's Corrective Advertising Claim Fails Because SDCC Never Valued its Marks or Diminished Value ..................................................... 12

III. CONCLUSION ..................................................................................................... 14

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adray v. Adry–Mart, Inc.*,
  76 F.3d 984 (9th Cir.1995) ................................................................ 12, 13

*Alpha Indus., Inc. v. Alpha Steel Tube & Shapes, Inc.*,
  616 F. 2d 440 (9th Cir. 1980) ....................................................................... 6

*AMF Inc. v. Sleekcraft Boats*,
  599 F.2d 341 (9th Cir. 1979) ........................................................... 1, 4, 9, 10

*Binder v. Disability Group, Inc.*,
  772 F. Supp. 2d 1172 (C.D. Cal. 2011) ................................................ 13, 14

*Brookfield Communications, Inc. v. West Coast Entertainment Corp.*,
  174 F.3d 1036 (9th Cir. 1999) ................................................................. 3, 8

*Cairns v. Franklin Mint Co.*,
  24 F. Supp. 2d 1013 (C.D. Cal. 1998) ........................................................... 2

*Dreamwerks Production Group, Inc. v. SKG Studio*,
  142 F.3d 1127 (9th Cir. 1998) ....................................................................... 4

*E.E.O.C. v. Go Daddy Software, Inc.*,
  581 F.3d 951 (9th Cir. 2009) ......................................................................... 1

*Entrepreneur Media, Inc. v. Smith*,
  279 F.3d 1135 (9th Cir. 2002) ................................................................ 5, 10

*Essence Communications, Inc. v. Singh Industries, Inc.*,
  703 F. Supp. 261 (S.D.N.Y.1988) .................................................................. 2

*Freecycle Network, Inc. v. Oey*,
  505 F.3d 898 (9th Cir. 2007) ....................................................................... 11

*Hormel Foods Corp. v. Jim Henson Productions, Inc.*,
  73 F.3d 497 (2d Cir. 1996) .......................................................................... 11

*International Oddities v. Record*,
  No. 12-cv-3934, 2013 WL 3864050 (C.D. Cal. July 22, 2013) ................... 13

*Lakeside–Scott v. Multnomah City.*,
   556 F.3d 797 (9th Cir. 2009) ............................................................................. 1

*Lindy Pen Co. Inc. v. Bic Pen Corp.*,
   725 F.2d 1240 (9th Cir. 1984) ........................................................................... 6

*Mytee Products, Inc. v. Shop Vac Corp.*,
   No. 13-cv-1610, 2013 WL 5945060 (S.D. Cal. Nov. 4, 2013) ........................ 7

*Official Airline Guides, Inc. v. Goss*,
   6 F.3d 1385 (9th Cir. 1993) ............................................................................... 3

*One Industries, LLC v. Jim O'Neal Distributing, Inc.*,
   578 F.3d 1154 (9th Cir. 2009) ........................................................................... 5

*Playboy Enterprises v. Netscape Communications Corp.*,
   55 F. Supp. 2d 1070 (C.D. Cal. 1999) .............................................................. 2

*Playboy Enters., Inc. v. Netscape Communications Corp.*,
   354 F.3d 1020 (9th Cir. 2004) ........................................................................... 7

*Plough, Inc. v. Kreis Labs.*,
   314 F.2d 635 (9th Cir. 1963) ........................................................................... 10

*Quia Corp. v. Mattel, Inc.*,
   Civ. No. 10-cv-1902, 2011 WL 2749576 (N.D. Cal. July 14, 2011) ........... 12

*Sportvision, Inc. v. Sportsmedia Technology Corp.*,
   No. 04-cv-03115, 2005 WL 1869350 (N.D. Cal. Aug. 4, 2005) ............... 2, 9

*Surfvivor Media, Inc. v. Survivor Productions*,
   406 F.3d 625 (9th Cir. 2005) ........................................................................... 3

**Statutes**

15 U.S.C. § 1114 ................................................................................................... 11

15 U.S.C. § 1125 ................................................................................................... 11

Defendants and counterclaimants Dan Farr Productions, LLC, Daniel Farr, and Bryan Brandenburg (collectively, "DFP") submit the following in support of their motion ("Motion") for judgment as a matter of law ("JMOL") on likelihood of infringement or, alternatively, damages. As on summary judgment, when weighing JMOL, the Court "must view the evidence in the light most favorable to the nonmoving party … and draw all reasonable inferences in that party's favor."[1] However—again as on summary judgment—neither a "mere scintilla" of evidence nor pure speculation is sufficient to sustain a verdict for the non-moving party.[2] DFP's Motion should be granted because, as shown below, SDCC has not presented sufficient evidence for a reasonable jury to find that DFP engaged in infringement or that SDCC was damaged.

## I. JUDGMENT THAT CONFUSION IS NOT LIKELY SHOULD BE ENTERED AS A MATTER OF LAW

Plaintiff and counterdefendant San Diego Comic Convention ("SDCC") asserts three marks: (1) the word mark COMIC-CON, (2) the word mark COMIC CON INTERNATIONAL, and (3) the eye logo shown at right. SDCC's infringement case comes down to this: SDCC has a strong brand; and because SALT LAKE COMIC CON includes "comic con," the marks are confusingly similar. But SDCC's evidence of brand strength is tied to the eye logo, while its similarity argument attaches to COMIC-CON—and neither, alone, could sustain a jury finding in SDCC's favor, especially in the face of the overwhelming empirical evidence of *no* confusion. Below, DFP first summarizes evidence *disproving* confusion that is applicable to all three asserted marks, and then separately applies the *Sleekcraft* factors to each mark.

As will be seen, SDCC is trying to ride two horses at once. When it comes to establishing strength of mark and the like, SDCC wants COMIC-CON to be lumped in together with COMIC CON INTERNATIONAL and the eye logo because those other

---

[1] *E.E.O.C. v. Go Daddy Software, Inc.*, 581 F.3d 951, 961 (9th Cir. 2009).

[2] *See Lakeside–Scott v. Multnomah Cty.*, 556 F.3d 797, 802–03 (9th Cir. 2009).

marks have some market strength and the logo even has conceptual strength; but then, when assessing similarity, SDCC wants to disregard the graphic elements of the logo and the INTERNATIONAL in COMIC CON INTERNATIONAL, which are bound up with their strength. But SDCC cannot have it both ways.

Considered in isolation from the eye logo and COMIC CON INTERNATIONAL, COMIC-CON is weak and SDCC has entirely failed to present evidence of marketplace use. If, on the other hand, actual marketplace use is taken into account, COMIC-CON will be evaluated as it appears within the logo or the longer word mark COMIC CON INTERNATIONAL—and the dissimilarity with SALT LAKE COMIC CON will be too great to sustain a finding of infringement. Either way, judgment should be rendered as a matter of law.[3]

### A. Evidence *Disproving* Confusion

Although DFP has no burden to disprove confusion, and has barely begun its own case, the record already is filled with evidence telling strongly *against* confusion. First, SDCC offered no confusion survey and "failure to offer a survey showing the existence of confusion is evidence that the likelihood of confusion cannot be shown."[4]

---

[3] *Cf. Sportvision, Inc. v. Sportsmedia Technology Corp.*, No. 04-cv-03115, 2005 WL 1869350 at *9-11 (N.D. Cal. Aug. 4, 2005) (finding no likelihood of confusion and granting partial summary judgment where the marks were found to be similar, but it was also found that the plaintiff's mark was not strong, there was no actual evidence of confusion, and there was not enough evidence to show that defendant intended to confuse consumers.)

[4] *Essence Comm., Inc. v. Singh Ind., Inc.*, 703 F. Supp. 261, 269 (S.D.N.Y.1988); *see also Playboy Enterprises v. Netscape Comms. Corp.*, 55 F. Supp. 2d 1070, 1084 (C.D. Cal. 1999) (failure to conduct a confusion survey "warrants a presumption that the results would have been unfavorable"); *Cairns v. Franklin Mint Co.*, 24 F. Supp. 2d 1013, 1041–42 (C.D. Cal. 1998) (because survey evidence "is often the most persuasive evidence," "a plaintiff's failure to conduct a consumer survey, assuming it has the financial resources to do so, may lead to an inference that the results of such a survey would be unfavorable").

Second, SDCC offered only six instances of actual confusion.[5] Attendance at the first Salt Lake Comic Con ("SLCC") topped 70,000 and attendance at Comic Con International: San Diego ("CCI") has topped 125,000 every year since 2008.[6] In addition, DFP holds another event (Salt Lake Comic Con FanXperience) and SLCC itself grew to more than 100,000 attendees in later years. Over the five years of SLCC's existence, the two conventions may have had over a million attendees between them; at a minimum, there were 195,000 attendees. Six out of 195,000 is a confusion rate of about three thousandths of one percent (0.003%)—far too small even to be considered de minimis.[7] So little evidence of *actual* confusion, with so many opportunities for confusion over such a long period of time, is compelling evidence that confusion is not *likely*.[8]

Third, SDCC's own damages expert, Dr. Patrick Kennedy, in his attempt to show that SDCC's brand has value, testified to "a series of indicators," including:

> [SDCC's] tickets do sell at a premium price when you compare them to, for example, the DFP shows in Salt Lake City.
>
> [I]n Salt Lake, they pay celebrities and give them travel and a share in photo ops and autographs. A very different circumstance at San Diego Comic-Con. There's a broad range of sponsors, vendors, celebrities that come to Comic-Con … without receiving any sort of compensation. … [T]hey're here for Comic-Con.

---

[5] *See* Exhibits 0003, 0064, 0065, 0073A, 0073B, 0073C. Cited transcript portions and exhibits are attached hereto, for the Court's convenient reference.

[6] *See* Nov. 28, 2017 p.m. transcript at 90:11–12 (CCI attendance); Exhibit 714 (CCI attendance).

[7] *See Surfvivor Media, Inc. v. Survivor Productions*, 406 F.3d 625, 629, 633 (9th Cir. 2005) (a survey showing less than two percent confusion is "scant evidence of confusion"); *Official Airline Guides, Inc. v. Goss*, 6 F.3d 1385, 1393 (9th Cir. 1993) (seven misdirected forms out of 80,000 sent was properly disregarded as de minimis).

[8] *See Brookfield Comm's, Inc. v. West Coast Entertainment Corp.*, 174 F.3d 1036, 1050 (9th Cir. 1999) ("We cannot think of more persuasive evidence that there is no likelihood of confusion between these two marks than the fact that they have been simultaneously used for five years without causing any consumers to be confused.").

> Another thing that is different with San Diego Comic-Con versus DFP's production is San Diego does not have to rely upon advertising in order generate ticket sales, to drive vendors over here to lease booths.[9]

SDCC's effort to establish value affirmatively disproves confusion because if people were confusing DFP's show with SDCC's then DFP, like SDCC, would also be able to charge premium ticket prices, not pay celebrities, and spend much less on advertising. More powerful *dis*proof of confusion than Kennedy's juxtapositions is hard to imagine.

### B. SDCC Has Not Introduced Sufficient Evidence of a Likelihood of Confusion with the Word Mark COMIC-CON

The eight *Sleekcraft* factors are:

> (1) strength of the mark; (2) proximity of the goods; (3) similarity of the marks; (4) evidence of actual confusion; (5) marketing channels used; (6) type of goods and the degree of care likely to be exercised by the purchaser; (7) defendant's intent in selecting the mark; and (8) likelihood of expansion of the product lines.[10]

In the context of jury instructions, the parties have agreed that the eighth factor is not in play here. As for the rest: "The factors should not be rigidly weighed; we do not count beans."[11]

#### 1. SDCC Has Not Shown that COMIC-CON Is Strong

SDCC's evidence on the strength of its mark has not been tailored to any particular mark; instead, SDCC's evidentiary presentation has gone indiscriminately to its undifferentiated "brand." There is no evidence showing that COMIC-CON, in particular, is a strong brand.

---

[9] Dec. 1, 2017 p.m. transcript at 29:22, 30:11–13, 31:3–11, 31:14–17. Regarding advertising, Kennedy testified that SDCC's advertising expenses were $3.65 million, or about 13% of DFP's $27.97 million in revenues—while SDCC's advertising expense has fallen to "[l]ess than 1 percent of revenue." *See id.* at 22:21–22, 50:8–11, 75:8–21.

[10] *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348–49 (9th Cir. 1979).

[11] *Dreamwerks Prod. Group, Inc. v. SKG Studio*, 142 F.3d 1127, 1129 (9th Cir. 1998).

As explained by the strength-of-mark instruction the parties have agreed to,[12] strength has two aspects: conceptual strength and commercial strength. Conceptually, COMIC-CON is weak because it is descriptive.

Nor has SDCC put in any evidence that COMIC-CON, in particular, is commercially strong. SDCC's paid sponsorship uses are tied more closely to SDCC's eye logo, not the bare words "comic con"; thus, e.g., Lionsgate's ComicConHQ logo mimics SDCC's eye logo[13] and SDCC "require[s] Warner Brothers to place the San Diego Comic-Con International eye design trademark on the front of the bag" that Warner Brothers sponsors.[14] Moreover the evidence already of record shows more than a hundred other shows using "comic con" in their names,[15] and "[w]hen similar marks permeate the marketplace, the strength of the mark decreases."[16]

SDCC has failed to establish that COMIC-CON itself, as opposed to some undifferentiated SDCC "brand," is strong.

**2.   Because COMIC-CON Is Weak, Similarity of Services Matters Less**

When a mark is descriptive, it will more naturally be used by competitors on similar services. To encourage the use of descriptive marks, which "are often the most useful identifiers," while at the same time "preserving common, useful words for the public domain," similarity of services is afforded little weight when a mark is descriptive.[17]

---

[12] *See* ECF Doc. 350 at 42–45.

[13] *See* Exhibit 1374.

[14] *See* Nov. 30, 2017 p.m. transcript at 64:17–20.

[15] *See* Exhibit 1351.

[16] *One Industries, LLC v. Jim O'Neal Distributing, Inc.*, 578 F.3d 1154, 1164 (9th Cir. 2009).

[17] *See Entrepreneur Media, Inc. v. Smith*, 279 F.3d 1135, 1147–48 (9th Cir. 2002).

### 3. SDCC Has Not Shown How COMIC-CON Is Used in the Marketplace

Similarity of marks is not determined in a vacuum, or in bits and pieces; instead, "the marks and names in their entirety and as they appear in the marketplace"[18] must be compared. Here, SDCC has presented little or no evidence of how COMIC-CON, as opposed to the other two asserted marks, is used in the marketplace. Such evidence as there is establishes that "if you are in San Diego during comic-con, there is a big banner that says Comic-Con International"—and "Comic Con International" is "in [SDCC's] publications. It's in emails. It's on our website."[19] Similarly, "[i]f you go to a panel room [i.e., a room in which a panel is being held during the convention], almost all the panel rooms have the logo behind them. It's used in publications and in our advertising. It's everywhere."[20] The use of the eye logo is demonstrated in photographic evidence. But evidence of how COMIC-CON is used in the marketplace without "International" or without the logo is non-existent (to the extent COMIC-CON is used in the marketplace *with* "International" or the eye logo, DFP's use of SALT LAKE COMIC CON is not likely to cause confusion for reasons explained below).

Moreover SDCC has not even attempted to compare COMIC-CON, as used in the marketplace, with SALT LAKE COMIC CON, as used in the marketplace. As the Ninth Circuit has held, even if "two marks viewed in isolation are indeed identical … their similarity must be considered in light of the way the marks are encountered in the marketplace and the circumstances surrounding the purchase of the [services]" in order to determine similarity.[21] Instead of looking to actual marketplace usage, SDCC relies entirely on the fact that the elements COMIC and CON are shared by both marks—which

---

[18] *Alpha Indus., Inc. v. Alpha Steel Tube & Shapes, Inc.*, 616 F. 2d 440, 444 (9th Cir. 1980).

[19] Nov. 29, 2017 a.m. transcript at 20:16–19.

[20] Nov. 29, 2017 a.m. transcript at 23:7–10.

[21] *Lindy Pen Co. Inc. v. Bic Pen Corp.*, 725 F.2d 1240, 1245 (9th Cir. 1984).

improperly (1) dissects DFP's mark by ignoring the SALT LAKE element that distinguishes DFP's mark from SDCC's and (2) disregards actual marketplace usage.

When assessed in the manner required by the Ninth Circuit, similarity of the marks weighs against confusion because (1) SDCC has presented no substantial evidence of actual marketplace usage of COMIC-CON, separate and apart from the eye logo and COMIC CON INTERNATIONAL (such evidence as there is shows use *with* the eye logo and COMIC CON INTERNATIONAL[22]), and (2) as more fully shown below, DFP's mark is entirely dissimilar to SDCC's eye logo and COMIC CON INTERNATIONAL mark as they are encountered in the marketplace.

### 4. The Empirical Evidence Affirmatively Disproves Confusion

As laid out above, the paucity of alleged actual confusion instances, the absence of a survey, and Kennedy's juxtaposition of SDCC's ticket pricing, celebrity appearances arrangements, and advertising requirements with DFP's tell strongly *against* a likelihood of confusion.

### 5. Shared Reliance on Internet Marketing Is Inconsequential

Coming now to marketing channels, SDCC and DFP both sell tickets over the internet. But "[g]iven the broad use of the Internet today, the same could be said for countless companies. Thus, this factor merits little weight."[23]

### 6. Price and Sophistication Tell Against Confusion

At $276,[24] comic con tickets cost enough that the degree of consumer care counts against a likelihood of confusion.[25] The type of goods, too, suggests greater consumer

---

[22] *See, e.g.*, Exhibits 552, 582.

[23] *Playboy Enters., Inc. v. Netscape Comms. Corp.*, 354 F.3d 1020, 1028 (9th Cir. 2004).

[24] *See* Dec. 1, 2017 a.m. transcript at 83:12.

[25] *See Mytee Products, Inc. v. Shop Vac Corp.*, No. 13-cv-1610, 2013 WL 5945060, at *5 (S.D. Cal. Nov. 4, 2013) ("Plaintiffs air movers appear to be priced at $199—$299 and Defendant's air movers have a suggested retail price of $69.99—$79.99. At these prices, the Court believes that the reasonably prudent consumer would exercise a high degree of care before making a purchase.").

care: because a convention is something a buyer has to attend—it's not delivered to the buyer by the mailman—the buyer can be expected to pay attention to its location.

### 7. SDCC Closed its Evidence Without Presenting Evidence of Defendants' Intent

The only evidence relating to defendants' state of mind are some snippets from a newspaper article and an email indicating that DFP thought (and thinks) "comic con" was another way to say "comic convention," and therefore free for the taking.[26] That is not evidence of intent.[27] Moreover, someone hoping to cause confusion would not have stopped at the widely used term "comic con": he would have adopted some version of SDCC's eye logo, by which SDCC had promoted and branded itself and its convention since 1995.[28]

SDCC is trying to ride two horses at once. When it comes to establishing strength of mark and the like, SDCC wants COMIC-CON to be lumped in together with COMIC CON INTERNATIONAL and the eye logo because those other marks have some market strength and the logo even has conceptual strength; but then, when assessing similarity, SDCC wants to disregard the graphic elements of the logo and the INTERNATIONAL in COMIC CON INTERNATIONAL. SDCC cannot have it both ways.

Considered in isolation from the eye logo and COMIC CON INTERNATIONAL, COMIC-CON is weak and SDCC has entirely failed to present evidence of marketplace use. If, on the other hand, actual marketplace use is taken into account, COMIC-CON will be evaluated as it appears within the logo or the longer word mark COMIC CON

---

[26] *See* Exhibits 138, 1375.

[27] *See Brookfield*, 174 F.3d at 1059–60 ("[T]his factor is only relevant to the extent that it bears upon the likelihood that consumers will be confused by the alleged infringer's mark (or to the extent that a court wishes to consider it as an equitable consideration). [Citation.] "Here, West Coast's intent does not appear to bear upon the likelihood of confusion because it did not act with such an intent from which it is appropriate to infer consumer confusion.").

[28] *See* Nov. 30, 2017 a.m. transcript at 73:20-74:9; page 27 of Exhibit 205, Bates no. CC417127.

INTERNATIONAL—and the dissimilarity with SALT LAKE COMIC CON will be too great to sustain a finding of infringement (as shown below). Either way, judgment should be rendered as a matter of law.[29]

### C. SDCC Has Not Introduced Sufficient Evidence of a Likelihood of Confusion with its Eye Logo

The differences between SDCC's eye logo and DFP's own logo are stark:

 

One has a border, the other does not; the graphics are wholly dissimilar—indeed they are not even of the same type: SDCC's logo is a cartooned closeup of an eye while DFP's is Salt Lake City's skyline against the backdrop of the Wasatch Mountains at whose feet the city sits; each includes words the other does not, which have different meanings; one has a border the other lacks.

Parts of the *Sleekcraft* analysis are the same for the logo as for COMIC-CON: there is no evidence of actual confusion (and an overwhelming body of empirical evidence *disproving* confusion), shared use of the internet as a marketing channel is inconsequential, and consumers are likely to exercise a high degree of care. Other parts are different: the graphic elements make the logo a strong mark, conceptually at least, and to the extent SDCC presented evidence of commercial strength, it is bound up with the eye logo. But strength alone cannot translate into infringement: PEPSI COLA does not infringe COCA-COLA, even though COCA-COLA is one of the world's strongest

---

[29] *Cf. Sportvision, Inc. v. Sportsmedia Technology Corp.*, No. 04-cv-03115, 2005 WL 1869350 at *9-11 (N.D. Cal. Aug. 4, 2005) (finding no likelihood of confusion and granting partial summary judgment where the marks were found to be similar, but it was also found that the plaintiff's mark was not strong, there was no actual evidence of confusion, and there was not enough evidence to show that defendant intended to confuse consumers.)

marks. As compared with the word mark COMIC-CON, the most radically different *Sleekcraft* consideration is the thoroughly *dis*similar character of the parties' logos. "Though likelihood of confusion depends upon many factors, the 'one essential feature, without which the others have no probative value,' is the similarity between the registered marks and the alleged infringing mark or phrase."[30] Here, similarity is absent.

"To constitute trademark infringement, use of a mark must be likely to confuse an appreciable number of people as to the source of the product."[31] A prudent consumer, exercising a high degree of care (as dictated by the nature and price of the goods), could not possibly confuse those pervasively dissimilar logos. SDCC argues that the shared presence of the dissimilarly presented elements "comic" and "con" could support a finding of infringement, but that is belied by all the empirical evidence of no confusion.

**D.  SDCC Has Not Introduced Sufficient Evidence of a Likelihood of Confusion with the Word Mark COMIC CON INTERNATIONAL**

COMIC CON INTERNATIONAL occupies a middle ground between the word mark COMIC-CON and the eye logo. COMIC CON INTERNATIONAL is stronger commercially and conceptually than COMIC-CON, in isolation; and it is weaker in both regards than the eye logo. Considered in isolation, COMIC CON INTERNATIONAL is more similar to SALT LAKE COMIC CON than the eye logo but less similar than COMIC-CON. But as with COMIC-CON, SDCC's evidence establishes that COMIC CON INTERNATIONAL is generally used in the marketplace with the eye logo: SDCC's swag bags have the eye logo, not the unadorned words COMIC CON INTERNATIONAL; SDCC's panels are held in rooms wallpapered with the full eye logo, not the bare words COMIC CON INTERNATIONAL; etc. As with the eye logo and the word mark COMIC-CON, the evidence touching on actual confusion tells decisively against a likelihood of confusion, shared use of the internet as a marketing channel is inconsequential, and consumers are likely to exercise a high degree of care. As

---

[30] *Plough, Inc. v. Kreis Labs.*, 314 F.2d 635, 638 (9th Cir. 1963).
[31] *Entrepreneur Media v. Smith*, 279 F.3d 1135, 1151 (9th Cir. 2002).

for similarity, SDCC has a choice: if it relies on use of the logo as use of COMIC CON INTERNATIONAL then its claim fails because the dissimilarities between SDCC's and DFP's logos are too great; if it does not then it has failed to present meaningful evidence of use in the marketplace, and therefore its claim fails on that ground. Either way, judgment should be entered as a matter of law that there is no likelihood of confusion.

## II.   JUDGMENT OF NO CORRECTIVE ADVERTISING DAMAGES SHOULD BE ENTERED AS A MATTER OF LAW

SDCC has pleaded two Lanham Act claims: one for trademark infringement under 15 U.S.C. § 1114(a) and another for false designation of origin under 15 U.S.C. § 1125(a)(1)(A). However the claims are styled:

> The central inquiry is whether there is a "likelihood of confusion," a "likelihood that an appreciable number of ordinarily prudent purchasers are likely to be misled, or indeed simply confused, as to the source of the goods in question," or that there may be confusion as to [SDCC's] sponsorship or endorsement of [DFP's] mark.[32]

If DFP had caused confusion about whether SDCC is the source of DFP's services, or about whether SDCC sponsors or endorses DFP's services, that might be actionable under the Lanham Act. But causing confusion about whether "comic con" is a proprietary mark is not confusion about source, sponsorship, or endorsement. If such a claim were actionable, it would be under a disparagement or slander of title theory; but "no such claim exists under the Lanham Act."[33]

---

[32] *Hormel Foods Corp. v. Jim Henson Prods., Inc.*, 73 F.3d 497, 502 (2d Cir. 1996); *see also* 15 U.S.C. § 1125(a)(1) ("Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any … false designation of origin … which—(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person … shall be liable in a civil action …").

[33] *Freecycle Network, Inc. v. Oey*, 505 F.3d 898, 904 (9th Cir. 2007) ("TFN's complaint also alleged 'trademark disparagement' under § 1125(a). However, no such claim exists under the Lanham Act.").

### A. SDCC's Corrective Advertising Claim Fails Because the Reluctance of Potential Licensees Is Not Harm for which Remedy is Available under the Lanham Act

SDCC's corrective advertising claim fails for two reasons. First, the harm on which it is predicated is not a harm for which remedy is available under the Lanham Act. According to SDCC, DFP's conduct "makes it harder for [SDCC] to license [its] trademarks."[34] But increased reluctance among potential licensees has nothing to do with confusion among ordinarily prudent consumers as to the source of DFP's services, or SDCC's sponsorship or endorsement of DFP's mark; at a minimum, no such connection is apparent and none has been shown. Instead, the theory seems to be that DFP's resistance encourages others to resist SDCC's licensing overtures; but that is, if anything, a type of disparagement or slander, which is not actionable under the Lanham Act. SDCC's corrective advertising claim fails, as a matter of law, because it is not grounded in or supported by *any* evidence of harm caused by confusion as to the source of DFP's services, or sponsorship or endorsement of its mark.

### B. SDCC's Corrective Advertising Claim Fails Because SDCC Never Valued its Marks or Diminished Value

Second, "corrective advertising, like compensatory damage awards in general, is intended to make the plaintiff whole. It does so by allowing the plaintiff to recover the cost of advertising undertaken to restore the value plaintiff's trademark has lost due to defendant's infringement."[35] Thus even for corrective advertising, "Plaintiff still has the burden of presenting evidence as to the foundational fact that its mark lost value at all."[36] "[S]peculation as to the harm that [SDCC] has suffered as a result of defendant's conduct

---

[34] Dec. 1, 2017 a.m. transcript at 92:18-19.

[35] *Adray v. Adry–Mart, Inc.*, 76 F.3d 984, 988 (9th Cir.1995).

[36] *Quia Corp. v. Mattel, Inc.*, Civ. No. 10-cv-1902, 2011 WL 2749576, at *6 (N.D. Cal. July 14, 2011);

is insufficient to support an award of compensatory damages for corrective advertising costs."[37]

Moreover, an award of corrective advertising damages may not exceed the damage to the value of the plaintiff's trademark.[38] Necessarily, then, there must be some valuation of the marks, or at least of diminution in their valuation.

Here, SDCC failed to quantify the value of its marks or any damage allegedly done thereto. SDCC hired a valuation expert;[39] but then, instead of having him value SDCC's marks,[40] it paid him to quote an advertising bid. The only testimony pertinent to valuation that Kennedy gave shows that SDCC's marks, far from being harmed, have been increasing and continue to increase in value. For example, he testified that SDCC's "event has continued to grow in demand without advertising," which is a sign of increasing brand strength, and "they've been able to over time to generate increasing shares of revenue from sponsorships," which is another indication of value "from an economic standpoint."[41]

Despite his own testimony showing that brand value had increased, SDCC's expert testified that SDCC had been harmed by decreased opportunity to enter the Utah market.[42] But the only source for his $9.62 million opinion is a bid that makes no mention

---

[37] *International Oddities v. Record*, No. 12-cv-3934, 2013 WL 3864050, at *14 (C.D. Cal. July 22, 2013); *see also Binder v. Disability Grp., Inc.*, 772 F. Supp. 2d 1172, 1181 (C.D. Cal. 2011) (finding that compensatory damages should not be awarded for corrective advertising where plaintiff offered no definitive evidence of any diminution in the goodwill associated with the defendant's mark)

[38] *See Adray*, 76 F.3d at 989 (damages may be awarded "only to the extent that the amount of money needed for corrective advertising does not exceed the damage to the value of Lou Adray's mark").

[39] *See* Dec. 1, 2017 p.m. transcript at 53:2–4.

[40] *See* Dec. 1, 2017 p.m. transcript at 53:17–54:1.

[41] *See* Dec. 1, 2017 p.m. transcript at 31:22–25; 32:3–5, 15.

[42] *See* Dec. 1, 2017 p.m. transcript at 83:2–6.

of Utah.[43] A budget for a gold-plated advertising campaign that excludes the market in which harm was allegedly suffered is not a valuation in any meaningful or proper sense. Without a proper valuation, SDCC's proposed advertising budget is not "sufficiently tethered to correcting the nature of the harm [allegedly] suffered."[44] That is a second reason SDCC's corrective advertising claim fails, at least in its $9.62 million form.

## III.   CONCLUSION

The Court should enter judgment as a matter of law of (1) no likelihood of confusion or, alternatively, (2) no corrective advertising damages (or at least not $9.62 million).

DATED:  December 3, 2017

Michael I. Katz
Charles J. Veverka
L. Rex Sears
MASCHOFF BRENNAN LAYCOCK
   GILMORE ISRAELSEN & WRIGHT, PLLC

By:  /s/  L. Rex Sears

Attorneys for Defendants and Counterclaimants DAN FARR PRODUCTIONS, DANIEL FARR, AND BRYAN BRANDENBURG

---

[43] *See* Exhibit 1210.

[44] *See Binder*, 772 F. Supp. 2d at 1180–81.

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the above and foregoing document has been served on December 3, 2017, to all counsel of record who are deemed to have consented to electronic service via the Court's CM/ECF system per Civil Local Rule 5.4.

By: /s/ *L. Rex Sears*