CALLIE A. BJURSTROM  (State Bar No. 137816)
PETER K. HAHN  (State Bar No. 165692)
MICHELLE A. HERRERA  (State Bar No. 209842)
PILLSBURY WINTHROP SHAW PITTMAN LLP
501 West Broadway, Suite 1100
San Diego, CA 92101-3575
Telephone:  619.234.5000
Facsimile:  619.236.1995
Email:      callie.bjurstrom@pillsburylaw.com
            peter.hahn@pillsburylaw.com
            michelle.herrera@pillsburylaw.com

Attorneys for Plaintiff
SAN DIEGO COMIC CONVENTION,
a California non-profit corporation

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SAN DIEGO COMIC CONVENTION, a California non-profit corporation,<br><br>Plaintiff,<br><br>v.<br><br>DAN FARR PRODUCTIONS, a Utah limited liability company; NEWSPAPER AGENCY COMPANY, a Utah limited liability company; DANIEL FARR, an individual; and BRYAN BRANDENBURG, an individual,<br><br>Defendants.<br><br>────────────────────<br><br>AND RELATED COUNTERCLAIM. | Case No. 3:14-cv-01865 AJB (JMA)<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF SAN DIEGO COMIC CONVENTION'S MOTION FOR ATTORNEYS' FEES AND COSTS PURSUANT TO 15 U.S.C. § 1117(a)**<br><br>Date:        May 3, 2018<br>Time:        2:00 p.m.<br>Courtroom:  4A<br>Judge:       Hon. Anthony J. Battaglia |

# TABLE OF CONTENTS

**Page**

I.     OVERVIEW ................................................................. 1

II.   ARGUMENT ................................................................ 7

     A.    The Substantive Strength of SDCC's Litigation Position Supports Finding This Case Is Exceptional ................................... 7

     B.    Defendants Have Shown a Continuing and Unwavering Disregard for SDCC's Trademark Rights Demonstrating the Exceptional Nature of this Case ................................. 9

     C.    Defendants Implemented a Duplicitous Litigation Strategy Built on Harassment, Excessive and Repetitive Motion Practice, Distortions of the Facts and Law, and Gamesmanship ................................................ 12

     D.    Trial Misconduct Renders This Case Exceptional ....................... 18

III.   SDCC'S REQUESTED FEES ARE REASONABLE ........................... 22

     A.    SDCC's Rates are Reasonable ...................................... 23

     B.    The Hours Allocated and Time Spent are Reasonable ................. 25

IV.   CONCLUSION ............................................................ 25

     Case No. 3:14-cv-01865 AJB (JMA)

# TABLE OF AUTHORITIES

**Page(s)**

<u>Cases</u>

*AANP v. American Ass'n of Naturopathic Physicians,*
    37 Fed.Appx. 893 (9th Cir. 2002) ....................................................................12

*Camacho v. Bridgeport Financial, Inc.,*
    523 F.3d 973 (9th Cir. 2008) ...................................................................22, 23

*City of Burlington v. Dague,*
    505 U.S. 557 (1992) ...........................................................................................22

*Earthquake Sound Corp., v. Bumper Industries,*
    352 F.3d 1210 (9th Cir. 2003) .........................................................................12

*Fogerty v. Fantasy, Inc.,*
    510 U.S. 517 (1994) .............................................................................................1

*Fox v. Vice,*
    131 S. Ct. 2205 (2011) .......................................................................................23

*Hensley v. Eckerhart,*
    461 U.S. 424 (1983) ...........................................................................................23

*Hoffman v. Brandt,*
    65 Cal.2d 549 (1966) .........................................................................................18

*Induct-O-Matic Corp. v. Inductotherm Corp.,*
    747 F.2d 358 (6th Cir. 1984) ..............................................................................9

*Ingram v. Oroudjian,*
    648 F.3d 925 (9th Cir. 2011) ............................................................................23

*Iorio v. Allianz Life Ins. Co.,*
    2011 WL 13177361, No. 05-cv-633-JLS-CAB (S.D. Cal. Mar. 3,
    2011) ....................................................................................................................24

*Kilopass Technology, Inc. v. Sidense Corp.,*
    2014 WL 3956703 (N. D. Cal. 2014) ...........................................................7, 12

*LFP IP, LLC v. Hustler Cincinnati, Inc.,*
    810 F.3d 424 (6th Cir. 2016) ............................................................................11

-ii-

*Lovett ex rel. Lovett v. Union Pacific R. Co.,*
   201 F.3d 1074 (8th Cir. 2000)........................................................................22

*Mountz, Inc. v. Northeast Industrial Bolting and Torque, LLC,*
   2017 WL 780585 (N.D. Cal.)...........................................................................12

*Octane Fitness, LLC v. ICON Health & Fitness, Inc.,*
   134 S.Ct. 1749 (2014) ........................................................................................1

*Playboy Enters., Inc. v. Netscape Communications Corp.,*
   354 F.3d 1020 (9th Cir. 2004)............................................................................9

*SunEarth, Inc. v. Sun Earth Solar Power Co., Ltd.,*
   839 F.3d 1179 (9th Cir. 2016)............................................................................1

*Toys "R" Us, Inc. v. Abir,*
   1999 WL 61817 (S.D.N.Y. February 10, 1999)..............................................24

*Watec Co., Ltd v. Liu,*
   403 F.3d 645 (9th Cir. 2005)..............................................................................1

*Zest IP Holdings, LLC v. Implant Direct Mfg., LLC,*
   No. 10-CV-0541-GPC WVG, 2014 WL 6851612 (S.D. Cal. Dec.
   3, 2014)..............................................................................................................24

## Statutes and Codes

United States Code
   Title 15, section 1117(a)...................................................................................25
   Title 35, section 285 ...........................................................................................1

## Rules and Regulations

Local Rule
   Rule 5.4.............................................................................................................26

# I.      OVERVIEW

Section 35 of the Lanham Act, 15 U.S.C. Section 1117(a), allows the district court to award the prevailing party reasonable attorneys' fees and costs in an "exceptional" case.  The test for determining what qualifies as an "exceptional" case was recently modified by the Ninth Circuit Court of Appeals in *SunEarth, Inc. v. Sun Earth Solar Power Co., Ltd.,* 839 F.3d 1179, 1180 (9th Cir. 2016).  In *SunEarth,* the Ninth Circuit adopted the definition of "exceptional" set forth by the United States Supreme Court in *Octane Fitness, LLC v. ICON Health & Fitness, Inc.,* 134 S.Ct. 1749 (2014), a case involving 35 U.S.C. Section 285, the fee-shifting provision of the Patent Act.  "[A]n 'exceptional' case is simply one that stands out from others with respect to the substantive strength of a party's litigating position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated." *SunEarth, Inc.,* 839 F.3d 1179, 1180 (9th Cir. 2016).   The determination of whether a trademark case is exceptional is a question for the district court and not for the jury.  *Watec Co., Ltd v. Liu,* 403 F.3d 645, 656 (9th Cir. 2005).  The Ninth Circuit instructs that district courts analyzing a request for fees under the Lanham Act "should examine the 'totality of the circumstances' to determine if the case is exceptional" and "exercise equitable discretion" using the nonexclusive factors identified in *Octane Fitness* and *Fogerty v. Fantasy, Inc.,* 510 U.S. 517, 534 (1994).  Those factors include "frivolousness, motivation, objective unreasonableness (both in the factual and legal components of the case) and the need in particular circumstances to advance considerations of compensation and deterrence." *Fogerty,* 510 U.S. at 534, n. 19.  The district court's decision will be reviewed only for abuse of discretion. *SunEarth, Inc.*, 839 F.3d at 1181.

This case is, without question, an exceptional case.  Whether you analyze it for the substantive strength of SDCC's litigating position or the unreasonable manner in which Defendants litigated this case, under either analysis the case is

1   exceptional and attorneys' fees and costs should be awarded to SDCC as the

2   prevailing party.  SDCC asserted infringement by Defendants of 3 incontestable

3   trademark registrations.  The jury agreed.

4        Defendants admit they were aware of SDCC's registered marks prior to

5   selecting the infringing marks.  Defendants admit they never bothered to seek legal

6   advice regarding the significance of SDCC's federal trademark registrations.

7   Defendants looked around and saw that others were using "comic con" with and

8   without a hyphen and assumed they could too.  Defendants never bothered to

9   consult with legal counsel to determine whether their assumption was legally

10   correct.  Defendants noted that SDCC's "Comic-Con" mark had a hyphen and

11   drew the conclusion that they could use the same mark without a hyphen.

12   Defendants similarly failed to consult legal counsel to determine whether their

13   conclusion was legally sound.

14        The record is also replete with evidence demonstrating Defendants'

15   motivation in selecting their infringing marks.  By their own words the infringing

16   marks were selected because of the "brand equity" and notoriety of Comic-Con.

17   Defendants were blatant about their intent to hijack, capitalize on and leverage the

18   Comic-Con brand.

19        SDCC put forth extensive evidence of the use and commercial strength of its

20   marks along with the goodwill that Defendants were capitalizing on.  The record

21   reflects over 45 years of consistent use by SDCC of the "Comic-Con" marks

22   independently and as the dominant part of other marks used by SDCC including

23   Comic Con International and San Diego Comic Con International with the eye

24   logo, the two other trademarks the jury determined Defendants infringed.  SDCC

25   presented survey results that established an 83% brand recognition rate for

26   "Comic-Con," a brand recognition rate that exceeded that for JELLO.  The

27   evidence was undisputed that demand for Comic-Con tickets far exceeded the

28   supply, that people from all over the World (including competitors) vie to attend

1  Comic-Con, that sponsors of Comic-Con include some of the most influential
2  companies in the comic and popular arts industry, and that Comic-Con attracts the
3  who's who of the entertainment industry.  It's no coincidence that Defendants set
4  their sights on infringing SDCC's trademarks.

5       The evidentiary record also reflects that Defendants' infringing conduct had
6  the desired result—consumers associated their event with SDCC and its Comic-
7  Con convention creating not just a likelihood of confusion but considerable actual
8  confusion.  By Defendants' own admissions significant numbers of people were
9  confused about the relationship between SDCC and Defendants' Salt Lake Comic
10  Con conventions.  Confused consumers contacted both Defendants and SDCC.
11  The fact that Defendants' first Salt Lake Comic Con convention attracted more
12  than 70,000 people, an attendance it took SDCC many decades to attract,
13  underscores the harm to SDCC as a result of Defendants' unauthorized use of its
14  marks.

15       When SDCC sent its cease and desist letter in July 2014, Defendants'
16  response speaks volumes.  Instead of investigating the intellectual property
17  concerns raised by the letter and responding in a reasonable and thoughtful
18  manner, Defendants issued press releases and granted interviews to gain media
19  attention for themselves and drive attendance at their conventions, to flout the use
20  of SDCC's marks and to make a public pronouncement that they had no respect for
21  SDCC's federal trademark registrations and that they would continue to infringe
22  SDCC's marks.  Defendants' efforts were aimed at bringing negative publicity to
23  SDCC during its convention in an effort to put pressure on SDCC to back away
24  from enforcing its legitimate intellectual property rights.  Defendants continued to
25  use the infringing trademarks over the course of 3 years of litigation and despite
26  the jury's verdict, such infringing use continues to this day.

27       Further, within a week of receiving the cease and desist letter and with full
28  knowledge of SDCC's incontestable trademark registrations and SDCC's claims of

-3-

1   infringement, Defendants "gamed" the system by attempting to register their

2   infringing Salt Lake Comic Con mark with the United States Patent and Trademark

3   Office.  They were successful in duping the USPTO into registering the infringing

4   Salt Lake Comic Con mark on the Supplemental Register necessitating the filing of

5   a Cancellation action.

6        Defendants also engaged in an all-out war on SDCC—focusing their attack

7   on SDCC and its trademarks in the "court of public opinion."  Their motivation

8   was to generate public pressure on SDCC to forego enforcement of its rights

9   regardless of the strength of SDCC's legal position.  Defendants issued numerous

10  press releases, gave interviews and published articles through social and traditional

11  media maligning and attacking SDCC, its executives and attorneys for asserting

12  SDCC's rights in its registered trademarks.  Defendants painted themselves as the

13  white knights out to save the "Comic Con industry" from the evil SDCC.  To this

14  end, Defendants disseminated a vast amount of untrue and distorted information of

15  both a factual and legal nature painting SDCC, its executives and attorneys as liars,

16  perjurers, fraudsters and conspirators.  Defendants spliced together information

17  from the internet, the pleadings on file in this case and on file with the USPTO in a

18  manner deliberately intended to distort the true nature of the facts and their legal

19  significance.  Defendants made untrue and irresponsible public pronouncements

20  pertaining to the case including (1) that SDCC admitted its trademarks were

21  generic; (2) that SDCC's Executive Director committed perjury and conspired with

22  SDCC's attorney to defraud the USPTO to obtain its trademarks; and (3) that the

23  USPTO determined that SDCC "abandoned" any right to the "Comic Con" mark

24  without a hyphen when SDCC withdrew an application to register the mark, to

25  name just a few.  None of this is true; all of this was rejected by the Court pre-trial

26  or by the jury in this case.  Yet despite these decisions, Defendants continue

27  perpetrating their intentionally reckless and objectively baseless factual and legal

28  assertions to the present day.

Defendants' litigation strategy mirrored their public harassment and intimidation campaign.  Defendants and their counsel engaged in extensive gamesmanship throughout this case taking unreasonable and unsupportable legal positions and making arguments based on distorted facts and inapplicable or incorrectly cited case law.  Defendants disregarded case deadlines and court procedures including briefing deadlines, page limits, and formalities pertaining to evidentiary submissions in an effort to gain an advantage requiring both the Court and SDCC to expend considerable resources addressing the same.  Defendants filed frivolous and untimely motions injecting issues and defenses not supported by the facts or the law intending merely to distract from the real issues and drive up the rancor and expense associated with the case.  Defendants made numerous efforts to re-brief and re-argue the same issues over and over again angling for a different outcome and when that didn't work they'd make an end run around the Court's rulings.

Defendants repeatedly made efforts to "backdoor" evidence at trial that had been specifically excluded by the Court.  They made improper, substantive modifications to proposed jury instructions including Ninth Circuit model instructions, re-writing established legal precedent in an effort to shift burdens of proof, confuse the applicable legal standards and create error in the hopes of capitalizing on the same.[1]  Most egregious was Defendants' misconduct in front of the jury.  Defendants and their counsel flagrantly violated established cannons of trial practice aimed at insuring a fair trial.  Counsel preyed upon the sympathies of the jury arguing in opening statement that the citizens of Utah would suffer if SDCC prevailed in this case, that Dan Farr Productions would go out of business and that Messrs. Farr and Brandenburg would be forced into bankruptcy.  Counsel

---

[1] See Dkt. 409, pp. 22 and 25 "[Y]ou guys are diddling around with these instructions and trying to massage them, multi-subject, argumentative;" "We aren't making a deal here.  Each instruction I am going to look at straight up."

1   then deliberately contrasted this grave outcome for the Defendants with the alleged

2   lack of harm to SDCC should Defendants win.  Defense counsel told the jury that

3   SDCC would not be harmed, that it was sitting on a "pile of cash," and owned

4   buildings and other assets suggesting that because SDCC had money it was not

5   entitled to a fair trial on the merits of its claims or damages.  Counsel also

6   intentionally violated this Court's motion *in limine* ruling in his opening statement

7   referencing the existence of a "generic" comic con brand.  When an objection to

8   the same was sustained, he seamlessly transitioned into referencing a "national"

9   comic con brand, clearly having tactically considered how he would respond

10  should he get caught.  Given the non-existence of a "national" comic con brand

11  this was, yet again, both an intentional direct violation of this Court's motion *in*

12  *limine* order as well as a deliberate effort to taint the jury through the injection of

13  scurrilous information that had no place in this trial.  Moreover, defense counsel

14  repeatedly attempted to elicit improper testimony about this alleged "generic" or

15  "national" comic con brand from his clients throughout trial, inundating the jury

16  with the impression that there was some national brand or alliance of comic

17  conventions that were entitled to use Comic Con in their name because they were

18  part of what Defendants dubbed the "Comic Con Circuit."  Similarly egregious

19  misconduct occurred during closing argument when defense counsel again told the

20  jury that SDCC would not be harmed by a finding that its Comic-Con mark is

21  generic but that Defendants would be harmed by a contrary finding.  Incredulously,

22  counsel then wrapped up his remarks by invoking the highly prejudicial Golden

23  Rule, asking the jurors to place themselves in the shoes of Messrs. Farr and

24  Brandenburg in deciding this case.

25       The litigation misconduct in this case is staggering.  Without question the

26  case is exceptional.  Without question Defendants' and their counsels' tactics had a

27  detrimental impact on the jury and impacted SDCC's rights.  Without question this

28  Court should award attorneys' fees and costs to deter Defendants from ever

1   engaging in such atrocious conduct in the future.  Awarding SDCC its attorneys'

2   fees and costs would help to alleviate the detrimental impact of Defendants'

3   misconduct on SDCC and deter Defendants from continuing to infringe SDCC's

4   trademarks.  Moreover, it would serve to "contribute to a fair allocation of the

5   burdens of litigation as between winner and loser." *Kilopass Technology, Inc. v.*

6   *Sidense Corp.,* 2014 WL 3956703 (N. D. Cal. 2014), *citing S.C. Johnson & Son,*

7   *Inc. v. Carter-Wallace, Inc.,* 781 F.2d 198, 201 (Fed. Cir. 1986).

8   **II.   ARGUMENT**

9       **A.   The Substantive Strength of SDCC's Litigation Position Supports

10           Finding This Case Is Exceptional**

11        As mentioned above, SDCC asserted 3 federally registered "Comic-Con"

12   trademarks against Defendants that had achieved incontestable status.  SDCC

13   established use of Comic-Con in commerce dating back to 1970, over 45 years of

14   continuous use.  (Trial Exhibits, hereafter "Tr. Ex.", 8, 204 and 205.)  The only

15   challenge Defendants' leveled to SDCC's use of its "Comic-Con" mark was based

16   on a distorted interpretation of the anti-dissection rule that this Court rejected.

17   (Dkt. 318, 340).  There has never been any question that SDCC's use of "Comic-

18   Con" pre-dates Defendants' use of the same.

19        Despite Defendants' claims throughout this case that "Comic-Con" is simply

20   short for "Comic Convention," given the incontestable nature of these marks any

21   legal challenge based on descriptiveness is gone.  Instead Defendants re-packaged

22   their claim that Comic-Con is descriptive into a challenge based on genericide.

23   SDCC's marks are not generic and Defendants knew that.  Mr. Brandenburg

24   admitted as much when he admitted that Comic-Con is a brand on the second to

25   last day of trial.  (Dkt. 383, p. 91, "Comic Con is a brand, yes.")  Further, at no

26   time did Defendants ever put forth a shred of evidence that either "Comic Con

27   International" or "San Diego Comic Con International" with the eye logo is

28   generic yet they continued to assert the same.

The weakness of Defendants' genericide defense is evidenced by Defendants' shifting litigation positions. This was readily apparent in Defendants' opposition to SDCC's motion for summary judgment and in its desperate effort to exclude the testimony of Mathew Ezell where they shifted away from their genericide defense to embrace a "*generic ab initio*" defense that is not recognized by the Ninth Circuit. (Dkt. 253, pp. 9, 10, 16 and 17.) "Comic-Con" is a strong mark. SDCC's trademark survey evidence established that 83% of consumers recognize it as a brand. (Tr. Ex. 643 and 645.) The Ninth Circuit recognizes trademark surveys as highly probative evidence of the primary significance of the mark to the consumer. (*See* Dkt. 253, p. 9 ll. 1-13 ("Most importantly, the Court notes that case law makes clear that courts in this district rely heavily upon consumer surveys in determining genericness") (citing *Elliott v. Google*, 860 F.3d 1151, 1160 (9th Cir. 2017), et. al.) Despite the fact that Defendants asserted genericide as a defense in this case and despite the fact that Defendants identified multiple trademark survey experts that they claimed would conduct a genericness survey on their behalf, Defendants never produced any survey evidence. (*See* Dkt. 398 at 36:2-24). This is despite the fact that SDCC had survey results reflecting a very strong brand recognition rate for Comic-Con. Instead, Defendants offered a "linguistics expert" whose testimony was struck in its entirety. (Dkt. 253). As for the commercial strength of the Comic-Con marks, that was never in question. Demand for Comic-Con tickets far exceeds supply. (*See* Dkt. 374 at 83:22-25; 84:1-6). Comic-Con attracts people and media from all over the World and professionals from every aspect of the comic and popular arts industry. (*See* Dkt. 381 at 87:18-24). Comic-Con has a bevy of high profile commercial sponsors. (Tr. Exs. 477, 583). SDCC's marks are exceedingly strong.

Finally, with respect to likelihood of confusion, this case stands apart from others. Defendants used the exact same mark as SDCC—"Comic Con." Defendants' other marks, Salt Lake Comic Con, Salt Lake Comic Con

-8-

1    FanXperience and their logo marks all encompass SDCC's "Comic-Con" mark.

2    Defendants and SDCC are competitors in the comic and popular arts convention

3    business, both target fans of comics and popular arts conventions, talent, sponsors

4    and exhibitors in this same field.  (*See* Dkt. 372 at 55:15-16; Dkt. 406 at 45:3-14).

5    Defendants' selection of the infringing marks was intended to create confusion; the

6    perception of an affiliation between Defendants' conventions and SDCC's Comic-

7    Con convention and it did.  There was substantial actual confusion created by

8    Defendants' use of their infringing marks.  (*See e.g.*, Dkt. 383 at 83:10-13; 85:1-4,

9    10-13; Tr. Exs. 3, 64, 65, 73A, 73B, 73C, 137, 151, 334).  This case is exceptional.

10   **B.    Defendants Have Shown a Continuing and Unwavering Disregard
          for SDCC's Trademark Rights Demonstrating the Exceptional**
11   **     Nature of this Case**

12       Defendants admit they were aware of SDCC's registered marks prior to

13   selecting their infringing marks.  (Dkt. 406 at 104:24-25; 105: 1; Dkt. 383 at 76:2-

14   21; Tr. Ex. 358).  Defendants admit they never bothered to seek legal advice

15   regarding the significance of SDCC's federal trademark registrations.  (Dkt. 406 at

16   14:22-25; 15:1-25; Dkt. 383 at 77:8-16).  Defendants looked around and saw that

17   others were using "comic con" with and without a hyphen and assumed they could

18   too.  Defendants never bothered to consult with legal counsel to determine whether

19   their assumption was legally correct.  (Dkt. 406 at 110:5-18).  Defendants noted

20   that SDCC's "Comic-Con" mark had a hyphen and drew the conclusion that they

21   could use the same mark without a hyphen.  Defendants similarly failed to consult

22   legal counsel to determine whether their conclusion was legally sound.  (*See id.*).

23   In fact, hyphens are legally insignificant for purposes of determining similarity

24   between trademarks.  *See e.g., Playboy Enters., Inc. v. Netscape Communications*

25   *Corp.*, 354 F.3d 1020, 1028 (9th Cir. 2004) (minor stylistic differences such as

26   lack of capitalization, different font, and use of plural form of terms did not detract

27   from similarity of the marks); *Induct-O-Matic Corp. v. Inductotherm Corp.*, 747

28   F.2d 358, 361 (6th Cir. 1984) (holding that "differences in spelling, number of

-9-

syllables, ***the use of hyphens***, and sound and visual appearance" between the marks at issue were "slight and unlikely to prevent confusion") (emphasis added).

The record is also replete with evidence demonstrating Defendants' motivation in selecting their infringing marks. By their own admissions the infringing marks were selected because of the "brand equity" and notoriety of Comic-Con. Defendants were blatant about their intent to hijack, capitalize on and leverage the Comic-Con brand. (Tr. Exs. 24, 25, 26, 52, 54, 109, 113, 116, 137, 138, 1375.)

Defendants' response to the cease and desist letter sent by SDCC on July 24, 2014 underscores the utter disregard for SDCC's intellectual property rights and the unreasonableness of Defendants' actions. Instead of engaging in a discussion with SDCC about its concerns, Defendants sought media attention to publicize and exploit their continued use of the infringing marks and to taunt SDCC. (Dkt. 406 at 102:3-25; Dkt. 383 at 93:14-20; Tr. Ex. 58). Defendants' strategy was aimed at bringing negative publicity to SDCC to put pressure on SDCC to back away from enforcing its legitimate trademark rights. Defendants' public bullying strategy persisted for over 3 years. Press releases, interviews, social media posts all aimed at denigrating SDCC, its executives and its intellectual property before the public and the industry in which it does business. An early example is an August 11, 2014 interview given by Defendant Brandenburg about Defendants' dispute with SDCC. Brandenburg is credited with stating that they "didn't want to go to court, they wanted to win in the court of public opinion" and that their legal strategy was to "put it out to the public, challenging the cease and desist letter publicly." (Dkt. 126, Ex. 1). The article paints Defendants as David and SDCC as Goliath and portrays SDCC as Lex Luther, Superman's nemesis.[2] Defendants made this case a

---

[2] *See also,* Dkt. 126, Ex. 2 (June 27, 2017 press release in Business Wire. In the press release Defendants repeatedly claim SDCC and individuals associated with SDCC engaged in fraud); Dkt. 126, Ex. 3 (An interview given by Mr. Brandenburg in August 2014 where he stated Defendants' intend to win this case in the "court of

1  cause célèbre painting themselves as the do-gooders out to save the "Comic-Con

2  industry" from SDCC.

3          As the case progressed toward trial without SDCC caving in to the negative

4  publicity and pressure, Defendants ratcheted up the rancor particularly on social

5  media.  Defendants posted distortions of factual information they claimed to have

6  learned in the deposition of SDCC Directors and through the production of SDCC

7  documents, all of which was designated Attorneys' Eyes Only and should never

8  have been made available to Defendants or the public under the terms of the

9  Protective Order in this case.  (Dkt. 126-8, Ex. 6, p. 32; Dkt. 129-1, p.7 ll. 7-18).

10  Defendants made irresponsible and unsubstantiated public accusations that SDCC

11  committed a felony in connection with trademark filings with the USPTO and that

12  SDCC, one of its directors and its trademark counsel obtained SDCC's trademark

13  registrations through fraud, none of which was true.  (*See* Dkt. 126-8, Ex. 2, 6 and

14  8; *see also,* Dkt. 202, Court's Order denying motion for leave to amend answer.)

15          Other objectively baseless legal attacks posted by Defendants on social

16  media and their website included their pronouncement to the World that SDCC

17  abandoned its rights to "Comic Con" because it withdrew an application to register

18  the mark with the USPTO.  (Dkt. 99, p. 4 ll. 11-17).  Trademark rights accrue

19  through use, not registration.  There is absolutely no legal significance to the

20  withdrawal of an application for registration yet Defendants continue to perpetrate

21  this legal fantasy.  *See LFP IP, LLC v. Hustler Cincinnati, Inc.,* 810 F.3d 424, 428-

22  29 (6th Cir. 2016).  The only purpose served by Defendants' actions is to denigrate

23  SDCC and its rights in an effort to continue using the infringing marks.

24  / / /

25

26  public opinion."); Dkt. 126, Ex. 6 (Screen shot of part of Bryan Brandenburg's
    Facebook page from June 27, 2017, commenting on this litigation and accusing

27  SDCC of obtaining trademarks by fraud.); Dkt. 126, Ex. 8 (Mr. Brandenburg's
    extensive reporting and commenting on the merits of the case on his personal

28  Facebook page, including a statement that SDCC had committed a felony in
    connection with the prosecution of its trademarks.)

-11-

As for the USPTO, within a week of receiving the cease and desist letter and with full knowledge of SDCC's incontestable trademark registrations and claims of infringement, Defendants "gamed" the system by submitting for registration with the USPTO the infringing Salt Lake Comic Con mark.  (Dkt. 304, pp. 1-2).

The actions engaged in by Defendants in this case are far worse than those engaged in by others where an award of attorneys' fees and costs was upheld by the Ninth Circuit even under the prior more rigorous standard.  *See Earthquake Sound Corp., v. Bumper Industries,* 352 F.3d 1210, 1217-19 (9th Cir. 2003) (defendant failed to establish reasonable measures to investigate possible infringement liability despite being repeatedly informed by plaintiff of the problem; plaintiff offered to settle the matter without litigation and defendant chose to continue to infringe); *AANP v. American Ass'n of Naturopathic Physicians,* 37 Fed.Appx. 893, 894 (9th Cir. 2002) (affirming award of attorneys' fees based on defendant's conduct in incorporating its organization under plaintiff's trademark, continuing to use the mark after notice of violation, and defendant's harassment of plaintiff by sending letters to plaintiff's members and appearing at conferences and other venues using plaintiff's mark); *Mountz, Inc. v. Northeast Industrial Bolting and Torque, LLC,* 2017 WL 780585, *2 (N.D. Cal. Jan. 27, 2017) (Defendant's conduct deemed exceptional based on litigation conduct, threats to plaintiff's business and attempt to register offending mark with the USPTO); and *Kilopass Technology, Inc. v. Sidense Corp.,* 2014 WL 3956703, *14 (N.D. Cal. Aug. 8, 2014) (Finding case exceptional based on meritless claims, shifting legal theories, failure to follow proper court procedures and gamesmanship).

### C.   Defendants Implemented a Duplicitous Litigation Strategy Built on Harassment, Excessive and Repetitive Motion Practice, Distortions of the Facts and Law, and Gamesmanship

Defendants' litigation strategy mirrored their public harassment and intimidation campaign.  Defendants engaged in extensive gamesmanship

throughout this case shifting legal strategies and taking meritless legal positions based on distorted facts and oftentimes wrong, inapplicable or incorrectly cited case law or at times failing to cite any authority whatsoever.  (*See e.g.,* Dkt. 253, pp. 10, 66, 22, Court's Order characterizing Defendants as "fluctuating" between two different defense theories, its arguments lacking in authority, "meritless," "unpersuasive" and "obtuse.")

Defendants' misconduct was particularly blatant in connection with their briefing and arguments on motions *in limine*.  This Court took them to task for their transgressions at the hearing and rightly so.

> **THE COURT:**  --You can make up the law as you go along . . . .
>
> . . .
>
> **THE COURT:**  Many of the cases you cited for propositions throughout your motions are incorrect cites, they aren't applicable, they are factually distinguishable, but you pronounce them as if they're gospel.  So I don't take your assurance that you are standing on the four corners of the law with a great deal of confidence.  Now the issue is they didn't coin the term.  I defy you to tell me how that is the law, they have to coin it.
>
> **MR. SEARS:**  . . . The notion that that is what we claim is put into our mouths by Plaintiff, and the Court should not look to Plaintiff to figure out what we are saying.
>
> **THE COURT:**  Oh, I didn't.  I read all of your cases because I found I must read all of your cases personally because they don't also [sic] match up with the concept.
>
> **MR. KATZ:**  They're ancient documents.
>
> **THE COURT:**  See, this is what you guys do that is frustrating:  oh, they're ancient documents.  Read the rules of evidence.  Authenticity, ancient document.  Then you have all the rest of the rules.  Hearsay, inadmissible opinion, lack of relevance . . . .  Don't argue it in pieces because it's just an obfuscation of the process.[3]

(*See* Ex. 4 to Bjurstrom Decl., 11/14/2017 Hearing Trans., pp. 17-18, 33.)

The unreasonableness of Defendants litigation practices was rampant

---

[3] This was not the first time the Court chastised Defendants for arguing matters piecemeal.  The Court warned Defendants in its Order Denying Leave to Amend Pleadings that "piecemeal litigation that fails to address the elements of their own motion will not be entertained in the future."  (Dkt. 202, p. 7, n. 7.)

1   throughout the case.  In its Order denying Defendants' motion to amend their
2   pleadings to allege fraud (Dkt. 202, pp. 5 and 8), the Court characterizes
3   Defendants' "good cause" argument as "meritless," "lacking any citation to
4   exhibits or evidence," "fails to cite the correct legal standard," and appearing to be
5   "a tactical play that gives the impression of bad faith," among other things.  And
6   despite the fact that fraud was never at issue in this case, Defendants continued
7   their intimidation campaign by filing in the public record motions flinging
8   accusations of fraud against SDCC and to which SDCC was required to respond.
9   The Court took note of the scurrilous and harassing nature of Defendants' litigation
10  tactics by filing its own motion to strike under Federal Rule of Civil Procedure
11  12(f).  The Court characterized allegations leveled by Defendants in their summary
12  judgment motions as "immaterial" and "impertinent;" recognizing them as "a
13  baseless attack on plaintiff unsupported by the record."  (Dkt. 253, p. 31-32.)

14         Despite the public reprimand, Defendants misconduct continued.  They filed
15  a motion *in limine* seeking to introduce evidence of their unclean hands defense at
16  trial despite admitting at the Pretrial Conference that the ***sole basis*** for this defense
17  was SDCC's alleged fraud on the USPTO.  (Dkt. 265, 9/21/17 Hrg. Trans., 12:8-20;
18  *see also id*., 14:25 (MR. SEARS: "[T]he facts are the same").

19         This was nothing other than a blatant attempt by Defendants to make an end
20  run around the Court's prior rulings necessitating both the Court and SDCC to
21  spend time and money addressing such gamesmanship.  At no time during
22  discovery did Defendants ever disclose that their unclean hands defense was a
23  veiled fraud defense.  (Dkt. 329).  Fraud must be pled with particularity.  It can't
24  be hidden in an obscure equitable defense and then sprung on the plaintiff at trial.

25         The foregoing are not the only instances of Defendants' efforts to reargue
26  and re-hash the same motions they lost.[4]  Despite this Court's clear ruling that

---

[4] During trial Defendants repeatedly attempted to elicit testimony that SDCC did
not enforce its trademarks against other "comic cons" requiring curative

*generic ab initio* is not the law in the Ninth Circuit and had no place in this case, Defendants relentlessly argued the point over and over again.  This Court requested briefing on the timeline of evidence that should be considered in connection with Defendant's genericide defense.  Instead of providing the Court with the briefing it requested, Defendants used that designated motion *in limine* as an opportunity to re-argue their *generic ab initio* summary judgment motion.

> **MR. SEARS: . . .** Once generic always generic—I didn't see any response to that coming from Plaintiffs in their response.  So that point now seems to be conceded.
>
> **THE COURT:**  Well, it could be that I ruled out *generic ab inito* [sic], already.  And re-arguing it again is questionable to whether it's in conformity to what [this] motion *in limine* is about.  But be that as it may, they didn't concede anything, in my view.  There ain't no *generic ab inito* [sic].

Defendants kept at it.

> **MR. SEARS:**  . . .  I would have thought, in fact, we are in agreement with the once-generic-always-generic proposition.
>
> **THE COURT:**  Well I'm not going to reargue the summary judgment.  We've already debated all of that. . . .

Defendants kept at it.

> **MR. SEARS:**  The point is there are publications in the 1960s being circulated in the relevant public.  And these publications use the term comic con. . . .
>
> **THE COURT:**  Well, that's it, change the topic.  This is a motion *in limine*.  We're talking about a timeline and you've tried to reargue the summary judgment.  In your papers you try to reargue the Ezell ruling and the Kennedy ruling.  You double up on some of the motions, to get two issues in.  I'm getting frustrated with this process.  We have now been babbling for an hour and we're still on the first of 11 motions.  Let's get to the point.

(*See* Ex. 4 to Bjurstrom Decl., 11/14/17 Hrg. Trans., pp. 5-7, 34.)

---

instructions from the Court.  Such was in clear violation of this Court's Order granting summary judgment on enforcement.  (*See* Dkt. 372, pp. 92-93, and p. 106; Dkt. 373, p. 87; Dkt. 397, p. 57.)

1   Defendants were cavalier when it came to compliance with the case schedule
2   and Court rules and procedures, compounding the litigation expenses incurred by
3   SDCC in this case.  They failed to file a timely Daubert challenge to Patrick
4   Kennedy, SDCC's damages expert and when this Court denied their motion to file
5   a late challenge they did one anyway by styling it as a motion *in limine*.  (*See* Dkt.
6   202, Dkt. 321; Ex. 4 to Bjurstrom Decl., p.168 ("The Court:  So I'm not revisiting
7   Kennedy").)  They did the same thing with Mr. Ezell.  Defendants' lost a Daubert
8   challenge to his testimony based on the alleged irrelevance of his survey results.
9   The Court rejected Defendants' argument that Ezell's report should be excluded
10  because it measures the primary significance of "Comic-Con" to the relevant
11  public in 2016, when the survey was conducted, and not in 1970 or when the
12  lawsuit commenced in 2014.  The Court held, "not only do Defendants fail to
13  provide case law to support this argument, but its reasoning is obtuse."  (Dkt. 253,
14  p. 10.)  Defendants recycled the same frivolous argument prior to trial in
15  connection with the genericide evidence timeline motion requested by the Court.
16  Defendants again argued that Ezell's survey results should be excluded as
17  irrelevant because the survey was performed after Defendants began infringing
18  SDCC's marks.  (Dkt. 314-1, pp. 6-7.)  The Court was required to shoot down this
19  argument for a second time.
20  With regard to Court rules and procedures violations by the Defendants, as
21  the Court recognized at the motion *in limine* hearing they were frequent.  In
22  addition to the violations referenced by the Court above, Defendants filed two
23  summary judgment motions to be heard on the same day totaling over 40 pages in
24  violation of this Court's rules.  (Dkts. 216, 218).  Defendants were chastised by the
25  Court for "document dumping" in connection with their summary judgment filings.
26  (Dkt. 253, p. 20.)  And most egregiously, Defendants refused to turn over financial
27  information until right before trial and then attempted to capitalize on their
28  misconduct by arguing that SDCC's damages expert shouldn't be allowed to

-16-

comment on information in the recently produced financial records.  The Court noted the hypocrisy:  "You can't give them information on the doorstep of trial and say here it is, but you can't use it.  So their economist can use it."  (Dkt. 409, p.97.)

An inordinate amount of time and money was also spent refuting Defendants' frivolous claim that SDCC abandoned trademark rights through naked licensing.  The Court denied Defendants' motion for summary judgment finding that the record did not, by any stretch, support the existence of a license agreement between SDCC and a third party operator of a comic and popular arts convention, much less a naked license.  (*See* Dkt. No. 253, pp. 27-28; Dkt. 265, pp. 9-10.)  Dissatisfied with that outcome, Defendants obtained the Court's permission to submit a motion *in limine* demonstrating "[a] narrative summary of the evidence to show a completed agreement."  (Dkt. 295, 2:19-20.)  The Court made it abundantly clear that "[w]ithout some evidence of a completed agreement, then we need no evidence on the subject at all," *Id.* at 2:20-21.  Defendants ignored the Court submitting nothing more than a re-hash of their summary judgment motion.

> **THE COURT:**  . . . I don't see that there is evidence of an agreement to license the mark for which you would have the first predicate for abandonment or a naked license as a part of an abandonment-type defense, estoppel, whatever, because the very communications show there was a discussion going on back and forth.  It appears to me that the issue became moot.

(Ex. 4 to Bjurstrom Decl., p. 131.)

In reality, the naked license defense to infringement was a bogus defense from the outset and Defendants knew it.  If SDCC had granted a license, Defendants would have obtained testimony from the purported licensee saying so; they didn't.  Defendants executed a Common Interest Agreement to share information in this case with that third party and pursuant to which documents were withheld from SDCC in discovery.  If a license existed, Defendants would have obtained the third party's testimony of the same and they certainly would not

have canceled the third party's deposition on that very topic which is exactly what they did.  (Bjurstrom Decl. ¶28, Ex. 5 (Common Interest Agreement).)

### D.   Trial Misconduct Renders This Case Exceptional

The most egregious misconduct engaged in by Defendants occurred during the trial of this case with full participation and orchestration by defense counsel.  The misconduct commenced at the beginning and continued throughout the trial.  As the California Supreme Court has stated, although it should not have to be said:

> Justice is to be accorded to rich and poor alike, and a deliberate attempt by counsel to appeal to social or economic prejudices of the jury, including the wealth or poverty of the litigants, is misconduct where the asserted wealth or poverty is not relevant to the issues of the case.

*Hoffman v. Brandt*, 65 Cal.2d 549 (1966).  An attempt to appeal to the sympathies of the jury on the basis of the claimed lack of wealth is clear misconduct.  To the extent the factual basis for the appeal to sympathy is false, the misconduct is compounded.  *Id*. at 553.  Although an admonishment may to some extent reduce the prejudice due to an improper reference to wealth, it does not completely eliminate the prejudice.  *Id.* at 554.

Mr. Katz told the jury in opening statement:

> The fact is Comic Con is thriving.  Okay.  They made more money each year since Salt Lake Comic Con came on the scene. . . . They own a downtown office building they paid $5 million cash for.  They're not for-profit, but they're the deep pocket.
>
> . . .
>
> So Defendants, if they have to pay even a fraction of what CCI asks would be put out of business and the people of Utah would be paying for it.  But they're also suing them individually.  So they would be pushing them to bankruptcy.  So I'll conclude . . . .  No infringement, no confusion, no damages, no enforceable mark in just Comic Con.  And no one loses.  Okay.  With that result, San Diego can go back to having a world-class international comic convention just as they do every year, and we can go back for doing what we do for the people of Utah.

(Dkt. 381, pp. 52-54.)  There was nothing "accidental" about counsel's remarks.  They were calculated and deliberate.  When called on it during a sidebar conference counsel's "explanation" was that he was stating "the facts."  Clearly

1  this was disingenuous as the Court noted there would be no such "facts" elicited

2  during the course of this trial.  (Dkt. 381, p. 54.)  This is not the only misconduct

3  engaged in by counsel during opening statement.

4          In direct violation of this Court's rulings on motions *in limine*, one of the

5  first concepts counsel introduced to the jury is that of a "generic brand."  (Dkt.

6  381, p. 35-36.)  There is no such thing as a "generic brand;" a mark is either a

7  brand or a common term.  This was Defendants' back door attempt to place the

8  concept of *generic ab initio* in front of the jury despite being told repeatedly "no."[5]

9  There would be no testimony by any witness of the existence of a "generic brand"

10  and Mr. Katz knew that.  No expert would speak of a "generic brand" and this

11  Court ruled that Defendants could not offer legal opinions or expert testimony.

12  (Bjurstrom Decl. ¶27, Ex. 4 at p. 35-36; Dkt., 398, 55-60; Dkt. 383, pp.61-62).

13  Without a doubt counsel's misconduct before the jury was deliberate and once he

14  was caught; he shifted gears.  Instead of using the terminology "generic brand"

15  counsel began referencing a "national brand" that he claimed all other "comic

16  cons" were using.  (Dkt. 381, p. 39.)  He told the jury that it was this "national

17  Comic Con brand" that Defendants took and turned it into their own.  *Id.* at p. 42.

18  As this Court stated during trial, there is no "national Comic-Con brand."  (*See*

19  Dkt. 398, 55-60; Dkt. 383, pp.61-62.)  Counsel deliberately injected non-existent

20  factual information and misleading and inaccurate legal concepts before the jury in

21  opening statement in direct contravention of this Court's motion *in limine* and

22  summary judgment rulings.  He did so to mislead the jury in an effort to explain

23  away the damning hijacking emails referenced by SDCC's counsel in her opening

24  statement.  (Dkt. 381, p. 43.)

25

26  _____

[5] Defendants tried again to back door the concept of *generic ab initio* during the cross-examination of Ms. Desmond and this Court called them on it stating,

27  "We're not getting into genericness except in the concept of genericide moving forward.  So this is out, pure and simple.  You guys are trying to back-door this."

28  (Dkt. 373, p. 86).

        

1    Counsel compounded the misconduct in his opening statement by continuing

2  to ask questions of Defendants to illicit testimony about this non-existent "national

3  brand."  On the morning before Mr. Brandenburg was to take the stand, during an

4  exchange outside the presence of the jury concerning alarming Facebook postings

5  by Defendants, this Court specifically warned Defendants and their counsel, under

6  threat of contempt, that there would be no testimony before the jury that "Comic

7  Con" is a "generic brand" that is "owned by the people" or "the World's mark" or

8  anything similar.  (Dkt. 398, pp. 55-60.)  Counsel attempted to illicit this testimony

9  anyway and then argued with the Court about it in front of the jury.

10    Q.  [Mr. Katz]  And when you said, but we are hijacking the brand,
11    were you referring to San Diego's brand?

12    A.  No, I was not.

    Q.  Whose brand were you referring to?
13
    A.  As you can see in the next sentence, I clarify what I was referring
14    to was the National Comic Con brand.

15    Ms. Bjurstrom:  Objection, your honor.

16    The Court:  Sustained.  Jury will disregard the last comic [comment.]

17    Mr. Katz:  I'm not sure why.

18    The Court:  There is no evidence of a national comic brand, sir.

19  (Dkt. 383, p. 61-62; *see also* Dkt. 397, pp. 37, 110 [counsel elicited similar

20  testimony from Mr. Farr about a non-existent national "Comic Con brand"].)

21    Counsel's closing argument was equally egregious.  Despite this Court's

22  repeated admonishment that there is no "generic brand" or "national brand" or

23  "national Comic Con brand," Mr. Katz "testified" to the jury that what

24  Mr. Brandenburg meant when he spoke of hijacking the Comic-Con brand was not

25  SDCC's brand but the "Comic Con Circuit as the Comic-Con brand."  (Dkt. 403,

26  p. 42.)  There is no Comic Con circuit brand.  This was counsel's disingenuous

27  attempt to circumvent this Court's repeated admonishments and to place before the

28  jury, yet again, scrurilous matter that it had been instructed to disregard.

-20-

Further, despite numerous rulings and comments by this Court both before and during trial that there would be no testimony or comments pertaining to actions being undertaken for the "greater good," Mr. Katz invoked that very same concept in his closing argument suggesting that the drop in attendance of Utah residents at Comic-Con was likely the result of a personal offense taken in response to SDCC's trademark enforcement efforts.  This Court immediately reacted to counsel's comments stating, "I don't think the offense of the public at large is an issue here, Mr. Katz.  It's inappropriate to expand the litigation beyond this dispute.  So please refrain from those comments."  (Dkt. 403, pp. 37-38.)

Counsel made up facts that were never before the jury testifying to "tie-ins" between media mentions of SDCC and sponsorships.  (Dkt. 403, p. 57.)  The only evidence before the jury was from Mr. Cabaza who refuted that claim.  (Dkt. 375, pp. 111-112.)  Counsel told the jury that Dr. Kennedy testified that "confusion is virtually non-existent."  (Dkt. 403, p. 64.)  Dr. Kennedy is a damages expert who said no such thing.

Counsel made multiple misstatements of the law and improperly focused the jury on factual matters that were legally insignificant, irrelevant or highly prejudicial in an effort to mislead and confuse the jury as well as to play to their sympathies.  In arguing against infringement of SDCC's trademarks, counsel injected a requirement of "substantial confusion" in place of the correct legal standard which is likelihood of confusion.  (Dkt. 403, p. 46.)  This Court admonished counsel to "stick to the instruction" after he misled the jury on what SDCC was required to prove concerning harm to its trademarks.  (Dkt. 403, p. 48.)  Counsel repeatedly referenced SDCC's Comic-Con mark as Comic hyphen Con drawing attention and importance to the hyphen despite this Court's repeated instruction to the jury that there is no legal insignificance to a hyphen in the likelihood of confusion analysis.  (Dkt. 403, p. 53:  "The real issue is whether they

1  confuse comic, dash, con with our Salt Lake Comic Con . . . .  I'm going to start by

2  focusing on Comic, dash, con.")[6]

3      And finally, as if the extent of the misconduct by the Defendants and their

4  counsel throughout this case were not bad enough, Counsel doubled down during

5  closing argument invoking the highly prejudicial and universally condemned

6  Golden Rule, asking the jury to put itself in the position of the Defendants in

7  deciding this case.  (Dkt. 403, p. 71.)  *See Lovett ex rel. Lovett v. Union Pacific R.*

8  *Co.,* 201 F.3d 1074, 1083 (8th Cir. 2000)(Golden Rule argument is universally

9  condemned for encouraging jury to decide case based on personal interest and bias

10  and not the evidence.)  Under any definition of "exceptional," this case qualifies.

11  **III.  SDCC'S REQUESTED FEES ARE REASONABLE**

12      SDCC incurred a substantial amount of attorney and expert fees in

13  prosecuting its trademark claims against Defendants.  Based on its most recent set

14  of invoices, SDCC incurred approximately $4,587,771.56 to prosecute its case and

15  defend against Defendants' baseless motions and defenses.  (Bjurstrom Decl. ¶22,

16  24).  In the Ninth Circuit, the starting point for the calculation of reasonable fees is

17  the "lodestar.*"  Secault S.A. v. Wuxi Shenxi Constr. Mach. Co., Ltd.*, 668 F.3d 677,

18  689 (9th Cir. 2012).  The lodestar is calculated by multiplying the number of hours

19  reasonably expended on the litigation by a reasonable hourly rate.  *Camacho v.*

20  *Bridgeport Financial, Inc.*, 523 F.3d 973, 978 (9th Cir. 2008).  There is a "strong

21  presumption" that the lodestar represents a 'reasonable fee.'"  *City of Burlington v.*

22  *Dague*, 505 U.S. 557, 562 (1992).  In rare cases the court may adjust the lodestar

23  figure based upon various factors such as the time and labor required, the novelty

24  and difficulty of the questions involved, the skill requisite to perform the legal

25  service properly, the customary fee, the amount involved and the results obtained,

---

[6] Counsel was warned that the Court would "come down" on anyone overemphasizing the importance of the hyphen as "gamesmanship."  Noting that "at every turn I find the Defendants try to slip back into something they have been told not to do."  (Dkt. 374, pp. 54 and 61.)

-22-

1   the experience, reputation and ability of the attorneys, and awards in similar cases.

2   *See Secault*, 668 F.3d at 689.

3        Here, the rates charged were reasonable, the amount of time spent on the

4   litigation was appropriate, and the resulting lodestar figure represents the

5   "reasonable attorneys' fees" that should be awarded to SDCC.

6       **A.    SDCC's Rates are Reasonable**

7        Reasonable hourly rates are determined by the relevant community, which is

8   generally the forum in which the district court sits.  *Camacho*, 523 F.3d at 979,

9   citing *Barjon v. Dalton*, 132 F.3d 496, 500 (9th Cir. 1997).  While determining the

10   prevailing market rate is inherently difficult, the "established standard when

11   determining a reasonable hourly rate is the 'rate prevailing in the community for

12   similar work performed by attorneys of comparable skill, experience, and

13   reputation.'"  *Id*., quoting *Blum v. Stenson*, 465 U.S. 886, 895 n. 11 (1984).

14   "Affidavits of the plaintiff's attorney[s] and other attorneys regarding prevailing

15   fees in the community, and rate determinations in other cases . . . are satisfactory

16   evidence of the prevailing market rate."  *Id*. at 980, quoting *United Steelworkers of*

17   *Am. v. Phelps Dodge Corp.*, 896 F.2d 403, 407 (9th Cir. 1990).

18        A court may also rely on its own knowledge, experience and familiarity with

19   the relevant legal market in determining reasonable hourly rates.  *Ingram v.*

20   *Oroudjian*, 648 F.3d 925, 928 (9th Cir. 2011).  Determining a fee award "should

21   not result in a second major litigation."  *Hensley v. Eckerhart*, 461 U.S. 424, 437

22   (1983).  "Trial courts need not, and indeed should not, become green-eyeshade

23   accountants."  *Fox v. Vice*, 131 S. Ct. 2205, 2216 (2011).  The trial court's goal "is

24   to do rough justice, not to achieve auditing perfection."  *Id*.  As such, "trial courts

25   may take into account their overall sense of a suit, and may use estimates in

26   calculating and allocating an attorney's time."  *Id*.

27        Pillsbury Winthrop Shaw Pittman LLP ("Pillsbury") is one of the country's

28   largest law firms, with over 600 attorneys in 21 offices around the world, focusing

-23-

1   on global business, regulatory and litigation matters.  (Bjurstrom Decl., ¶17).

2   Pillsbury leads AmLaw 100 firms with the twelfth highest percentage of

3   *Chambers*-ranked lawyers.  Pillsbury's IP litigation practice ranks among the top

4   in the nation in patent, trademark and copyright litigation.  Pillsbury's IP litigation

5   practice was named in the Best Lawyers in America for 2017.  (*Id.*)

6         Firms that specialize in intellectual property often charge hourly rates that

7   are competitive with or higher than general market rates, given the degree of

8   specialization required.  *See, e.g., Toys "R" Us, Inc. v. Abir*, 1999 WL 61817 *2

9   (S.D.N.Y. February 10, 1999) (recognizing that "[t]rademark litigation is a

10  particularly difficult field of specialization and is recognized as meriting greater

11  than average rate of pay").

12        Rates consistent with those charged here have also been approved in other

13  matters before the Southern District of California.  *See, e.g., Zest IP Holdings, LLC

14  v. Implant Direct Mfg., LLC*, No. 10-CV-0541-GPC WVG, 2014 WL 6851612, at

15  *5-6 (S.D. Cal. Dec. 3, 2014) (approving hourly rates of $895 for partner and $565

16  to $695 for associates); *Iorio v. Allianz Life Ins. Co.*, 2011 WL 13177361, No. 05-

17  cv-633-JLS-CAB, at *9 (S.D. Cal. Mar. 3, 2011) (hourly rates of up to $750 for

18  partners and $575 for associates approved).  In a case in this District Court, the

19  Hon. Jill L. Burkhardt found the hourly rates of Ms. Bjurstrom and Ms. Herrera

20  (among other Pillsbury timekeepers) to be reasonable, as did the Hon. Cynthia

21  Bashant in a separate order in the same case.  (*See* Ex. 1 to Bjurstrom Decl.)

22        Understanding that markets change and grow over time, SDCC's counsel's

23  rates are representative of prevailing market rates, particularly as they fall within

24  the ranges approved by courts in this district in other cases and in prior time

25  periods.  The Declaration of Jose L. Patiño, a partner at the local office of Foley &

26  Lardner LLP and the Chair of that firm's Intellectual Property Litigation Practice,

27  submitted herewith likewise supports a finding that the hourly rates charged by the

28  Pillsbury attorneys representing SDCC in this matter are reasonable.

-24-

**B.**     **The Hours Allocated and Time Spent are Reasonable**

As evidenced by the facts set forth above, the Court's docket and records, and the time entries itemized in Exhibit 2 to Ms. Bjurstrom's declaration, the number of hours that SDCC timekeepers and experts spent was appropriate given the complexity of the issues in this litigation, the length of trial, the extensive evidence presented, and the unreasonable manner in which the case was defended.

## IV.     CONCLUSION

SDCC respectfully requests that the Court rule that this case is exceptional under 15 U.S.C. § 1117(a) and Defendants be assessed SDCC's reasonable attorneys' fees and expert costs.

Dated:  January 16, 2018

PILLSBURY WINTHROP SHAW
PITTMAN LLP

By:     _/s/ Michelle A. Herrera_

CALLIE A. BJURSTROM
PETER K. HAHN
MICHELLE A. HERRERA
Attorneys for Plaintiff
SAN DIEGO COMIC CONVENTION,
a California non-profit corporation

-25-

CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the above and foregoing documents has been served on January 16, 2018, to all counsel of record deemed to have consented to electronic service via the Court's CM/ECF system per Civil Local Rule 5.4.  Any other counsel of record will be served by electronic mail, facsimile, and/or overnight delivery.

*/s/ Michelle A. Herrera*
MICHELLE A. HERRERA