Michael I. Katz (CA State Bar No. 181,728)
    mkatz@mabr.com
L. Rex Sears (CA State Bar No. 294,533)
    rsears@mabr.com
MASCHOFF BRENNAN LAYCOCK
    GILMORE ISRAELSEN & WRIGHT, PLLC
20 Pacifica, Suite 1130
Irvine, California 92618
Telephone:   (949) 202-1900
Facsimile:   (949) 453-1104

Charles J. Veverka (*pro hac vice*, UT State Bar No. 7,110)
    cveverka@mabr.com
MASCHOFF BRENNAN LAYCOCK
    GILMORE ISRAELSEN & WRIGHT, PLLC
1389 Center Drive, Suite 300
Park City, Utah 84098
Telephone:   (435) 252-1360
Facsimile:    (435) 252-1361

Attorneys for Defendants and Counterclaimants DAN FARR PRODUCTIONS, LLC,
DANIEL FARR, and BRYAN BRANDENBURG

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SAN DIEGO COMIC CONVENTION, a California nonprofit corporation,<br><br>        Plaintiff,<br><br>        v.<br><br>DAN FARR PRODUCTIONS, a Utah limited liability company; and DANIEL FARR and BRYAN BRANDENBURG, individuals,<br><br>        Defendants.<br><br>**AND RELATED COUNTERCLAIMS** | Case No. 14-cv-1865-AJB-JMA<br><br>**DEFENDANTS' OPPOSITION TO MOTION FOR ATTORNEY FEES AND COSTS**<br><br>Date:   May 31, 2018<br>Time:   2:00 p.m.<br>Courtroom: 4A (4th Floor Schwartz)<br>Judge: Hon. Anthony Battaglia |

1

## TABLE OF CONTENTS

2   I.    INTRODUCTION .................................................................................... 1

3   II.   ARGUMENT ........................................................................................... 2

4         A.   The Trial Yielded a Split Verdict, with No Clear Winner ................. 2

5         B.   This Case Is Not Exceptional .......................................................... 3

6              1.   Objectively, DFP's Defensive Positions Were Reasonable ..................... 3

7                   a.   The Jury and the Court Have Recognized the Substantive Strength
                         of DFP's Positions .................................................................. 3

8                   b.   SDCC's Argument Rests on Distortions ......................................... 4

9              2.   Subjectively, DFP Did Not Act from Bad Motives.................................. 6

10                  a.   The Pre-Dispute Conduct Cited by SDCC Is Unpersuasive.............. 7

11                  b.   The Post-Dispute Conduct Cited by SDCC Is Neither Persuasive
                         nor Proper Grounds for a Lanham Act Award ................................... 9

12
13                       i.    DFP Should Not Be Punished for Exercising its First
                               Amendment Rights............................................................ 9

14
15                       ii.   SDCC Should Not Rely on Evidence that it Persuaded the
                               Court to Exclude for Lack of Relevance................................. 10

16
                         iii.  DFP's First Amendment Conduct, to the Extent it Has any
17                             Bearing, *Supports* DFP's Litigation Position............................ 10

18                       iv.   DFP's Attempts to Publicize SDCC's Allegations Disprove
                               any Intent to Trade on SDCC's Goodwill................................. 11

19                       v.    Prevailing Party Fees Under the Lanham Act Are Not a
                               Proper Remedy for SDCC's Unproven Claims of Trademark
20                             Disparagement and Personal Defamation................................. 12

21             3.   DFP Did Not Engage in Pretrial Litigation Misconduct ........................ 13

22                  a.   SDCC's Compilation of the Court's Comments Is Misleadingly
                         Selective .......................................................................... 13

23
                    b.   SDCC's Critiques Are Hyperbolic and Hypocritical........................ 14
24
                    c.   SDCC Relies on Criticism the Court Withdrew ................................ 15
25
26                  d.   In its Zeal to Cast Aspersions, SDCC Distorts the Record ............. 16

                    e.   DFP's Substantive Advocacy Is Not Sanctionable Misconduct....... 18
27
                         i.    DFP's Prosecution of its Unclean Hands Defense Is Not
28                             Misconduct................................................................... 19

ii.   DFP's Advocacy of Genericness *Ab Initio* Was Not Misconduct ............................................................... 19

iii.   DFP's Assertion of Naked Licensing Was Not Misconduct .... 20

4.   DFP Did Not Engage in Trial Misconduct ................................. 21

C.   If Fees Are to Be Awarded, Further Proceedings Should Be Had on the Amount ....................................................................... 24

III.   CONCLUSION ...................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allen v. Ghoulish Gallery*,
    No. 06CV371, 2008 WL 802980 (S.D. Cal. Mar. 24, 2008) ....................................... 24

*BDO Remit (USA), Inc. v. Stichting BDO*,
    No. CV1104054, 2012 WL 12895658 (C.D. Cal. Sept. 19, 2012) ............................. 11

*Cairns v. Franklin Mint Co.*,
    292 F.3d 1139 (9th Cir. 2002) ....................................................................................... 24

*Classic Foods International Corp. v. Kettle Foods, Inc.*,
    468 F. Supp. 2d 1181 (C.D. Cal. 2007) ....................................................................... 20

*In re Dan Farr Productions*,
    874 F.3d 590 (9th Cir. 2017) ........................................................................................... 9

*Freecycle Network, Inc. v. Oey*,
    505 F.3d 898 (9th Cir. 2007) ......................................................................................... 13

*Gold v. NCO Finanical Systems, Inc.*,
    No. 09CV1646-LAB CAB, 2010 WL 3339498 (S.D. Cal. Aug. 23, 2010) ................ 25

*Hamby v. Walker*,
    No. 3:14-CV-00089, 2015 WL 1712634 (D. Alaska Apr. 15, 2015) ........................... 24

*Kellogg Co. v. National Biscuit Co.*,
    305 U.S. 111 (1938) ......................................................................................................... 5

*National Union Fire Insurance Co. of Pittsburgh, PA v. Garber*,
    No. CV-F-94-5414, 2006 WL 2038538 (E.D. Cal. July 18, 2006) ............................. 24

*Nissan Motor Co. v. Nissan Computer Corp.*,
    378 F.3d 1002 (9th Cir. 2004) ....................................................................................... 13

*Octane Fitness, LLC v. ICON Health & Fitness, Inc.*,
    134 S. Ct. 1749 (2014) ......................................................................................... 1, 10, 12

*Seoul Broad. Systems International, Inc. v. Korea International Satellite Broadcasting*,
    No. CV0805119, 2009 WL 10672770 (C.D. Cal. June 19, 2009) ............................... 25

*Shige Takiguchi v. MRI International*,
No. 2:13-CV-1183, 2017 WL 1843698 (D. Nev. May 8, 2017) ..................................24

*Smith v. CitiFinancial Retail Services*,
No. 06-2966, 2007 U.S. Dist. LEXIS 58723, 2007 WL 2221072
(N.D. Cal Aug. 2, 2007)...................................................................................................24

*Sunearth, Inc. v. Sun Earth Solar Power Co.*,
839 F.3d 1179 (9th Cir. 2016) .......................................................................................1, 7

*Surgicenters of America, Inc. v. Medical Dental Surgeries Co.*,
601 F.2d 1011 (9th Cir. 1979) .....................................................................................6, 20

*Zest IP Holdings, LLC v. Implant Direct Manufacturing, LLC*,
No. 10-CV-0541-GPC WVG, 2014 WL 6851612
(S.D. Cal. Dec. 3, 2014).................................................................................................24

**Statutes**

15 U.S.C. § 1052 ...............................................................................................................11

15 U.S.C. § 1117 .................................................................................................................1

15 U.S.C. § 1125 .........................................................................................................12, 13

18 U.S.C. § 1001 .................................................................................................................9

**Rules**

Federal Rule of Civil Procedure 11 ...................................................................................18

Federal Rule of Civil Procedure 26 ...................................................................................17

Federal Rule of Civil Procedure 33 ...................................................................................18

Federal Rule of Civil Procedure 37 ...................................................................................17

Federal Rule of Civil Procedure 54 ...................................................................................24

Federal Rule of Evidence 402 ...........................................................................................17

Federal Rule of Evidence 403 ...........................................................................................17

Federal Rule of Evidence 702 ...........................................................................................17

Federal Rule of Evidence 703 ............................................................................... 17

Local Civil Rule 7.1.h .......................................................................................... 14

1    Defendants and counterclaimants (collectively "DFP") submit the following in

2    *opposition* to San Diego Comic Convention's ("SDCC's") "… Motion for Attorneys'

3    Fees …" ("Motion," ECF Doc. 425).

## I.    INTRODUCTION

5    SDCC seeks $4.6 million in attorney fees under 15 U.S.C. § 1117(a), which

6    provides: "The court in exceptional cases may award reasonable attorney fees to the

7    prevailing party." Thus built into the statutory text are three limitations: fees may be

8    recovered only (1) by "the prevailing party," (2) in "exceptional cases"; and (3) they must

9    be reasonable. The exceptionality determination is guided by cases applying a parallel

10   provision of the Patent Act,[1] which teach that an exceptional case "stands out" with

11   respect to either "the substantive strength of a party's litigating position … or the

12   unreasonable manner in which the case was litigated."[2] Relevant considerations include

13   "frivolousness, motivation, objective unreasonableness … and the need in particular

14   circumstances to advance considerations of compensation and deterrence."[3]

15   SDCC's supporting memorandum ("Mem.," ECF Doc. 425-1) begins with a six-

16   page litany of allegations, which are then repeated under four topical headings:

17       (1) DFP's *objective* reasonableness, in light of what SDCC calls "the substantive

18           strength of SDCC's litigation position";

19       (2) DFP's *subjective* motivation, or what SDCC calls "continuing and unwavering

20           disregard for SDCC's trademark rights";

21       (3) DFP's pretrial litigation conduct, which SDCC characterizes as "a duplicitous

22           litigation strategy built on harassment, excessive and repetitive motion practice,

23           distortions of the facts and law, and gamesmanship"; and

24       (4) what SDCC calls "trial misconduct."[4]

---

[1] *See Sunearth, Inc. v. Sun Earth Solar Power Co.*, 839 F.3d 1179, 1180 (9th Cir. 2016).

[2] *See Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 134 S. Ct. 1749, 1756 (2014).

[3] *See id.* at 1756 n. 6 (quoting *Fogerty v. Fantasy, Inc.*, 510 U.S. 517, 534 n. 19 (1994)).

[4] *See* Mem. at p. i, lines 5–13.

1   SDCC's Motion should be denied. First, SDCC's "victory" is so thin as to call into

2   question whether SDCC even qualifies as "the prevailing party." As for exceptionality:

3       (1)  the Court has already and repeatedly found that DFP had objectively reasonable

4           grounds for contesting SDCC's claims;

5       (2)  the jury correctly found no willfulness;

6       (3)  although SDCC diligently mined the record for harsh words said by the Court,

7           DFP's actual conduct does not warrant the opprobrium heaped upon it; and

8       (4)  DFP conducted itself properly at trial—even though SDCC did not.

9   Finally, SDCC's request is not reasonable. SDCC seeks, on a single motion, *double* the

10  profits disgorgement on which a two-week jury trial was just had. If the Court were to

11  find SDCC is entitled to fees, further proceedings should be had on the proper amount.

12  ## II.   ARGUMENT

13  ### A.   The Trial Yielded a Split Verdict, with No Clear Winner

14      The Lanham Act authorizes an award of fees "to the prevailing party." SDCC

15  glosses over this threshold requirement by breezily asserting that "SDCC asserted

16  infringement by Defendants of 3 incontestable trademark registrations" and "[t]he jury

17  agreed."[5] But that is not the whole story. The whole story begins with SDCC asserting

18  *four* trademarks in its complaint, not three;[6] and dropping one of the four before getting

19  to trial.[7] It continues with SDCC going to trial on two claims, one for infringement and

20  another for false designation of origin;[8] and asking the jury to award a total of $12.2

21  million in damages, consisting of $9.6 million for corrective advertising and another $2.6

22  million in disgorged profits.[9] And it ends with the jury splitting its verdict on liability,

23  finding trademark infringement but *no* false designation of origin—and also splitting its

24  _____

25  [5] *See* Mem. at 2:2–3.

26  [6] *See* ECF Doc. 1 at 5:1–13.

27  [7] *See* ECF Doc. 394 at 11:9–16.

   [8] *See* ECF Doc. 394 at 3:22–4:3.

28  [9] *See* Dec. 7, 2017 Tr. at 35:3–6.

verdict on damages, awarding only $20,000 for corrective advertising (0.2% of what SDCC had sought) and *no* profits.[10] This case has no clear winner.

**B.   This Case Is Not Exceptional**

Even if SDCC were a prevailing party, still SDCC's Motion should be denied because this case is not exceptional: DFP's positions were objectively reasonable, as the Court has repeatedly found; DFP did not act from improper motives, as the jury found; and DFP did not engage in litigation misconduct, either before or during the trial.

**1.   Objectively, DFP's Defensive Positions Were Reasonable**

DFP resisted SDCC's claims on objectively reasonable grounds. DFP denied infringement and false designation of origin, and also disputed the validity of SDCC's marks. Rulings previously made by the Court and the verdict returned by the jury show that those positions were objectively reasonable.

**a.   The Jury and the Court Have Recognized the Substantive Strength of DFP's Positions**

First, DFP cannot have been objectively unreasonable about false designation of origin because it won on that claim.[11] Second, when SDCC sought summary judgment of infringement, the Court first determined that the most relevant *Sleekcraft* factors were "similarity of the marks, relatedness of the goods or services, and the simultaneous use of the same marketing channels"; then found that (1) the similarity of marks factor "weighs against Plaintiff," (2) the proximity of goods factor "favors Plaintiff," and (3) the marketing channels factor "weighs neutrally"; and therefore denied SDCC's motion.[12] When SDCC later moved for directed verdict on likelihood of confusion, the Court denied that motion too: "I think the evidence would allow a finding either way, and, therefore, we should not disturb the jury's function in that regard."[13] Those rulings

---

[10] *See* ECF Doc. 395 at 1:14–28, 2:16–3:3, 3:19–4:6, 6:2–5, 8:1–5, 10:9–16.

[11] *See* ECF Doc. 395 at 5:2–5.

[12] *See* ECF Doc. 260 at 23:1–2, 28; 24:22–23; 25:10–11, 15–16.

[13] Dec. 7, 2017 Tr. at 107:22–24.

1   establish the objective reasonableness of DFP's noninfringement position.

2      Third, when SDCC moved for summary judgment on genericness, the Court found

3   that DFP's "evidence of over 100 competitors using the unhyphenated form of Plaintiff's

4   trademark strongly suggests that the mark is generic," amounting to "persuasive evidence

5   of genericide," and that "copious amounts of news articles" constitutes "further evidence

6   in favor of genericide"—and, therefore, the Court denied SDCC's motion "for summary

7   judgment on this defense."[14] On directed verdict, the Court denied SDCC's motion (and

8   DFP's) "for judgment as a matter of law on genericide" because it found "compelling

9   evidence on both sides."[15] As with infringement, those rulings refute SDCC's claim that

10  DFP's genericness contention was objectively unreasonable.

11      **b.   SDCC's Argument Rests on Distortions**

12      Without considering any of that, SDCC insists: "SDCC's marks are not generic and

13  Defendants knew that. Mr. Brandenburg admitted as much when he admitted that Comic-

14  Con is a brand …"[16] That spin falsifies Mr. Brandenburg's testimony because, as SDCC

15  knows, his use of "brand" is not the same as a trademark lawyer's. To a trademark

16  lawyer, "[t]here is no such thing as a 'generic brand;' a mark is either a brand or a

17  common term."[17] But Mr. Brandenburg used the phrase "generic brand."[18] So when *he*

18  said "comic con is a brand" he did *not* mean "comic con" is not generic.

19      The defendants' use of "brand" approximates what the Supreme Court called "the

20  goodwill of the article" in the shredded wheat case. There, National Biscuit Company

21  (n/k/a "Nabisco") and its predecessors patented and brought to market the cereal known

22  as "shredded wheat." After the patent expired, Kellogg Company launched a competing

23

24  [14] *See* ECF Doc. 260 at 19:22–24, 28; 20:17–18, 21–22.

25  [15] *See* Dec. 7, 2017 Tr. at 107:1, 9–10.

26  [16] *See* Mem. at 7:23–24.

27  [17] *See* Mem. at 19:6–7.

28  [18] *See, e.g.*, Trial Exhibit 1375 ("We knew that the term 'comic con' is kind of like a Xerox, it's a generic brand.").

product, which it also called "shredded wheat." Nabisco's infringement claim failed because Nabisco had no right to what the Court called "the goodwill of the article":

> Kellogg Company is undoubtedly sharing in the goodwill of the article known as "Shredded Wheat"; and thus is sharing in a market which was created by the skill and judgment of plaintiff's predecessor and has been widely extended by vast expenditures in advertising persistently made. But that is not unfair. Sharing in the goodwill of an article unprotected by patent or trade-mark is the exercise of a right possessed by all—and in the free exercise of which the consuming public is deeply interested.[19]

Nabisco and its predecessors had created goodwill in shredded wheat as an article, through "skill and judgment … and … vast expenditures in advertising persistently made." But to the extent the term "shredded wheat" captured goodwill associated with the article rather than its source, it was generic and unprotectable.[20]

One way to express DFP's genericness contention is that any goodwill embodied in "comic con" is "the goodwill of the article"—or rather, the goodwill of the *event*—not the proprietary goodwill of SDCC or any other particular source of such events. The jury disagreed; but in finding no willfulness, the jury accepted DFP's explanation that when the defendants used the term "brand," they were referring to *that* goodwill, the goodwill of the events. That is why Mr. Brandenburg could sensibly speak of a "generic brand"; and that is why his testimony that "Comic Con is a brand, yes"[21] is *not* an admission that "SDCC's marks are not generic."

SDCC also argues, "at no time did Defendants ever put forth a shred of evidence that either 'Comic Con International' or 'San Diego Comic Con International' with the eye logo is generic."[22] But as the Court pointed out when it denied SDCC's directed verdict

---

[19] *See Kellogg Co. v. National Biscuit Co.*, 305 U.S. 111, 122 (1938).

[20] *See Kellogg*, 305 U.S. at 116 ("The plaintiff has no exclusive right to the use of the term 'Shredded Wheat' as a trade name. For that is the generic term of the article, which describes it with a fair degree of accuracy; and is the term by which the biscuit in pillow-shaped form is generally known by the public.").

[21] *See* Dec. 6, 2017 p.m. Tr. at 91:25.

[22] *See* Mem. at 7:25–28.

motion, there was no need to develop *independent* bodies of genericness evidence for each mark because SDCC's own trial strategy for proving infringement of all three marks by emphasizing the "comic con" element in each—"we pull up Comic Con International and we say Comic-Con is the guts of that one … And then we take the logo and we do the same"—legitimizes an inference that if "Comic-Con" is generic then so are the others because they are, one and all, "driven from a generic progenitor."[23]

None of SDCC's other self-serving, scattershot arguments has merit, either: the Ninth Circuit does recognize the once-generic-always-generic principle, which the Court has observed is "really the same thing" as genericness *ab initio*;[24] the Court observed that some of the critical observations made by DFP's survey expert "logically made sense" and expressed reservations about SDCC's expert's 83% figure, and DFP never claimed its survey expert "would conduct a genericness survey";[25] DFP's linguist prepared a report that generally tracked the report relied on in another case to find genericness;[26] and SDCC's argument that DFP's marks "encompass" "comic con"[27] violates the anti-dissection rule. Most fundamentally, even if SDCC's chest thumping about the "substantive strength" of its own position were well-founded, it would not support an exceptionality finding because DFP had a substantively strong position, too.

## 2.   Subjectively, DFP Did Not Act from Bad Motives

Willfulness used to be a sine qua non for a prevailing-party attorney fees award under the Lanham Act, in the Ninth Circuit. Now courts consider the totality of the circumstances. Subjective state of mind remains relevant, but now it goes under the name

---

[23] *See* Dec. 7, 2017 Tr. at 113:5–7, 14–16.

[24] *See, e.g., Surgicenters of Am., Inc. v. Medical Dental Surgeries Co.*, 601 F.2d 1011, 1014 (9th Cir. 1979) ("A 'generic' term ... cannot become a trademark under any circumstances."); Nov. 14, 2017 Tr. at 6:5–6 ("it's really the same thing").

[25] *See* Dec. 7, 2017 Tr. at 106:14–15, 19; *cf.* Mem. at 8:13–16.

[26] *See generally* ECF Doc. 436-1 at 5:17–7:13.

[27] *See* Mem. at 8:28–9:1.

1    "motivation" and it is just one consideration instead of a necessary condition.[28]

2       The state-of-mind evidence that SDCC relies on can be divided into pre-dispute and
3    post-dispute conduct. None of it is persuasive.

4              **a.    The Pre-Dispute Conduct Cited by SDCC Is Unpersuasive**

5       While working out jury instructions, SDCC proposed that a single instruction on
6    willfulness would govern disgorgement of profits and also "trigger the requirements …
7    for the recovery of attorneys' fees."[29] Ultimately, the Court and the parties agreed "that
8    the Court would find willfulness as to the issue of fees" but "[t]he definition for that
9    purpose would be whatever definition we adopt for profits."[30]

10      SDCC argues that DFP, before selecting its name, knew of SDCC's registrations but
11   did not seek legal advice; and that before getting sued, DFP made remarks about "brand
12   equity" and "hijacking the brand."[31] All that "evidence" was presented to the jury, which
13   found no willfulness. SDCC now asks the Court to reach a *different* result by applying the
14   *same* stipulated definition of willfulness to the *same* body of evidence. While perhaps not
15   impermissible, that outcome would certainly be anomalous.

16      Nor is a different result warranted. As explained above, one way to express DFP's
17   genericness contention is that any goodwill embodied in "comic con" is what the
18   Supreme Court, in the shredded wheat case, called "the goodwill of the article"—or
19   rather, the goodwill of the *event*—not the proprietary goodwill of SDCC or any other
20   particular source of such events. DFP's corresponding defense to willfulness is that
21   whatever goodwill "comic con" *in fact* embodies, DFP was only trying to tap into the
22   goodwill of the event when it named its event "Salt Lake Comic Con." In finding
23   COMIC-CON valid, the jury seems to have agreed with SDCC that the term *actually*
24   embodies proprietary goodwill; but in finding that DFP had not infringed *willfully*, the

---

25
26   [28] *See Sunearth*, 839 F.3d at 1180–81.

27   [29] *See* Dec. 1, 2017 Addendum Tr. of Excerpts During Trial at 57:15–19.

     [30] *See* Dec. 6, 2017 p.m. Tr. of Excerpt During Trial at 15:9–18.

28   [31] *See* Mem. at 9:12–10:8.

jury also accepted DFP's claim that the "brand equity" it tried to "hijack" was the goodwill associated with comic conventions as a category. The jury also probably credited DFP's explanation that it *thought* hyphenation made a difference.

SDCC has given this Court no reason to reach a different conclusion, based even on the limited evidence the jury received. Moreover the jury did not have the benefit of all the exculpatory evidence known to the Court. For example, the only United States Patent and Trademark Office ("PTO") records that the jury knew DFP was aware of are SDCC's asserted trademark registrations, including SDCC's registration of the hyphenated form "comic-con." The Court, however, knows that through the same search of PTO records that made DFP aware of those registrations, DFP also learned that SDCC had "abandoned" an application for registration of the unhyphenated form "comic con."[32] Whatever the technical legal rule about hyphenation might be, DFP's awareness that SDCC had, according to the PTO, *abandoned* an application for the unhyphenated form "comic con" but then obtained a registration for the hyphenated form "comic-con," as standalones,[33] gives further credence to DFP's claim that it *thought* hyphenation makes a difference—which is what matters, when it comes to subjective motivation. The Court also knows, but the jury did not, that DFP used phrases like "generic brand"—which reinforces that DFP was not using the term "brand" in its technical trademark sense when it made the comments SDCC tries to twist into admissions of willfulness. DFP has more fully detailed its arguments and provided record citations on these issues in § II.B of its opposition to SDCC's companion "… Motion … for Judgment as a Matter of Law …"[34]

All the willfulness evidence SDCC presents was already presented to the jury, which

---

[32] *See* ECF Doc. 218-13 at 3. Whatever quarrel SDCC might have with it, the word "abandoned" is what showed in the PTO records that DFP reviewed before selecting "Salt Lake Comic Con."

[33] SDCC has pointed out that the "comic con" portion of its logo and word mark COMIC CON INTERNATIONAL is unhyphenated. To DFP, that simply reinforced the importance of the hyphen in the registration for standalone COMIC-CON.

[34] ECF Doc. 433.

found no willfulness. But the Court has before it an even stronger body of *exculpatory* evidence. The Court, applying the same definition as the jury, should not now find willfulness based on a body of evidence that points even more decisively to subjectively innocuous motivation.

### b. The Post-Dispute Conduct Cited by SDCC Is Neither Persuasive nor Proper Grounds for a Lanham Act Award

SDCC also tries to support its willfulness case by citing (1) "[p]ress releases, interviews, social media posts" and (2) DFP's filing of two applications for trademark registration.[35] This line of argument suffers from several fatal defects.

### i. DFP Should Not Be Punished for Exercising its First Amendment Rights

Press releases, interviews, social media posts, and applications for trademark registration all have this in common: they are protected by the First Amendment, which safeguards DFP's rights of free speech and to petition its government.[36] By asking the Court to find exceptionality and award attorney fees based on this conduct, SDCC is asking the Court to punish DFP with a $4.6 million sanction for exercising its constitutional rights. That would be wrong.[37]

---

[35] *See* Mem. at 10:17–19, 12:1; *see generally id.* at 10:9–12:4.

[36] *See* U.S. Const. amend. I ("Congress shall make no law … abridging the freedom of speech, or of the press; or the right … to petition the Government …"). DFP stands by what it said in its press releases and interviews, and on social media, but it does not acquiesce in SDCC's characterizations of what was said. For example, SDCC's statement that DFP made a "public accusation[] that SDCC committed a felony," *see* Mem. at 11:10–11, is a stretch. DFP posted a link to what it called "the fraudulent statement [SDCC] used to obtain their trademarks when they knew there were many comic cons out there"; someone asked "[i]sn't there like a fine for falsifying stuffs?"; DFP responded, "[i]t's a felony"—which is true because "falsifying stuffs," which is what the question was about, is a felony, *see* 18 U.S.C. § 1001—and "nobody will go to jail."

[37] *See generally In re Dan Farr Productions*, 874 F.3d 590 (9th Cir. 2017); Dec. 7, 2017 a.m. Tr. at 58:19–21 ("The circuit appears to feel that people can say anything they want in the world and in the media.").

### ii.   SDCC Should Not Rely on Evidence that it Persuaded the Court to Exclude for Lack of Relevance

Before trial, SDCC moved for and obtained an *in limine* order barring any evidence of DFP's trademark applications because, supposedly, they do not have "any relevance to the claims and defenses at issue."[38] If those applications do not have *any* relevance to the claims and defenses at issue then they cannot support SDCC's fees application.

### iii.   DFP's First Amendment Conduct, to the Extent it Has any Bearing, *Supports* DFP's Litigation Position

For the most part, DFP's First Amendment conduct has no bearing on any of the considerations relevant to a prevailing-party attorney fees award under the Lanham Act; to the extent it does, it *undermines* SDCC's Motion.

To be exceptional, a case must stand out with regard to either "the substantive strength of a party's litigating position … or the unreasonable manner in which the case was litigated."[39] Press releases, interviews, social media posts, and trademark applications are not litigation conduct *at all*; therefore they do not bear on whether this case was litigated *reasonably*. Moreover press releases, interviews, and social media posts have no bearing on "the substantive strengths" of the parties' litigation positions.

DFP's applications for trademark registration do have some bearing—but they fortify the substantive strength of DFP's litigation position, not SDCC's. That is why SDCC moved to exclude them. As DFP explained in its opposition to SDCC's successful motion to exclude the very trademark applications that SDCC now relies on:

> On July 31, 2014 … DFP applied to register (1) the word mark SALT LAKE COMIC CON and (2) a logo. … [T]he examiner determined: "the wording 'COMIC CON' immediately describes that applicant provides comic conventions. See attached definition of 'CON' as an abbreviation for 'convention'."

---

[38] *See* ECF Doc. 304-1 at 1:9–10; ECF Doc. 340 ("Minute Order … Granting [304-1] In Limine Motion to Exclude Evidence and Argument Regarding Dan Farr Productions, LLC's Registrations and Applications to Register Trademarks …").

[39] *See Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 134 S. Ct. 1749, 1756 (2014).

1
2
3
4

> … [I]n March 2015, SDCC filed letters of protest in the PTO, and the PTO instructed the examiner that she "must consider" SDCC's registrations in determining whether to allow DFP's applications. … [E]ven over SDCC's registrations, the examiner still allowed supplemental registration of SALT LAKE COMIC CON; and … she likewise allowed DFP's logo, for which DFP seeks a principal registration, to be published for opposition.[40]

5   The examiner's determination that "comic con" "immediately describes that applicant

6   provides comic conventions" supports DFP's genericness contention. Registration of the

7   word mark SALT LAKE COMIC CON and publication for opposition of the logo, over

8   SDCC's registrations, supports DFP's contention that its marks were not confusingly

9   similar to SDCC's.[41] Indeed that evidence should be conclusive as to DFP's subjective

10  motivation because "[a] good faith belief that no confusion exists when the USPTO

11  grants a trademark registration or publishes a trademark application for opposition after

12  finding no likelihood of confusion exists with other marks."[42] Therefore, the trademark

13  applications fortified the substantive strength of DFP's litigation positions and further

14  justified DFP's belief that it was in the right.

15
16
### iv.   DFP's Attempts to Publicize SDCC's Allegations Disprove any Intent to Trade on SDCC's Goodwill

17  Considerations relevant to the exceptionality determination under the Lanham Act's

18  fee-shifting provision include "frivolousness, motivation, objective unreasonableness …

19  and the need in particular circumstances to advance considerations of compensation and

20
21
22

---

[40] *See* ECF Doc. 334 at 2:8–18.

23
24
25
26
27

[41] *See* 15 U.S.C. §§ 1052(d) ("a mark which so resembles a mark registered in the Patent and Trademark Office … as to be likely … to cause confusion" is unregistrable); 1062(a) ("if on … examination it shall appear that the applicant is entitled to registration … the Director shall cause the mark to be published [for opposition]"); 1091(a) (authorizing supplemental registration of "marks capable of distinguishing applicant's goods and services and not registrable on the principal register … except those declared to be unregistrable under subsections (a), (b), (c), (d), and (e)(3) of section 1052").

28

[42] *See BDO Remit (USA), Inc. v. Stichting BDO*, No. CV1104054, 2012 WL 12895658, at *25 (C.D. Cal. Sept. 19, 2012).

1    deterrence."[43] As shown above, DFP's First Amendment conduct—specifically, DFP's

2    applications for trademark registration—*reinforces* the objective reasonableness of DFP's

3    positions and thereby undermines any claim of frivolousness.

4         As for motivation, DFP's decision to issue a press release "[i]nstead of engaging in a

5    [private] discussion with SDCC about its concerns"[44] may have offended SDCC's genteel

6    sensibilities. But publicizing SDCC's infringement allegations is *not* what DFP would

7    have done if it were trying to trade on SDCC's goodwill. That would be madness, like a

8    jeweler in the business of selling fake Rolex watches telling the newspaper about a cease-

9    and-desist it had received from Rolex. If DFP's use of a mark that incorporates "comic

10   con" had indeed confused anyone about SDCC's "sponsorship, or approval of [DFP's]

11   goods, services, or commercial activities,"[45] there was no better way to dispel that

12   confusion than to do exactly what DFP did: hold a press conference to tell the world that

13   SDCC had accused DFP of infringing SDCC's trademarks in an attempt to trade on

14   SDCC's goodwill. Indeed if SDCC were really concerned about public confusion then it

15   would have issued its own press release—instead of trying to do yet another of the

16   unheralded arrangements by which it has been more quietly and strategically cultivating

17   its growing portfolio of registrations, ever since Chicago Comicon shut down SDCC's

18   more upfront attempt to register the unhyphenated form "comic con."

19   <br>20                     **v.    Prevailing Party Fees Under the Lanham Act Are Not a Proper**
                                 **Remedy for SDCC's Unproven Claims of Trademark**
                                 **Disparagement and Personal Defamation**

21        SDCC also mentions compensation and deterrence, but those are not properly

22   invoked in relation to DFP's First Amendment conduct because SDCC's complaints

23   about that conduct have nothing to do with trademark infringement. Instead, SDCC

24   accuses DFP of "denigrating SDCC, its executives and its intellectual property before the

25

26   ───────────────
27   [43] *See Octane Fitness*, 134 S. Ct. at 1756 n. 6 (quoting *Fogerty*, 510 U.S. at 534 n. 19).

27   [44] *See* Mem. at 10:11–12.

28   [45] *See* 15 U.S.C. § 1125(a)(1)(A)

1   public and the industry in which it does business" in press releases, interviews, and social

2   media posts.[46] Denigration of companies, executives, and intellectual property is not

3   regulated by the Lanham Act. To the extent SDCC seeks remedies for denigration of its

4   intellectual property, it is really trying to prosecute a claim for trademark disparagement;

5   but "no such claim exists under the Lanham Act,"[47] and SDCC should not be allowed to

6   manufacture one under the guise of a motion for attorney fees. To the extent SDCC seeks

7   remedies for denigration of itself and its executives, it is really trying to prosecute a

8   common law defamation claim through its Motion, which is equally improper.[48]

9   ### 3.   DFP Did Not Engage in Pretrial Litigation Misconduct

10   #### a.   SDCC's Compilation of the Court's Comments Is Misleadingly Selective

11   SDCC's primary evidence of pretrial misconduct is a selective compilation of

12   sometimes harsh things the Court said about DFP and its counsel over the course of

13   several months, multiple hearings, and a large number of filings.[49] SDCC seems to infer

14   from that collection that the Court is already predisposed to punish DFP, and is just

15   waiting for an invitation and assurance that its decision to do so "will be reviewed only

---

[46] *See* Mem. at 10:17–19.

[47] *Freecycle Network, Inc. v. Oey*, 505 F.3d 898, 904 (9th Cir. 2007) ("TFN's complaint also alleged 'trademark disparagement' … However, no such claim exists under the Lanham Act. The 'elements' of TFN's 'trademark disparagement' claim …— i.e., false statement, with malice, about TFN's operations and the validity of its mark — simply cannot be gleaned from § 1125(a)'s text or its prohibition against unfair competition …").

[48] The Lanham Act's false advertising provision targets misrepresentations of "goods, services, or commercial activities." *See* 15 U.S.C. § 1125(a)(1)(B). But denigration of the *supplier* of such "goods, services, or commercial activities" is not within the scope of the statute, *see also Nissan Motor Co. v. Nissan Computer Corp.*, 378 F.3d 1002, 1017 (9th Cir. 2004) ("Negative commentary about Nissan Motor does more than propose a commercial transaction and is, therefore, non-commercial."); and even if it were, SDCC has not made and certainly did not prevail on any false advertising claim.

[49] *See* Mem. at 13:3–6, 14:11–13, 16:12–13 (quoting harsh words from summary judgment ruling); 13:10–23, 15:19–23 (quoting critical comments delivered during *in limine* hearing); 14:3–5 (quoting harsh words from order denying leave to amend).

for abuse of discretion."[50] DFP thinks SDCC misreads the Court. DFP had more disagreements with the Court than SDCC did because the Court ruled against DFP more often than against SDCC. Human nature being what it is, that resulted in more frequent (and more colorful) chastisement directed to DFP.

Moreover SDCC's cherry-picked list of comments does not tell the whole story. The *in limine* hearing that SDCC highlights,[51] for example, ended with the Court saying:

> Thank you all for your endurance and your patience with me, helping me. Your arguments, in most respects, were helpful, even if I disagreed with how it came out. I appreciate your efforts, so thank you.[52]

Presenting arguments that are "in most respects … helpful" is not litigation misconduct.

### b. SDCC's Critiques Are Hyperbolic and Hypocritical

SDCC makes mountains of molehills. For example, SDCC accuses DFP of "Court rules and procedures violations" including: "Defendants filed two summary judgment motions to be heard on the same day totaling over 40 pages."[53] DFP thought it had leave to make its filings because the Clerk gave out a single hearing date for all dispositive motions. But if DFP was wrong then the proper remedy would have been resetting one of the motions for a different hearing date, not a $4.6 million sanction.

SDCC's denunciations are also hypocritical. Civil Rule 7.1.h, the rule that SDCC says DFP should be sanctioned for breaking, provides: "Briefs or memoranda in support of or in opposition to all motions noticed for the same motion day must not exceed a total of twenty-five (25) pages in length, per party …" On the same day that DFP filed "motions to be heard on the same day totaling over 40 pages," SDCC filed both a motion for summary judgment, supported by a 25-page brief, and a motion to exclude DFP's

---

[50] *See* Mem. at 1:24–25. Note the wording: "*only* for abuse of discretion" instead of just "for abuse of discretion."

[51] *See, e.g.*, Mem. at 13:7–24; 14:25–15:24; 16:3–7,

[52] Nov. 14, 2017 Tr. at 181:3–6.

[53] *See* Mem. at 16:20–24.

experts, supported by a 19-page brief[54]—for a combined total of 43 pages, well in excess of the 25-page limit set by the rule.

Another of the Court's "rules and procedures" is Civil Case Procedure II.A, which directs: "Objections relating to the motion should be set forth in the parties opposition or reply." SDCC violated that procedure by filing a standalone set of objections to the evidence cited by DFP in support of its summary judgment motions—which the Court struck.[55] If DFP's supposed "Court rules and procedures violations" entitle SDCC to fees for prevailing (sort of) on trademark infringement then SDCC's violations would entitle DFP to fees as the prevailing party on false designation of origin.

### c.   SDCC Relies on Criticism the Court Withdrew

SDCC's reliance on the Court's sua sponte order striking part of DFP's summary judgment briefing is doubly revealing. According to SDCC:

> The Court characterized allegations leveled by Defendants in their summary judgment motions as "immaterial" and "impertinent;" recognizing them as "a baseless attack on plaintiff unsupported by the record."[56] (Dkt. 253, p. 31–32.)

But the document SDCC cites in support, ECF Doc. 253, does not exist; the Court withdrew it. Had *DFP* cited a withdrawn document, SDCC would doubtless add that to its list of supposed misconduct.

The reason the document was withdrawn is even more telling. At page 31, line 25 to page 32, line 1, the withdrawn document had chided DFP for making "fraud allegations … in complete disregard of the Court's previous order," in which the Court had "denied their motion to amend their pleadings to assert the allegations that Plaintiff's trademarks were procured in fraud." But as the replacement document observes, "the Court had not ruled on Defendants' motion to amend the pleadings at the time Defendants' submitted

---

[54] *See* ECF Docs. 91, 97.

[55] *See* ECF Docs. 175, 182.

[56] Mem. at 14:11–13.

their motion for summary judgment."[57] DFP pointed that out to the Court during a hearing, as an example of "misunderstanding between us and the Court," to illustrate "that some of what we do may be misinterpreted."[58] The Court acknowledged, "That's a good point. I'll look at that. We have had a lot of documents flowing, all of us."[59] The Court thereafter withdrew ECF Doc. 253 in favor of ECF Doc. 260, which does not include the "baseless attack" language seized upon by SDCC.

### d.   In its Zeal to Cast Aspersions, SDCC Distorts the Record

Regarding SDCC's survey expert, Matthew Ezell, SDCC accuses DFP of arguing "that Ezell's survey results should be excluded as irrelevant because the survey was performed after Defendants began infringing SDCC's marks."[60] What DFP *actually* said is that *if* the Court rigidly applied what cases call "the crucial date" for genericness—viz., the date an alleged infringer begins using its accused mark—*then* Mr. Ezell's survey results would be excluded.[61] DFP then went on to give reasons why the Court might *not* rigidly apply that cutoff.[62] And at the *in limine* hearing, DFP again clarified:

> With regard to the survey, again, the position that we articulated in our papers is being distorted. … What the papers said is there are cases in the Ninth Circuit that say the critical date is the date the accused infringer enters the market. That is what the Ninth Circuit cases say. And we pointed out that if that date were applied, then that could cost them their survey.
>
> However, we also said that because the meanings of words do persist over time, a survey conducted in 2016 would be relevant [to] how words are used in 2013.[63]

The point was driven home in this exchange with the Court:

---

[57] *See* ECF Doc. 260 at 31:26–27.

[58] *See* Sept. 21, 2017 Tr. at 82:14–16, 82:25–83:1.

[59] *See* Sept. 21, 2017 Tr. at 83:8–9.

[60] Mem. at 16:16–18.

[61] *See* ECF Doc. 314 at 7:1–10.

[62] *See* ECF Doc. 314 at 7:13–22.

[63] Nov.14, 2017 Tr. at 28:4–14.

THE COURT: … [W]e've gravitated to the survey, specifically. In one respect, you say that you focused at 2013, and then you also say that 2016 as a viewing point backward was okay. So I don't know that the survey is challenged in what you're saying.

MR. SEARS: No, it's not.

THE COURT: Oh, good. Okay.[64]

SDCC's advocacy in support of its misconduct argument is itself dishonest.

SDCC also mischaracterizes proceedings relating to its damages expert. First, SDCC says DFP did not file a "Daubert challenge to Patrick Kennedy," which is true. SDCC then says DFP filed a Daubert challenge under the guise of a motion in limine, which is false: DFP filed a motion challenging evidence under (1) Federal Rules of Civil Procedure 26(a)(1)(A) and 37(c)(1), for untimely disclosure, and (2) Federal Rules of Evidence 402 and 403, for irrelevance and prejudice—not a motion challenging Dr. Kennedy under Rules 702 or 703.[65] SDCC also alleges that "Defendants refused to turn over financial information until right before trial and then attempted to capitalize on their misconduct by arguing that SDCC's damages expert shouldn't be allowed to comment on the information in the recently produced financial records."[66] What *really* happened is DFP updated its earlier production of financial on a mutually agreed-upon timetable, and then objected to certain opinions *on the ground that they had not been disclosed in a report issued <u>after</u> the updated financial information had been provided*.[67] DFP never said "SDCC's expert shouldn't be allowed to comment on the information in the recently produced financial records"; what DFP said is he should not be allowed testify to opinions not disclosed in the report he issued after receiving those records.

SDCC's allegation of "hypocrisy"[68] in connection with Dr. Kennedy comes with ill

---

[64] Nov. 14, 2017 Tr. at 29:12–18.

[65] *See generally* ECF Doc. 323.

[66] *See* Mem. at 16:26–17:1.

[67] *See* Addendum Tr. of Excerpts During Trial at 95:24–96:1, 96:13–18 (Dec. 1, 2017).

[68] *See* Mem. at 17:2.

1    grace. If DFP had been trying to get away with anything, it failed because Dr. Kennedy

2    was allowed to testify to the opinions not disclosed in his later-issued report. But SDCC

3    *succeeded* in turning *worse* conduct to its own litigation advantage. Federal Rule of Civil

4    Procedure 33(b)(3) requires a responding party to serve interrogatory answers "in writing

5    [and] under oath." But SDCC was not just *late* in providing verifications: it refused to

6    provide them altogether. And because SDCC had not verified its responses, DFP was not

7    allowed to use them to impeach SDCC's witnesses.[69]

8        DFP supplemented its financial production—late according to SDCC, on an agreed-

9    upon timetable according to DFP; SDCC's expert then supplemented his report, but did

10   not include certain opinions; SDCC's expert was nonetheless allowed to give those

11   opinions at trial, based on the supposed lateness of its supplementation. SDCC, on the

12   other hand, *never* verified its interrogatory responses; as a result, DFP was not allowed to

13   use them at trial. If anyone engaged in prejudicial pretrial misconduct, it was SDCC.

14             **e.**    **DFP's Substantive Advocacy Is Not Sanctionable Misconduct**

15        SDCC's effort to show pretrial litigation misconduct consists mostly of procedural

16   nitpicking. To the extent it has a substantive dimension, it is that DFP misbehaved in its

17   advocacy of three positions: fraud and unclean hands, genericness *ab initio*, and naked

18   licensing.[70] As shown below, none of SDCC's misconduct accusations has merit.

19        The *real* misconduct in connection with filings and arguments has been SDCC's. As

20   set forth more fully in a companion opposition—and in a sanctions motion that DFP has

21   served and expects to file, unless SDCC withdraws its offending motion before the 21-

22   day safe harbor provided Federal Rule of Civil Procedure 11(c)(2) expires—SDCC filed

23   a post-verdict motion for judgment as a matter of law on grounds not presented in

24   SDCC's pre-verdict motion, which is not allowed; but even after DFP pointed out the

25   problem, SDCC refused to correct it. *That* is misconduct.

26    ─────────────

27   [69] *See* Addendum Tr. of Excerpts During Trial at 88:17–22 (Dec. 1, 2017).

28   [70] *See* Mem. at 14:1–24 (fraud and unclean hands), 14:26–15:24 (genericness *ab initio*), 17:4–18:2.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### i.    DFP's Prosecution of its Unclean Hands Defense Is Not Misconduct

DFP motion for leave to add a claim seeking cancelation of SDCC's trademark registration based on fraudulent procurement was not misconduct because DFP had a sound basis for it: no one disputes that SDCC filed a declaration that its use of "comic-con" had been substantially exclusive when the declarant knew SDCC's use *had not* been that.[71] Turning to unclean hands, SDCC claims misconduct because "[a]t no time during discovery did Defendants ever disclose that their unclean hands defense was a veiled fraud defense" and "[f]raud must be pled with particularity." But at no time during discovery did SDCC ever ask DFP the basis for its unclean hands defense; and even though SDCC has known the basis for DFP's defense since at least early September, when the parties began exchanging pretrial order drafts, SDCC has yet to bring or seek leave to file a motion to dismiss based on the alleged pleading deficiency. DFP has a pleaded defense and evidence to support it. DFP's counsel would be shirking their duty of zealous advocacy if they did *not* try to seek relief based on that defense.

### ii.    DFP's Advocacy of Genericness *Ab Initio* Was Not Misconduct

SDCC also alleges that DFP engaged in misconduct because it "relentlessly argued" genericness *ab initio* "over and over again"; but it turns out that by "over and over again," SDCC means: during a single hearing, the one on *in limine* motions.[72]

The *in limine* issue was an evidentiary one: what evidence should be allowed at trial? DFP argued that *all* evidence of usage should be allowed, without a temporal cutoff.[73] The primary basis for DFP's argument was that the issue for the jury should be whether "comic con" was generic in 2013 (DFP's date of first use) or at any time prior. That subsumes but does not coincide with the *ab initio* inquiry.

---

[71] *See* ECF Doc. 155-1 Ex. 21, at 131.

[72] *See* Mem. at 15:2–24.

[73] *See* ECF Doc. 314-1 at 10:22.

DFP's attempt to frame the relevant issue for trial is supported by cases holding that "[t]he crucial date for the determination of genericness" is the date an accused infringer "first entered the market with the disputed mark"; and if the asserted mark had become generic by that date "or at *any time* prior, it is not a valid, protectable mark."[74] Moreover DFP thought the Court had left the door open to its argument by first stating, during the final pretrial conference, that "Mr. Sears' point is really more, I think, succinct than I first appreciated it";[75] and then by making this longer statement in the Pretrial Order:

> The Court took issue with the defense on this point at the Pre Trial Conference. The argument may be semantic, on what the defense and the Court meant by "generic," respectively. The Court referring to words in the general lexicon and the defense, it appears using the legal connotation. The court's intent was to point out that common terms can be put together and be trademarked.[76]

DFP thought it saw in those remarks an opening to reconcile its own reading of Ninth Circuit precedent, as embracing the once-generic-always-generic principle,[77] with the Court's analysis by clarifying what DFP and the cases it relied upon meant by "generic."

The Court further "suggest[ed] to the parties that evidence of general use of the term by others from the claimed first use in 1970 would frame the 'continuum,'"[78] but it left that an open question and invited briefing on it. If the Court did not leave the door open to DFP's arguments then DFP misunderstood the Court. But that is not misconduct.

### iii.  DFP's Assertion of Naked Licensing Was Not Misconduct

As its final instance of supposed pretrial litigation misconduct, SDCC complains

---

[74] *See Classic Foods Int'l Corp. v. Kettle Foods, Inc.*, 468 F. Supp. 2d 1181, 1188 n. 10 (C.D. Cal. 2007).

[75] *See* Sept. 21, 2017 Tr. at 22:1–2.

[76] *See* ECF Doc. 261 at 10:24–11:1.

[77] *See Surgicenters*, 601 F.2d at 1014 (9th Cir. 1979) ("A 'generic' term ... cannot become a trademark under any circumstances."). As the Court pointed out during the *in limine* hearing, once-generic-always-generic is intimately related to genericness *ab initio*. *See* Nov. 14, 2017 Tr. at 6:5–6 ("To my understanding, it's really the same thing.").

[78] *See* ECF Doc. 261 at 11:4–6.

1    that DFP, after losing its motion for summary judgment of naked licensing, then filed a

2    motion *in limine* proffering evidence in support of that defense.[79] Although DFP moved

3    for summary judgment on its naked licensing defense, SDCC did not. Thus, as the Court

4    acknowledged during the pretrial conference, "by denying summary judgment" it had

5    "preserved or allowed" the defense "to go forward."[80] But the Court also expressed doubt

6    about whether the defense would survive a directed verdict motion at trial.[81] When the

7    Court flagged that as a question it would "renew … at the time of trial," *SDCC*, not DFP,

8    proposed "that before they ever attempt to put that issue in front of a jury, that they have

9    to basically come forward and proffer some kind of evidence of an agreement."[82] So DFP

10   offered to "prepare a formal proffer document and submit that in advance of the MIL

11   hearing," which the Court said "would be very helpful."[83] Providing the proffer that

12   SDCC had requested is not misconduct.

13         SDCC also calls the defense "bogus" because DFP did not obtain "testimony from

14   the purported licensee."[84] But DFP used all its depositions and could not get leave to take

15   more. Moreover, as the emails that DFP submitted with its naked licensing proffer show,

16   SDCC has its own ongoing, cooperative relationship with the New York Comic Con

17   organizers—closer, in fact, than DFP's; and SDCC took fewer than ten depositions so it

18   had depositions to spare. If *SDCC* really thought its New York friends would back *its*

19   story then *SDCC* would have obtained deposition testimony to refute DFP's defense.

20   **4.    DFP Did Not Engage in Trial Misconduct**

21         According to SDCC, "[t]he most egregious misconduct engaged in by Defendants

22

23

---

24   [79] *See* Mem. at 17:4–6.

25   [80] *See* Sept. 21, 2017 Tr. at 9:11–13.

     [81] *See* Sept. 21, 2017 Tr. at 9:14–24.

26   [82] *See* Sept. 21, 2017 Tr. at 10:6–7, 10:24–11:1.

27   [83] *See* Sept. 21, 2017 Tr. at 11:18–20.

28   [84] *See* Mem. at 17:21–24.

occurred during the trial of this case."[85] SDCC's trial misconduct arguments touch only briefly on DFP's actual testimony[86]—perhaps because the Court has already observed:

> I thought Mr. Farr, you know, handled that in an appropriate fashion. … I thought he was well-tempered in his addressing the narrow issues that we are facing, and I expect the same from Mr. Brandenburg and Mr. Solberg. And I will put them in jail if they violate this order that they are not to escalate this case into a war involving the world or the world's view.[87]

The Court expressly commended Mr. Farr for his conduct on the stand; and it must have been satisfied with Mr. Brandenburg's testimony, as well, or it would have jailed him. So SDCC focuses instead on DFP's opening statement and closing argument.

DFP is responding substantively to SDCC's arguments about openings and closings in § II.B.5 of its opposition to SDCC's "… Motion … for Judgment as a Matter of Law…"[88] Moreover, to illustrate just how easily zealous advocacy can be repainted as exceptional misconduct, consider the following appraisal of SDCC's own counsel:

The first objection made during trial was to "misconduct" *by SDCC's counsel* in *her* opening statement. The objection came about 12 minutes in, and it was: "Sustained. Jury will disregard the last comment. It's argument that can wait until later."[89] But SDCC's counsel continued to inject argument into her statement, drawing another objection and admonition less than ten minutes later: "Sustained. We want to know what the evidence will show and leave the argument for the end of the case."[90] But she persisted for another 12 minutes, finally drawing yet another objection and this rebuke:

> Sustained. Ladies and gentlemen, you're not to consider the consequences of any of this. This is really inappropriate argument. I'm going to ask you to disregard it. If there's evidence on these points, fine. Your consideration has to wait until all the evidence is in. It means give the defense a chance to come

---

[85] Mem. at 18:1–2.

[86] *See* Mem. at 20:8–20.

[87] Dec. 6, 2017 p.m. Tr. at 59:16–22.

[88] ECF Doc. 433.

[89] Nov. 28, 2017 p.m. Tr. at 22:10–11.

[90] Nov. 28, 2017 p.m. Tr. at 26:24–27:1.

forward with theirs. Okay. So don't make up any mind. This is really not what opening statement should be. So we need to wrap it up.[91]

Littered throughout SDCC's "inappropriate argument" were a variety of misstatements. For example, before trial, this Court had already ruled: "evidence of over 100 competitors using the unhyphenated form of Plaintiff's trademark strongly suggests that the mark is generic" and "is persuasive evidence of genericide."[92] But SDCC's counsel told the jury in her opening, "[i]t doesn't matter if there's two other conventions or 50 other conventions or 100 conventions [using 'comic con']";[93] and she continued to push that false line in her closing, restated as "[i]t doesn't matter how many other people out there call themselves comic con."[94] SDCC also mischaracterized Mr. Ezell's primary-significance survey by spinning it as evidence of "an exceptionally strong brand"[95]—even though the Court had struck Mr. Ezell's testimony "that COMIC-CON is … a strong mark" because the survey goes only to whether COMIC-CON is perceived as a brand name, which is "another concept."[96]

SDCC's counsel also engaged in misconduct during witness examinations. For example, during the examination of Phoenix Comicon's founder, SDCC's counsel tried to elicit testimony about the witness's interest in the outcome—even though, as the Court pointed out, that questioning fell "into an area … that [SDCC] wanted to keep out."[97]

DFP leaves for the Court to decide whether SDCC's counsel engaged in exceptional misconduct. DFP's point is simply this: SDCC's susceptibility to criticism for its own counsel's conduct should drive home how weak SDCC's argument is, and how unfair an

---

[91] Nov. 28, 2017 p.m. Tr. at 32:17–24.

[92] *See* ECF Doc. 260 at 19:22–24 ("evidence of over 100 competitors using the unhyphenated form of Plaintiff's trademark strongly suggests that the mark is generic" and "is persuasive evidence of genericide").

[93] Nov. 28, 2017 p.m. Tr. at 32:12–13.

[94] Dec. 7, 2017 Tr. at 75:16–17

[95] *See* Dec. 7, 2017 Tr. at 26:13–16.

[96] *See* Dec. 1, 2017 a.m. Tr. at 34:7–12.

[97] *See* Dec. 6, 2017 p.m. Tr. at 79:18–19.

award of fees against DFP would be.

**C.   If Fees Are to Be Awarded, Further Proceedings Should Be Had on the Amount**

Federal Rule of Civil Procedure 54(d)(2)(C) authorizes the Court to "decide issues of liability for fees before receiving submissions on the value of services."[98] Bifurcation would be proper here because SDCC's fee submission is seriously defective but DFP cannot, in this brief, fully respond to both liability *and* the proper amount of any award.

One problem is that because SDCC did not prevail on all its Lanham Act claims, the Court has a "duty to make some attempt to adjust the fee award in an effort to reflect and apportionment."[99] Another is that SDCC's counsel billed in quarter-hour increments. "The Ninth Circuit has affirmed an across the board reduction of attorney's fees when services were billed on the quarter hour without proper specificity … because the use of quarter hour minimums can easily lead to billing abuses."[100] This Court has reduced fees upwards to twenty percent based on quarter-hour billing practices.[101] Compounding this abuse, the task descriptions are highly general and frequently redacted, and therefore warrant closer scrutiny.[102] Finally, "[f]ees are properly reduced when the task is overstaffed," which includes "failure to appropriately delegate tasks to staff or colleagues

---

[98] *See also National Union Fire Ins. Co. of Pittsburgh, PA v. Garber*, No. CV-F-94-5414, 2006 WL 2038538, at *6 (E.D. Cal. July 18, 2006), *Allen v. Ghoulish Gallery*, No. 06CV371, 2008 WL 802980, at *1 (S.D. Cal. Mar. 24, 2008).

[99] *See Cairns v. Franklin Mint Co.*, 292 F.3d 1139, 1157–58 (9th Cir. 2002) (requiring apportionment between successful and unsuccessful Lanham Act claims).

[100] *Smith v. CitiFinancial Retail Servs*, No. 06-2966, 2007 U.S. Dist. LEXIS 58723 at *8, 2007 WL 2221072 (N.D. Cal Aug. 2, 2007) (citing *Welch v. Metropolitan Life Ins. Co.*, 480 F.3d 942, 948-49 (9th Cir.2007)).

[101] *Zest IP Holdings, LLC v. Implant Direct Mfg. LLC*, No. 10-CV-0541-GPC WVG, 2014 WL 6851612, at *9 (S.D. Cal. Dec. 3, 2014).

[102] *Shige Takiguchi v. MRI Int'l*, No. 2:13-CV-1183, 2017 WL 1843698, at *1 (D. Nev. May 8, 2017) ("Without an adequate description of the work performed, the court is unable to determine the reasonableness of this and other similarly redacted time entries."); *Hamby v. Walker*, No. 3:14-CV-00089, 2015 WL 1712634, at *8 (D. Alaska Apr. 15, 2015).

1    with lower billing rates."[103] Here, only 7% of SDCC's fees are for junior attorneys; 70%

2    are for senior attorneys—of whom Ms. Herrera, an 18-year lawyer, is the most junior.

3          The foregoing is not intended to be exhaustive, but it should suffice to show there

4    *are* problems. Because SDCC's redacted billing records have serious flaws that cannot be

5    adequately addressed in a single submission that must also cover liability, further

6    proceedings should be had on the amount of fees if the Court decides to make an award.

7                               **III.   CONCLUSION**

8          SDCC's Motion should be denied because SDCC's status as prevailing party is

9    debatable; and the case is not exceptional because DFP was objectively reasonable, did

10   not act from improper motives, and did not engage in misconduct. Moreover SDCC's

11   $4.6 million request is manifestly unreasonable, both in light of the outcome ($20,000 in

12   damages on a split verdict) and because SDCC's supporting submissions are flawed and

13   unreliable. Therefore if the Court does decide to award fees then further proceedings

14   should be had on the amount.

15   DATED: February 20, 2018              Michael I. Katz
                                          Charles J. Veverka
16
                                          L. Rex Sears
17                                        MASCHOFF BRENNAN LAYCOCK
                                             GILMORE ISRAELSEN & WRIGHT, PLLC
18

19                                        By:   /s/  *L. Rex Sears*
                                                _____
20
                                          Attorneys for Defendants and Counterclaimants
21                                        DAN FARR PRODUCTIONS, DANIEL FARR, AND
                                          BRYAN BRANDENBURG
22

23

24

25   _____
     [103] *See Gold v. NCO Fin. Sys., Inc.*, No. 09CV1646-LAB CAB, 2010 WL 3339498, at *1
26   (S.D. Cal. Aug. 23, 2010) (internal quotations and citations omitted); *see also Seoul*
     *Broad. Sys. Int'l, Inc. v. Korea Int'l Satellite Broad.*, No. CV0805119, 2009 WL
27   10672770, at *9 (C.D. Cal. June 19, 2009) (reducing fees due to an "imbalance between
28   the time spent by the senior attorney in relation to the junior attorneys").

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## **CERTIFICATE OF SERVICE**

The undersigned hereby certifies that a true and correct copy of the above and foregoing document has been served via email on February 20, 2018, to counsel of record who are deemed to have consented to electronic service.


By:  /s/ *L. Rex Sears*