UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SAN DIEGO COMIC CONVENTION, a California non-profit corporation,<br><br>                                         Plaintiff,<br><br>v.<br><br>DAN FARR PRODUCTIONS, a Utah limited liability company, DANIEL FARR, an individual, BRYAN BRANDENBURG, an individual,<br><br>                                         Defendants. | Case No.:  14-cv-1865-AJB-JMA<br><br>**ORDER DENYING DEFENDANTS' MOTION FOR JUDGMENT AS A MATTER OF LAW PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 50**<br><br>(Doc. No. 429) |

Unwavering in their ultimate defenses, Defendants Dan Farr Productions, Daniel Farr, and Bryan Brandenburg (collectively referred to as "DFP") move for judgment as a matter of law on two issues: genericness and likelihood of confusion. (Doc. No. 429.) Plaintiff San Diego Comic Convention ("SDCC") opposes the motion in its entirety. (Doc. No. 468.) On May 31, 2018, the Court held a hearing on the motion and then took the matter under submission. (Doc. No. 504.) As the record does not permit a conclusion contrary to the jury's verdict, the Court **DENIES** DFP's Federal Rule of Civil Procedure 50 motion. (Doc. No. 429.)

///

# **BACKGROUND**

The Court is already well-versed as to the events leading up to the institution of this action. Thus, for the purposes of this Order, the Court will only provide a narrow review of this lawsuit's factual and procedural background.

On August 7, 2014, SDCC filed a lawsuit alleging two causes of action against DFP: (1) Federal Trademark Infringement, 15 U.S.C. § 1114; and (2) False Designation of Origin, 15 U.S.C. § 1125(a). (*See generally* Doc. No. 1.) SDCC is a non-profit corporation, formed in 1975, that is dedicated to the awareness and appreciation of comics and related popular art forms. (Doc. No. 1 ¶ 10.) Every year since 1970, SDCC has produced and held its "Comic-Con convention" in San Diego, California. (*Id.* ¶ 11; Doc. No. 97 at 9.)[1] The convention spans several days in length and showcases several hundred events, workshops, educational and academic programs, games, award shows, costume contests, as well as hosts panels of special guests that include science fiction and fantasy authors, film and television actors, directors, producers, and writers. (Doc. No. 1 ¶ 12; Doc. No. 97 at 9.) In 2016, attendance to San Diego Comic-Con exceeded over 135,000 attendees. (Doc. No. 97 at 9.)

SDCC's family of trademarks at issue in this case are:

1. Comic-Con;

2. Comic Con International;

3. Anaheim Comic-Con; and



4.

---

[1] Page numbers refer to the CM/ECF number and not the number listed on the original document.

(Doc. No. 1 ¶ 13; Doc. No. 244 at 11.) Each of these registered trademarks is incontestable. (Doc. No. 381 at 25:15–25.) Additionally, SDCC states that it has used these Comic-Con marks extensively and continuously in interstate commerce and thus the marks have become valuable assets as well as symbols of its goodwill and positive industry reputation. (Doc. No. 1 ¶ 15.)

In early 2013, Defendant Dan Farr Productions, a limited liability company, began to advertise and promote its own popular arts convention named "Salt Lake Comic Con" ("SLCC"). (Doc. No. 234-2 at 7; Herrera Decl. Ex. 5 ("Farr Depo." 11:4–9, Doc. No. 95-7).) Similar to SDCC's convention, SLCC is a three-day fan event featuring the best in movies, television shows, gaming, sci-fi, fantasy, and comic books. (Doc. No. 244 at 12.) Since 2013, SLCC has been held every year and in the beginning of 2014, Dan Farr Productions created its Salt Lake Comic Con FanXperience event, which has also been held every year since its inception. (Farr Depo. at 11:10–15; Doc. No. 97 at 11.)

Thus, the marrow of this case is whether DFP's comic arts and popular fiction event named "Salt Lake Comic Con" infringed on SDCC's three incontestable trademarks.[2] On December 8, 2017, after an eight-day jury trial, the jury found that DFP had indeed infringed on SDCC's family of service marks. (Doc. No. 395 at 2–5.) As to unfair competition and false designation of origin however, the jury found in favor of DFP. (*Id.* at 6.) In total, the jury awarded corrective advertising damages to SDCC in the amount of $20,000.00. (*Id.* at 8.)

Post-trial, DFP filed four motions: (1) the present matter, their motion for judgment as a matter of law, (Doc. No. 429); (2) a motion for new trial of validity and infringement, (Doc. No. 436); (3) a motion for ruling on estoppel defense, (Doc. No. 508); and (4) their motion for ruling on unclean hands defense, (Doc. No. 510).

///

---

[2] The Court notes that after the trial, DFP changed the name of their event to "FanX Salt Lake Comic Convention." (Doc. No. 513 at 7–8.)

## LEGAL STANDARD

"[I]n entertaining a motion for judgment as a matter of law, the court should review all of the evidence in the record." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). In doing so, a court "must view the evidence in the light most favorable to the nonmoving party . . . and draw all reasonable inferences in that party's favor." *Josephs v. Pac. Bell*, 443 F.3d 1050, 1062 (9th Cir. 2006). "The test applied is whether the evidence permits only one reasonable conclusion, and that conclusion is contrary to the jury's verdict." *Id.* In other words, DFP has the high burden of demonstrating that there is a "complete absence of probative facts to support the conclusion reached so that no reasonable juror could have found for the nonmoving party." *Eich v. Bd. of Regents for Cent. Missouri State Univ.*, 350 F.3d 752, 761 (8th Cir. 2003) (citation omitted).

## DISCUSSION

DFP moves for judgment as a matter of law ("JMOL") on genericness and likelihood of confusion. (*See generally* Doc. No. 429-1.) As will be explained in great detail below, the Court's review of the record demonstrates that there is substantial evidence to support the jury's verdict.

A.    Genericness

Generic terms are "common descriptive" marks which identify only the type of good "of which the particular product or service is a species[.]" *Park'N Fly, Inc. v. Dollar Park and Fly, Inc.*, 718 F.2d 327, 329 (9th Cir. 1983), *judgment reversed on other grounds by* 469 U.S. 189 (1985). Generic terms are not protectable because they do not identify the source of a product. *Id.* In determining whether a phrase is generic or not, the main question a court must ask itself is whether the "primary significance of the registered mark to the relevant public" is as the name for a particular type of good or service irrespective of its source. *Elliott v. Google, Inc.*, 860 F.3d 1151, 1156 (9th Cir. 2017) (citation omitted).

Overtime, the holder of a valid trademark may become a "victim of genericide." *Freecycle Network, Inc. v. Oey*, 505 F.3d 898, 905 (9th Cir. 2007) (citation and internal quotation marks omitted). Genericide happens when the public uses a trademark as a

none
4

14-cv-1865-AJB-JMA

generic name for the specific type of good or service "irrespective of its source." *Elliott*, 860 F.3d at 1156. For example, marks such as Aspirin, Cellophane, and Escalator, were once "protectable as arbitrary or fanciful marks because they were primarily understood as identifying the source of certain goods." *Id*. However, over time the marks were appropriated by the public and are now primarily understood as generic names for the goods. *Id*.

Incontestable marks, like SDCC's three trademarks, have been in use for five consecutive years and are still in use in commerce. *KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.*, 408 F.3d 596, 602 (9th Cir. 2005). An incontestable registration is "conclusive evidence of the validity of the registered mark . . . ." 15 U.S.C. § 1115(b). However, an incontestable mark can still be subject to challenge through a generic defense. *See Park'N Fly, Inc. v. Dollar Park and Fly, Inc.*, 469 U.S. 189, 194–95 (1985) (citation omitted).

DFP provides four different arguments to support their belief that the evidence at trial "overwhelmingly" shows that SDCC's marks are generic: (1) widespread use of "Comic Con" by SDCC's competitors; (2) media usage of the phrase; (3) SDCC's purported own generic use of "Comic Con"; and (4) the inapplicability of SDCC's consumer survey and its various defects render it useless to the matter at hand. (Doc. No. 429-1 at 8–15.) Each of these factors do not on its own demonstrate genericness. *See Classic Foods Int'l Corp. v. Kettle Foods, Inc.*, 468 F. Supp. 2d 1181, 1189 (C.D. Cal. 2007) ("Federal courts rely on several sources to determine whether a term" is generic). Thus, for purposes of this Order, the Court will look at the totality of the evidence to determine if the record establishes that no reasonable juror could find for SDCC as to the issue of genericness.

### i. WideSpread use of "Comic-Con" by SDCC's Competitors

DFP contends that SDCC's failure to police its mark has resulted in over one-hundred competitors using "Comic Con," which is strong evidence of genericide. (Doc. No. 429-1 at 9–10.) In opposition, SDCC argues that third-party use of "Comic-Con" is

only <u>infringing trademark use</u>, not generic use of the Comic-Con mark and that third-party infringing use does not on its own render its mark generic. (Doc. No. 468 at 11–13.)

Courts view a mark's use by competitors as "strong evidence of how the public perceives the term." *Classic Foods Int'l Corp.*, 468 F. Supp. 2d at 1190. Logically, "when more members of the public see a mark used by several producers in the industry, the less likely they will identify a particular producer with that mark." *CG Roxane LLC v. Fiji Water Co. LLC*, 569 F. Supp. 2d 1019, 1027 (N.D. Cal. 2008).

The Court does not deny that the extensive use of "Comic Con" by SDCC's competitors is evidence that heavily advances DFP's assertions of genericness. *See id.* at 1027–28 (explaining that the evidence weighed in favor of the defendant as it had produced evidence of almost two dozen competitors using the mark "bottled at the source" on their bottles). However, in reviewing the record in the light most favorable to SDCC, the evidence does not permit only one reasonable conclusion—the genericness of the phrase "Comic Con." *See Harper v. City of Los Angeles*, 533 F.3d 1010, 1021 (9th Cir. 2008). This is especially in light of the Teflon survey produced by SDCC that established for the jury that 83% of the relevant public recognize "Comic-Con" as a brand name and not a common term. (Doc. No. 468 at 11.)

Accordingly, under this first factor, despite SDCC's competitors' widespread use of "Comic Con," there is still adequate evidence to support the conclusion that "Comic-Con" is not generic.

### ii. Media Usage of Comic-Con

> The media is often considered to have its finger on the pulse of the general public, and its use of a particular term will likely conform to the public's understanding of that term. The press also has the ability to shape public interpretation. If consumers repeatedly encounter a term used generically in the media, they will be much more likely to use the term generically themselves.

*Classic Foods Int'l Corp.*, 468 F. Supp. 2d at 1189.

6

To support genericide through media usage, DFP introduced into evidence various news articles with titles such as "Comic Con Culture on the Rise," "Waco Comic Con Arrives in Central Texas," "Comic Con Brand Brings Show to Tulsa for First Time Ever," and "Comic Con Comes to Atlanta." (Doc. No. 382 at 22:11–13, 26:17–18, 27:5–6, 89:13–14.) DFP then surmises that as these articles consistently used "comic con" to refer to the type of event being offered and not to denote SDCC as the specific producer, that media usage of the phrase "Comic Con" supports the conclusion that the mark is generic. (Doc. No. 429-1 at 10–12.)

To contest DFP's media evidence, SDCC produced competing media usage to demonstrate the exact opposite—that "Comic Con" is used by the media to refer specifically to SDCC's comic convention. For instance, SDCC showed the jury television shows such as the Big Bang Theory that built story lines around attending San Diego Comic-Con. (Doc. No. 381 at 98:23–99:6.) Additionally, SDCC provided evidence of Comic-Con being featured in shows such as "How I Met Your Mother," "Chuck," "OC," and "American Dad." (*Id*. at 99:1–6.) Moreover, not only were there television shows, but SDCC also highlighted that several movies such as "Shaun of the Dead," "I Wish I was There," two documentaries, and Jeopardy all either took place or talked about San Diego Comic-Con. (*Id*. at 100:1–22.) Finally, SDCC also underscored that Conan, David Letterman, Entertainment Tonight, and Extra all did segments on San Diego Comic-Con.[3] (*Id*. at 102:5–7.)

DFP attempts to detract from SDCC's abundance of media evidence by arguing that the majority of it is from sources that have a business relationship with SDCC. (Doc. No. 429-1 at 12.) Thus, this evidence does not reflect the views of the purchasing public. (*Id*.) Unfortunately, the Court's responsibility at this stage is not to weigh the evidence. *See*

---

[3] Bizarrely, DFP's motion argues that SDCC only provided "scant" evidence of the media using "Comic Con" to refer specifically to SDCC's event. (Doc. No. 429-1 at 11.) DFP clearly misrepresents the record.

*Winarto v. Toshiba Am. Elecs. Components, Inc.*, 274 F.3d 1276, 1283 (9th Cir. 2001). Instead, the Court "should simply ask whether the plaintiff has presented sufficient evidence to support the jury's conclusion." *Wallace v. City of San Diego*, 479 F.3d 616, 624 (9th Cir. 2007).

Under this framework, the record illustrates that SDCC has generated substantial evidence of the media using "Comic Con" in a non-generic way that goes to supporting the jury's ultimate verdict. *See Johnson v. Paradise Valley Unified School Dist.*, 251 F.3d 1222, 1227 (9th Cir. 2001) ("Substantial evidence is evidence adequate to support the jury's conclusion, even if it is also possible to draw a contrary conclusion from the same evidence.").

In addition, the Court notes that the case law DFP employs to support their contention that the "biased media sources" do not reflect the views of the purchasing public are misplaced. (Doc. No. 429-1 at 12.) In *Krav Maga Ass'n of Am., Inc. v. Yaniliov*, 464 F. Supp. 2d 981 (C.D. Cal. 2006), DFP cites to the court's statement that "[a]ttestations from persons in close association and intimate contact with the trademark plaintiff's business do not reflect the views of the purchasing public." *Id.* at 988. Thus, in *Krav Maga*, the declarations from former students submitted by the plaintiff were insufficient to raise a genuine issue as to the genericness of the term "krav maga." *Id.* Regrettably for DFP, the Court does not find business associations on the same plane as "intimate" personal associations and DFP provides no case law for the Court to bridge this gap. *Id.* Most notably, even if DFP had successfully argued this point, the Court at this juncture "must disregard all evidence favorable to the moving party that the jury is not required to believe[,]" *Reeves*, 530 U.S. at 135, and may not substitute its view of the evidence for that of the jury, *Gilbrook v. City of Westminister*, 177 F.3d 839, 856 (9th Cir. 1999).

In a further attempt to diminish SDCC's media evidence, DFP argues that Mr. Glanzer's testimony at trial proves that the media used the term comic-con generically, as he had to constantly clarify that the evidence referred specifically to SDCC's convention. (Doc. No. 429-1 at 12.) The portion of the record referenced by DFP is as follows:

8

Q. Do other media outlets like magazines cover comic con?
A. Yes, they do.
. . .
Q. Let's take a look at Plaintiff's exhibit 370. Can you identify this exhibit for me, sir?
A. Yes. This is comic con issue of entertainment weekly.
. . .
The Court: I have a question. It says what it says, but is it related to San Diego Comic Con as opposed to some other entity?
The Witness: Yes.

(Doc. No. 381 at 102:8–103:10.)

But as already noted, Ninth Circuit precedent dictates that this Court's limited review process does not include making witness credibility determinations. *See Chuang v. Univ. of Cal.*, 225 F.3d 1115, 1129 (9th Cir. 2000) ("It is not the province of a court to spin such evidence in [the moving party's] favor when evaluating its motion" for judgment as a matter of law).[4] Accordingly, DFP's attempt to chip away at Mr. Glanzer's testimony does nothing to undermine the mammoth amount of media use evidence produced by SDCC.

### iii.    Use of Consumer Surveys to Establish Genericide

Under this factor, in an effort to throw out SDCC's Teflon Survey, which is unmistakably one of SDCC's most persuasive pieces of evidence, DFP yet again contends that Teflon Surveys are only appropriate where the question is whether a coined or arbitrary mark has become generic. (Doc. No. 429-1 at 14.) In support of this argument, DFP points to cases from the Trademark Trial and Appeal Board and the fourth, seventh, and eighth circuits. (*Id.*)

---

[4] *Chuang* analyzes race discrimination in a summary judgment context. *Chuang*, 225 F.3d at 1129. However, the Court finds its analysis persuasive as the standard for judgment as a matter of law "mirrors" the standard for summary judgment, "such that the inquiry under each is the same." *Madrigal v. Allstate Insurance Co.*, 215 F. Supp. 3d 870, 892 (C.D. Cal. 2016) (citing *Reeves*, 530 U.S. at 150).

The Court is perplexed that DFP has again brought these unsupported, inapplicable, and legally feckless claims—claims the Court already disposed of previously. (*See* Doc. No. 253 at 10–11; Doc. No. 263 at 7–10.) Perhaps recognizing the inadequacy of these arguments, DFP's Reply Brief states that "even if the Court determines that Ninth Circuit law differs from that of the jurisdictions cited by DFP" their motion should be granted on other grounds. (Doc. No. 471 at 5–6.)

DFP again misses the mark. Here, DFP has the burden of persuading the Court that "the record as a whole" demonstrates only one thing—that Comic-Con is generic. *See Johnson*, 251 F.3d at 1227. Thus, this string of non-dispositive case citations that contain no reference to the record are clearly frivolous arguments that only demonstrate DFP's faulty understanding of their burden in this motion.

DFP then switches gears and tersely argues that the jury was presented with evidence that demonstrated that SDCC's Teflon survey is flawed. (Doc. No. 429-1 at 14–15.) Thus, the jury should have afforded little weight to the survey. (*Id.* at 14.) Specifically, DFP is referencing Andrew Baker's testimony where he stated:

> A. Well, these types of studies are difficult to design. There can always be some mistakes, but the question is how many mistakes there are and how profound they are with respect to the key results that we are reporting. And in the case of Mr. Ezell's study, there are too many substantial mistakes, rendering his final number -- I have no confidence that number does or does not reflect the reality of the percentage of people who think Comic-Con is a brand.

(Doc. No. 398 at 32:20–33:2.)

Unfortunately for DFP, the jury was free to disbelieve and disregard the testimony of Mr. Baker and the Court cannot at this stage make any credibility determinations.[5] *See*

---

[5] Further evidence that highlights DFP's misunderstanding of their burden and the Court's limited review process in a motion for JMOL is their argument that the Court itself voiced its own fears regarding the accuracy of the survey. (Doc. No. 429-1 at 15.) The testimony DFP points to is:

*Lucent Techs., Inc. v. Microsoft Corp.*, 837 F. Supp. 2d 1107, 1111 (S.D. Cal. 2011) (emphasizing that the district court "is not to make credibility determinations or weigh the evidence . . . [and] must accept the jury's credibility findings consistent with the verdict.") (citation and internal quotation marks omitted); *see also Johnson*, 251 F.3d at 1227 (explaining that the jury is free to disbelieve or disregard evidence favorable to the moving party).

In sum, under the proper standard for motions for JMOL, SDCC's Teflon Survey is substantial evidence to support a reasonable juror's finding that SDCC's trademarks are a brand name and are not victims of genericide.

### iv. SDCC's Own Use of the Trademark "Comic-Con"

DFP briefly argues that the emails between SDCC's executives demonstrates that they themselves used the term "Comic-Con" in a generic sense. (Doc. No. 429-1 at 13.) SDCC retorts that DFP has distorted the factual record. (Doc. No. 468 at 16.)

The statement DFP clings to is one made by Mr. Glanzer in an email: "I think it's really important that we state, as we did at wondercon, how we are different from other shows, especially other <u>comic cons</u>." (Doc. No. 382 at 71:13–15 (emphasis added).)

---

> **Ms. Herrera**: Defendants don't have a survey of their own. And Mr. Baker -- his criticisms of Mr. Ezell's surveys were not well taken. At this point I question his qualifications as an expert to testify as to surveys, period. But I know we are kind of past that point.
> **Mr. Sears**: Really, your Honor, do we have to denigrate the witness like that?
> **The Court**: There was no challenge to his credentials so we need not speculate what would have happened had there been.
> I thought some of his observations logically made sense. I could see some of the logic. Ezell, as you point out, was the only survey. And it was right on genericide in the sense of primary significance of the term to the public . . . I'm not sure I'd take the 83 percent to the bank, but that is not my job at this stage.

(Doc. No. 403 at 106:4–20.) All in all, the Court is puzzled as to how the Court's statement supports DFP's motion as the statement was not made before the jury. *See* Fed. R. Civ. P. 50(a) (explaining that in a motion for JMOL, the court will not consider evidence that was not before the jury when it rendered its verdict).

However, when questioned about the email at trial, Mr. Glanzer stated that he was not using the phrase comic con to refer to other comic conventions, but was using it to refer to "other people who are using [SDCC's] mark." (*Id*. at 71:17–22.)

Another email produced at trial stated: "Interesting, Wizard has teamed with a company to provide a <u>comic con</u> channel featuring product that will be of interest to comic con fans." (*Id*. at 73:2–4 (emphasis added).) However, similar to the email above, when Mr. Glanzer was asked whether he was referring to fans of comic conventions, he responded that he was not, but that he was simply relating Wizard's ideas as they called themselves a comic con channel. (*Id*. at 73:5–10.)

Thus, as a whole, though reasonable minds could differ as to the conclusions to be drawn from the evidence presented, there is sufficient evidence to support the finding that SDCC's executives did not use the mark generically.

### v.    Conclusion

A party seeking judgment as a matter of law has a "very high" standard to meet. *Costa v. Desert Palace, Inc.*, 299 F.3d 838, 859 (9th Cir. 2002). Ultimately, a moving party's "burden is one of production, not persuasion; it 'can involve no credibility assessment.'" *Reeves*, 530 U.S. at 142 (citation omitted).

Presently, despite DFP's aggressive posture, the majority of their motion for JMOL advances under a false understanding of their burden and the Court's limited review process. Consequently, they have not illustrated that the evidence is so "overwhelmingly in favor of [them] that a reasonable jury could not arrive at a contrary verdict." *Middlebrooks v. Hillcrest Foods, Inc.*, 256 F.3d 1241, 1246 (11th Cir. 2001). Instead, viewing the evidence in the light most favorable to SDCC, the Court finds that the evidence is more than sufficient to support the jury's verdict. Thus, DFP's motion for judgment as a matter of law on genericness is **DENIED**.[6] *See Pensacola Motor Sales Inc. v. E. Shore*

---

[6]As evidence of the extremely high standard a defendant must meet under a motion for JMOL, the Court highlights the Ninth Circuit's decision in *M2 Software, Inc. v. Madacy*

*Toyota, LLC*, 684 F.3d 1211, 1226 (11th Cir. 2012) (holding that the JMOL standard is "heavily weighted in favor of preserving the jury's verdict.").

B.    Likelihood of Confusion

The second half of DFP's Rule 50 motion asks that the Court enter JMOL in their favor as to likelihood of confusion. (Doc. No. 429-1 at 15–25.) In support of this assertion, DFP runs through all of the *Sleekcraft* factors. (*Id*. at 15.)

### i.    Evidence Disproving Confusion

As an initial matter, DFP asserts that SDCC's failure to offer a survey showing the existence of confusion, the minimal amount of confusion evidence produced at trial, and the testimony of SDCC's own damages expert, Dr. Patrick Kennedy, affirmatively disproves confusion. (*Id*. at 16–17.) The Court wholeheartedly disagrees.

First, it is true that SDCC did not provide the jury with a likelihood of confusion survey. Second, DFP does accurately cite to a case that states "failure to offer a survey showing the existence of confusion is evidence that the likelihood of confusion cannot be shown." (*Id*. at 16 (*see Essence Commc'n, Inc. v. Singh Indus., Inc.*, 703 F. Supp. 261, 269 (S.D.N.Y. 1988).) In addition to this, DFP also correctly points to two Central District of California cases that purportedly demonstrate that SDCC's lack of survey evidence "warrants a presumption that the results would have been unfavorable." (Doc. No. 429-1 at 16.)

However, these arguments generate more heat than light. First, it is unquestionable that the New York District Court case mentioned above is not dispositive. Second, and most peculiarly, the two Central District of California cases do not support DFP's position.

---

*Entm't*, 421 F.3d 1073, 1086 (9th Cir. 2005). In this case, the district court granted judgment as a matter of law. *Id*. The Ninth Circuit affirmed finding that at trial, defendant SFX Entertainment demonstrated that it was not directly involved in the production, manufacturing, marketing, or sale of M2 Entertainment products and was thus not liable. *Id*. It is patently clear that *M2 Software* is not comparable to this current matter.

The Court notes that DFP does correctly cite to *Playboy Enters., Inc. v. Netscape Commc'ns Corp.*, 55 F. Supp. 2d 1070, 1084 (C.D. Cal. 1999), to argue that failure to conduct a confusion survey permits the inference that the results would have been unfavorable. However, DFP turns a cold shoulder to the remainder of the case that rejects their arguments. If DFP had continued to read *Playboy Enters.*, they would have seen the court cite to *Cairns v. Franklin Mint Co.*, 24 F. Supp. 2d 1013, 1041–42 (C.D. Cal. 1998), and its holding that "[s]urvey evidence is <u>not required</u> to establish likelihood of confusion[.]" *Id.* at 1084 (emphasis added).

The Northern District of California has made a similar conclusion:

> Undoubtedly, survey evidence is "often the most persuasive" evidence concerning likelihood of confusion. Moreover, a trier of fact may be entitled to presume that one party's failure to conduct a survey concedes that the survey evidence would be unfavorable to it. However, survey evidence is not required to show likelihood of confusion.

*Monster, Inc. v. Dolby Laboratories Licensing Corp.*, 920 F. Supp. 2d 1066, 1072 (N.D. Cal. 2013) (citation omitted). Thus, though a confusion survey would have been helpful, SDCC was under no obligation to provide one and DFP is incorrect in asserting that a lack of a confusion survey demonstrates that confusion is not likely.

Additionally, despite DFP's claim that SDCC only offered six instances of confusion, the record tells a much different story. (Doc. No. 429-1 at 16.) For instance, Mr. Brandenburg testified that there were "several instances" on social media where people confused SLCC with SDCC's Comic-Con—the incidences that he personally experienced were "less than a hundred" somewhere from 30–50. (Doc. No. 383 at 83:10–13; 118:22-119:2.) Additionally, the record demonstrates that Mr. Brandenburg received correspondence from consumers asking if SLCC was affiliated with San Diego, (*Id.* at 85:1–4), and Ms. Follet testified that she was aware of confusion by vendors, exhibitors, attendees, reporters, and others, (Doc. No. 405 at 120–21; Doc. No. 468 at 21).

Finally, DFP argues that Dr. Patrick Kennedy's testimony disproves confusion. (Doc. No. 429-1 at 17.) DFP then resorts to picking apart Mr. Kennedy's statements made

at trial. (*Id.*) However, this personal reflection of Mr. Kennedy's testimony again ignores the "bedrock principles delineating the trial judge's limited role in reviewing a jury's factual findings," *Johnson*, 251 F.3d at 1227, which requires a court to only review a jury's verdict for substantial evidence and does not allow a court to make any credibility determinations, *see Amor Ministries v. Cent. Surety Co.*, No. 3:13-cv-01441, 2016 WL 1388077, at *5 (S.D. Cal. Apr. 7, 2016). Accordingly, DFP's view of Mr. Kennedy's testimony is diametrically unhelpful in the instant matter.

### ii. The Sleekcraft Factors

The *Sleekcraft* factors are: "(1) strength of the mark; (2) proximity of the goods; (3) similarity of the marks; (4) evidence of actual confusion; (5) marketing channels used; (6) type of goods and the degree of care likely to be exercised by the purchaser; (7) defendant's intent in selecting the mark; and (8) likelihood of expansion of the product lines."[7] *Rearden LLC v. Rearden Commerce, Inc.*, 683 F.3d 1190, 1199 (9th Cir. 2012). The Ninth Circuit has noted that this eight-factor test is a "pliant" one, in which "[s]ome factors are much more important than others[.]" *Brookfield Commc'ns, Inc. v. W. Coast Entm't Corp.*, 174 F.3d 1036, 1054 (9th Cir. 1999).

DFP asserts that SDCC did not introduce sufficient evidence to support a finding of the likelihood of confusion as to its trademark "Comic-Con" and DFP's "Salt Lake Comic Con" mark. (Doc. No. 429-1 at 17.) The Court disagrees. Viewing the evidence in the light most favorable to SDCC and drawing all reasonable inferences in its favor, there is substantial evidence to support the jury's conclusion. *See Mockler v. Multnomah Cty.*, 140 F.3d 808, 815 n.8 (9th Cir. 1998) (citation omitted).

### a. Strength of the Mark

DFP argues that there is no evidence demonstrating that Comic-Con is a strong brand. (Doc. No. 429-1 at 18.) Instead, DFP contends that the other one-hundred "comic

---

[7] Both parties agree that the eighth factor is inapplicable to the present matter. (Doc. No. 429-1 at 18; Doc. No. 468 at 18–24.)

con" events in the marketplace decreases the strength of the mark. (*Id*. at 19.) SDCC mounts in opposition that Comic-Con is both commercially strong and has brand recognition. (Doc. No. 468 at 19.)

"The more likely a mark is to be remembered and associated in the public mind with the mark's owner, the greater protection the mark is accorded by trademark laws." *GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1207 (9th Cir. 2000). However, "[a] mark's overall strength is relative and cannot be determined by mechanistically assessing its conceptual or commercial strengths." *M2 Software, Inc. v. Madacy Entm't*, 421 F.3d 1073, 1081 (9th Cir. 2005). The Ninth Circuit has "previously recognized that a suggestive or descriptive mark, which is conceptually weak, can have its overall strength as a mark bolstered by its commercial success." *Id*. Where a court is dealing with incontestable marks, these marks are "presumed to be strong marks." *AutoZone, Inc. v. Tandy Corp.*, 373 F.3d 786, 794 (6th Cir. 2004).

At trial, SDCC produced the following evidence (1) that all three of its trademarks are incontestable; (2) that its Teflon Survey illustrated that 83% of consumers thought that "Comic-Con" was a brand; (3) that Comic-Con has been used in commerce for over forty-five years; and (4) that a multitude of television shows and movies referred to SDCC's event. (Tr. Exs. 35, 36, 38, 370, 372, 643, 645, Doc. No. 392.) In addition, despite DFP's assertions that SDCC commingled the mark with its other marks, the record demonstrates an entirely different state of affairs. For instance, SDCC provided a documentary called "Comic-Con Episode IV," articles entitled "Star Trek: Discovery Reveals Exciting Comic-Con Plans[,]" "At Comic-Con, Bring Out Your Fantasy and Fuel the Culture," and "On Dipping an Introverted Toe in the Comic-Con Ocean." (Tr. Exs. 217, 379, 381, 389.)

Thus, drawing all reasonable inferences in SDCC's favor, there is more than sufficient evidence to demonstrate that a reasonable jury could find that "Comic-Con" is a strong mark. *See Moroccanoil, Inc. v. Zotos Int'l, Inc.*, 230 F. Supp. 3d 1161, 1173 (C.D. Cal. 2017) (highlighting that the mark "Moroccanoil" is commercially strong as the company had made a significant investment in advertising of the brand, received

recognition from celebrities and consumers throughout the world, and was featured in widely circulated magazines).

### b. Similarity of Services

It is unquestionable that the services provided and events produced by SDCC and DFP are almost mirror reflections of each other. SDCC is a non-profit education corporation "dedicated to celebrating and promoting comics and the popular arts." (Doc. No. 381 at 17:4–7.) SDCC's main event is its Comic-Con Convention that takes over San Diego for four-days every July and draws famous actors to speak at panels, premieres major motion pictures, and allows fans to meet and congregate. (*Id*. at 19:18–20:25.)

At trial, DFP highlighted some unique aspects of their event—that SLCC is Mormon and family-friendly, that SLCC has a kid-friendly event called "Kid Con," and that DFP has a strong relationship with the U.S. Air Force. (Doc. No. 383 at 35:15–22, 36:12–19, 37:10–13.) These miniscule differences, however, do not detract from the overwhelming similarities that exist between SLCC and San Diego Comic-Con. In fact, DFP's motion does not attempt to contest this fact.

Instead, seeking to challenge the parallels between the two events at issue, DFP points the Court to *Entrepreneur Media, Inc. v. Smith*, 279 F.3d 1135, 1147–48 (9th Cir. 2002), to argue that similarity of services is afforded little weight when the trademark is descriptive. (Doc. No. 429-1 at 20.) However, DFP torpedoes their own claim as SDCC's trademarks are "incontestable" and not descriptive. Moreover, the mark at issue in *Entrepreneur*, was "Entrepreneur." *Id*. at 1138. Thus, in making the conclusion that similarity of services is afforded little weight when a mark is descriptive, the court was focusing on specific policy concerns such as the "broad societal interest in preserving common, useful words for the public domain." *Id*. at 1148. Presently, the mark "Comic-Con" is not a common or straightforward phrase. If the mark in this case had been "Comic Convention," the conclusion in *Entrepreneur* would have been more persuasive.

Succeeding on this factor is not difficult. *See Dreamwerks Prod. Grp., Inc. v. SKG Studio*, 142 F.3d 1127, 1131 (9th Cir. 1998) (indicating that a finder of fact could find

14-cv-1865-AJB-JMA

proximity where the plaintiff sponsored science fiction conventions and the defendant was a well-known movie studio because, among other things, consumers could easily suspect that the studio sponsored conventions at which its merchandise was sold); *see also Am. Int'l Grp., Inc. v. Am. Int'l Bank*, 926 F.2d 829, 832 (9th Cir. 1991) (stating that "[a]lthough the parties are not direct competitors," their respective financial services "may be sufficiently 'complementary' or 'related' that the public is likely to be confused as to the source of the services.") (citation omitted). Thus, as delineated above, there is sufficient evidence to support a reasonable jury's finding that the services are similar.

### c.     Similarity of the Marks

DFP contends that SDCC presented little to no evidence of how Comic-Con was used in the marketplace, separate from the eye logo mark and its "Comic Con International" trademark. (Doc. No. 429-1 at 20–21.) In opposition, SDCC argues that the jury is entitled to give greater weight to the dominant feature of a mark in determining likelihood of confusion. (Doc. No. 468 at 22.)

Here, SDCC's incontestable trademark is "Comic-Con" and DFP's mark is "Salt Lake Comic Con." Though DFP's mark uses a different font and has the geographic identifier in front of the phrase "Comic Con," the most salient feature of the mark is still "Comic Con." As SDCC has argued repeatedly, the jury is entitled to put more weight on the most prevalent part of the mark. *See Rearden LLC*, 683 F.3d at 1212 (explaining that the two logos were very different, but noted the prominence of the word "Rearden" in both marks when analyzing the similarity of the marks); *see also KP Permanent Make-Up, Inc.*, 408 F.3d at 603–04 (emphasizing that the court could look at the most "salient feature" of a logo mark).

DFP stresses that in determining the similarity of marks, the mark must be viewed as it is seen in the marketplace. (Doc. No. 429-1 at 20–21.) Accordingly, SDCC's failure to provide evidence of how "Comic-Con" is used in the marketplace, apart from "Comic Con International" or the eye logo, disproves confusion. (*Id*.) However, as already discussed *supra* p. 16, there is ample evidence of "Comic-Con" being used in the

marketplace. Moreover, as the Ninth Circuit has repeatedly expounded, similarities in marks "weigh more heavily than differences." *Alpha Indus., Inc. v. Alpha Steel Tube & Shapes, Inc.*, 616 F.2d 440, 444 (9th Cir. 1980) (citation omitted).

Thus, though reasonable minds could differ as to the conclusions to be drawn from the evidence presented, there is still sufficient evidence to support the jury's finding that the marks are similar.

### d. *Empirical Evidence of Confusion*

In one sentence, DFP contends that the paucity of alleged actual confusion instances, the absence of a confusion survey, and Dr. Kennedy's testimony, hold strongly against a likelihood of confusion. (Doc. No. 429-1 at 21.) The Court disagrees.

As already noted *supra* p. 14–15, the record at trial demonstrates that SDCC provided a multitude of instances of actual confusion. This evidence "that use of the two marks has already led to confusion is persuasive proof that future confusion is likely." *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 352 (9th Cir. 1979), *abrogated on other grounds by Mattel, Inc. v. Walking Mountain Prods.*, 353 F.3d 792 (9th Cir. 2003). Moreover, as already explained, a confusion survey is not required. Therefore, taking all the evidence in SDCC's favor, there is ample support for a fair-minded juror to conclude that actual confusion exists.[8] *See Nitco Holding Corp. v. Boujikian*, 491 F.3d 1086, 1089 (9th Cir. 2007) (highlighting that a Rule 50(b) motion preserves a challenge to the "sufficiency of the evidence to support the verdict in a civil case[.]").

///

---

[8] DFP argues that the amount of actual confusion presented at trial is miniscule compared to the 195,000 estimated attendees who visited SDCC's event. (Doc. No. 429-1 at 16, 21.) Mathematically, DFP is correct that the percentage of actual confusion is not altogether that high. However, the Court highlights that actual confusion is incredibly hard to garner. *See Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc.*, 618 F.3d 1025, 1035 (9th Cir. 2010). Thus, in this case, SDCC's ability to acquire so many instances of actual confusion, further enhances and boosts the jury's likelihood of confusion verdict in its favor.

### e. Marketing Channels Used

"Convergent marketing channels increase the likelihood of confusion." *Nutri/System, Inc. v. Con-Stan Indus., Inc.*, 809 F.2d 601, 606 (9th Cir. 1987).

DFP claims that this factor merits little weight as all companies use the Internet to market their products and events. (Doc. No. 429-1 at 22.) SDCC asserts that the internet is not the only shared marketing channel used by DFP. (Doc. No. 468 at 24.) Instead, according to SDCC, DFP also used traditional media, as well as billboards, both stationary and mobile. (*Id.*) Additionally, SDCC puts great emphasis on the fact that DFP brought an Audi R8 sports car to SDCC's event to serve as a mobile billboard. (*Id.*)

Given that both companies use the internet, the "shared use[] of the internet as a marketing channel is ubiquitous and, thus, does not shed much light on the likelihood of consumer confusion." *Groupion, LLC v. Groupon, Inc.*, 859 F. Supp. 2d 1067, 1077 (N.D. Cal. 2012) (citation omitted). To the extent the parties use other marketing channels, they do not overlap to any significant degree. Particularly, the record fails to illuminate that SDCC also uses mobile billboards, such as luxury cars to promote its event. Accordingly, the evidence in the record demonstrates that this factor weighs neutrally.

### f. Degree of Care Likely to be Exercised by the Purchaser

DFP asserts that the price of comic con tickets—$276.00—demonstrates that a buyer would exhibit a higher degree of care. (Doc. No. 429-1 at 22.) SDCC states in opposition that $276.00 is the cost of a four-day pass and that single day tickets are only $50–70 per day. (Doc. No. 468 at 24.) Thus, the degree of care of a consumer attending its comic convention is low. (*Id.*)

In analyzing this factor, "[c]ourts look to what the reasonably prudent purchaser, using ordinary caution, would do to distinguish between the two product lines." *Maxim Integrated Prods., Inc. v. Quintana*, 654 F. Supp. 2d 1024, 1034 (N.D. Cal. 2009). When goods are more expensive, the court assumes purchasers will exercise greater care. *E. & J. Gallo Winery v. Gallo Cattle Co.*, 967 F.2d 1280, 1293 (9th Cir. 1992).

The Court explicates that what is considered "inexpensive" vs. "expensive" in relation to a multi-day comic convention is a fluid concept. It is not as simple as determining that a $1000.00 pen is "expensive." Moreover, in light of the fact that the demand for San Diego Comic Convention tickets is well above supply, the Court leans towards finding that the event is not per se "expensive."

Nevertheless, despite this obscurity, this factor is "entitled to only minimal weight in this case" as "given the similarity of the parties' marks and relatedness of the goods on which those marks appear, even purchasers exercising a high degree of care would likely be confused, and some, in fact, have been confused." *Boldface Licensing %8F Branding v. By Lee Tillett, Inc.*, 940 F. Supp. 2d 1178, 1194 (C.D. Cal. 2013).

Thus, without reweighing the evidence or substituting the Court's view of the record in favor of the juries, this factor weighs neutrally.[9]

### g. *Defendants' Intent in Selecting the Mark*

The intent factor generally carries minimal weight because "an intent to confuse customers is not required for a finding of trademark infringement." *Id*. at 1195 (citation omitted). On the other hand, "intent to deceive is strong evidence of a likelihood of confusion" because, "[w]hen the alleged infringer knowingly adopts a mark similar to another's, reviewing courts presume that the defendant can accomplish his purpose: that is, that the public will be deceived." *Entrepreneur Media*, 279 F.3d at 1148 (citation omitted). Therefore, "[w]here an alleged infringer chooses a mark he knows to be similar to another, one can infer an intent to confuse." *Id*.

---

[9] DFP cites to *Mytee Prods., Inc. v. Shop Vac Corp*, No. 13cv1610, 2013 WL 5945060, at *5 (S.D. Cal. Nov. 4, 2013), and the court's statement that "Plaintiff's air movers appear to be priced at $199–$299 . . . and Defendant's air movers have a suggested retail price of $69.99–$79.99 . . . At these prices, the Court believes that the reasonably prudent consumer would exercise a high degree of care before making the purchase." (Doc. No. 429-1 at 22.) However, the record demonstrates that Mr. Kennedy testified that SLCC requires attendees to pay for photo-ops. (Doc. No. 376 at 22:6–15.) Thus, the Court finds this case unpersuasive as an SLCC attendee may end up paying the same if not more to attend SLCC.

DFP asserts that SDCC provided little to no evidence that demonstrated DFP's state of mind and the evidence that was produced did not illustrate intent. (Doc. No. 429-1 at 22–23.) The Court disagrees.

Below is just a small sampling of the evidence produced at trial that illustrates that DFP was aware that they were using SDCC's mark, adopted a mark similar to SDCC's trademarks, and through their own research, found out that SDCC had trademark rights in the subject marks.

1.) An email dated July 13, 2013, an entire year before SDCC sent DFP a cease and desist letter, where Mr. Brandenburg stated: "Obviously, Hijacking the comic con brand, having major media companies as partners and having $100,000-plus worth of celebrity guests is part of the magic formula." (Doc. No. 383 at 87:19–25.)

2.) Mr. Brandenburg's extensive research between January and April 2013 on Comic Con events. (*Id*. at 127:20–25.)

3.) DFP's research demonstrated that they were readily aware that SDCC owned trademarks for the term "Comic-Con" and knew that they were purportedly infringing on those marks as they received a cease and desist letter from SDCC. (*Id*. at 28:15–19; 87:8–13.)

Thus, drawing all reasonable inferences in SDCC's favor, there is adequate evidence to support the conclusion that DFP intended to select SDCC's mark. *See Boldface Licensing*, 940 F. Supp. 2d at 1195 (holding the intent factor weighed in favor of confusion as the defendant was "unquestionably aware" of the plaintiff's rights as they made initial trademark research that uncovered the plaintiff's registration, that the defendant had actual knowledge of the plaintiff's rights through the cease and desist letter they received, and that despite all of this the defendant "continued unabated" in rolling out its beauty products).

### h. Conclusion

The foregoing factors are not of equal importance and do not apply in every case. *See Thane Int'l Inc. v. Trek Bicycle Corp.*, 305 F.3d 894, 901 (9th Cir. 2002) ("The list of

factors is not a score-card – whether a party 'wins' a majority of the factors is not the point. Nor should '[t]he factors…be rigidly weighed; we do not count beans.'") (citation omitted). In this case, DFP has failed to show that the only reasonable conclusion permitted by the evidence on the record is that there is no likelihood of confusion between their "Salt Lake Comic Con" mark and SDCC's "Comic-Con" mark. Accordingly, DFP's motion for judgment as a matter of law as to likelihood of confusion in this respect is **DENIED**. *See Krechman v. Cty. of Riverside*, 723 F.3d 1104, 1109 (9th Cir. 2013) (holding that "[a] district court can grant a Rule 50(a) motion for judgment as a matter of law only if there is no legally sufficient basis for a reasonable jury to find for that party on that issue.") (citation omitted); *see also Lawson v. Umatilla Cty.*, 139 F.3d 690, 692 (9th Cir. 1998) ("Judgment as a matter of law is proper when the evidence permits a reasonable jury to reach only one conclusion.").

### iii. Likelihood of Confusion as to SDCC's Two Other Trademarks

DFP also argues that there is not enough evidence on the record to support the jury's finding that their "Salt Lake Comic Con" mark infringes SDCC's Comic Con International trademark and eye logo mark. (Doc. No. 429-1 at 24–25.) To support these arguments, DFP points to similar contentions already discussed at length by the Court in this Order. (*Id.*) SDCC contends that as each of its two other marks use the phrase "comic con," that the jury was entitled to give greater weight to this dominant feature in determining likelihood of confusion. (Doc. No. 468 at 25–26.) The Court agrees with SDCC.

The Court finds that it need not reiterate its exhaustive analysis of the *Sleekcraft* factors delineated in the foregoing eight pages. Instead, the Court finds that the analysis applied above equally applies to the two trademarks here. For clarity, however, the Court expounds the most vital points. Here, as to both of SDCC's other trademarks, there is the presumption of the strength of the marks as they are incontestable, the events remain identical, the similarity of the marks remains elevated as they all employ "Comic Con," SDCC produced substantial amounts of evidence of actual confusion, and SDCC

introduced evidence that DFP intended to select SDCC's marks knowing that they were registered with the United States Patent and Trademark Office.

Consequently, reviewing the record as a whole, the Court finds that there is a legally sufficient basis for a reasonable jury to find for SDCC as to likelihood of confusion in relation to these two trademarks. *See Jorgensen v. Cassiday*, 320 F.3d 906, 917 (9th Cir. 2003); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (explaining that judgment as a matter of law may be granted only where "there can be but one reasonable conclusion as to the verdict."); *Pavao v. Pagay,* 307 F.3d 915, 918 (9th Cir. 2002) ("A jury's verdict must be upheld if it is supported by substantial evidence, which is evidence adequate to support the jury's conclusion[.]"). Thus, DFP's motion for judgment as a matter of law as to likelihood of confusion in regards to SDCC's Comic Con International and Eye Logo trademarks is **DENIED**.

## CONCLUSION

DFP as the moving party, had an extremely "high hurdle" to meet on their motion for judgment as a matter of law. *Costa*, 299 F.3d at 859. Unfortunately, proceeding under a flawed misunderstanding of their burden and the Court's limited review process, and construing the evidence in the light most favorable to SDCC, there is substantial evidence to support the jury's verdict in regards to genericness and likelihood of confusion. Accordingly, the Court **DENIES** DFP's motion for judgment as a matter of law in its entirety.

**IT IS SO ORDERED**.

Dated:  August 23, 2018

Hon. Anthony J. Battaglia
United States District Judge