UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SAN DIEGO COMIC CONVENTION, a California non-profit corporation, | Case No.: 14-cv-1865-AJB-JMA |
| Plaintiff, | **ORDER DENYING DEFENDANTS' MOTION FOR NEW TRIAL OF VALIDITY AND INFRINGEMENT** |
| v. | |
| DAN FARR PRODUCTIONS, a Utah limited liability company, DANIEL FARR, an individual, BRYAN BRANDENBURG, an individual, | (Doc. No. 436) |
| Defendants. | |

After three years of litigation and a jury trial, Defendants Dan Farr Productions, Daniel Farr, and Bryan Brandenburg (collectively referred to as "DFP") present the Court with a Sisyphean task. Under the guise of a motion for new trial, the majority of DFP's motion seeks to relitigate issues thoroughly briefed, argued, and decided in the past. Specifically, DFP argues that a new trial should be allowed on three issues: (1) their naked licensing defense; (2) genericness; and (3) infringement. (*See generally* Doc. No. 436-1.) Plaintiff San Diego Comic Convention ("SDCC") opposes the motion. (Doc. No. 467.) On May 31, 2018, the Court held a hearing on the matter and then submitted the motion. (Doc.

No. 504.) Finding no reasons to support a new trial, the Court **DENIES** DFP's motion in its entirety. (Doc. No. 436.)

# BACKGROUND

The Court is already well-versed as to the events leading up to the institution of this action. Thus, for the purposes of this Order, the Court will only provide a narrow review of this lawsuit's factual and procedural background.

On August 7, 2014, SDCC filed a lawsuit against DFP alleging two causes of action: (1) Federal Trademark Infringement, 15 U.S.C. § 1114; and (2) False Designation of Origin, 15 U.S.C. § 1125(a). (*See generally* Doc. No. 1.) SDCC is a non-profit corporation, formed in 1975, that is dedicated to the awareness and appreciation of comics and related popular art forms. (Doc. No. 1 ¶ 10.) Every year since 1970, SDCC has produced and held its convention known as the "Comic-Con convention" in San Diego, California. (*Id.* ¶ 11; Doc. No. 97 at 9.)[1] The convention spans several days in length and showcases several hundred events, workshops, educational and academic programs, games, award shows, costume contests, as well as hosts panels of special guests that include science fiction and fantasy authors, film and television actors, directors, producers, and writers. (Doc. No. 1 ¶ 12; Doc. No. 97 at 9.) In 2016, attendance to San Diego Comic-Con exceeded over 135,000 attendees. (Doc. No. 97 at 9.)

SDCC's family of trademarks at issue in this case are:

1. Comic-Con;

2. Comic Con International;

3. Anaheim Comic-Con; and

---

[1] Page numbers refer to the CM/ECF number and not the number listed on the original document.



4.

(Doc. No. 1 ¶ 13; Doc. No. 244 at 11.) Each of these registered trademarks is incontestable. (Doc. No. 381 at 25:15–25.) Additionally, SDCC states that it has used these marks extensively and continuously in interstate commerce and thus the marks have become valuable assets as well as symbols of its goodwill and positive industry reputation. (Doc. No. 1 ¶ 15.)

In early 2013, Defendant Dan Farr Productions, a limited liability company, began to advertise and promote its own popular arts convention named "Salt Lake Comic Con" ("SLCC"). (Doc. No. 234-2 at 7; Herrera Decl. Ex. 5 ("Farr Depo." 11:4–9, Doc. No. 95-7).) Similar to SDCC's convention, SLCC is a three-day fan event featuring the best in movies, television shows, gaming, sci-fi, fantasy, and comic books. (Doc. No. 244 at 12.) Since 2013, SLCC has been held every year and in the beginning of 2014, Dan Farr Productions created its Salt Lake Comic Con FanXperience event, which has also been held every year since its inception. (Farr Depo. at 11:10–15; Doc. No. 97 at 11.)

Thus, the marrow of this case is whether DFP's comic arts and popular fiction event named "Salt Lake Comic Con" infringed on SDCC's three incontestable trademarks.[2] On December 8, 2017, after an eight-day jury trial, the jury found that DFP had indeed infringed on SDCC's family of trademarks. (Doc. No. 395 at 2–5.) As to unfair competition and false designation of origin however, the jury found in favor of DFP. (*Id*. at 6.) In total, the jury awarded corrective advertising damages to SDCC in the amount of $20,000.00. (*Id*. at 8.)

---

[2] The Court notes that after the trial, DFP changed the name of their event to "FanX Salt Lake Comic Convention." (Doc. No. 513 at 7–8.)

Post-trial, DFP filed four motions: (1) their motion for judgment as a matter of law, (Doc. No. 429); (2) the present motion, their motion for new trial of validity and infringement, (Doc. No. 436); (3) a motion for ruling on estoppel defense, (Doc. No. 508); and (4) their motion for ruling on unclean hands defense, (Doc. No. 510).

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 59, a new trial may be granted in an action in which there has been a trial by jury, for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the United States. Fed. R. Civ. P. 59(a)(1). As this circuit has noted, "Rule 59 does not specify the grounds on which a motion for a new trial may be granted[.]" *Zhang v. Am. Gem. Seafoods, Inc.*, 339 F.3d 1020, 1035 (9th Cir. 2003). Rather, the court is "bound by those grounds that have been historically recognized." *Id*. Three historically recognized grounds include, but are not limited to: (1) the verdict is against the weight of the evidence; (2) damages are excessive; or (3) the trial was not fair to the moving party. *Molski v. M.J. Cable, Inc.*, 481 F.3d 724, 729 (9th Cir. 2007). Additional grounds can be "errors in admission or rejection of evidence or instructions to the jury." *Montgomery Ward & Co. v. Duncan*, 311 U.S. 243, 251 (1940).

## DISCUSSION

DFP's motion for new trial is based on the following contentions: (1) DFP is entitled to a proper adjudication of their naked licensing defense; (2) that genericness should be retried; (3) that the expert linguist testimony was improperly excluded; (4) extensive media evidence was improperly excluded; (5) DFP should have been allowed to bring their defense of genericness *ab initio*; (6) SDCC promoted a false and legally flawed narrative because pre-1970 usage was excluded and requested instructions were not given; (7) the jury's validity verdict is against the weight of the evidence; and (8) infringement should be retried. (*See generally* Doc. No. 436-1.) SDCC challenges DFP on each contention. (*See generally* Doc. No. 467.)

As the majority of the foregoing issues have already been considered carefully and the remainder of the arguments do not demonstrate that the verdict is contrary to the clear

4

weight of the evidence or that there were errors made during trial, the Court finds a new trial unjustified. *See Murphy v. City of Long Beach*, 914 F.2d 183, 187 (9th Cir. 1990) (holding that the Court's review process in a motion for new trial is to "weigh the evidence . . . and to set aside the verdict of the jury . . . where, in [the Court's] conscientious opinion, the verdict is contrary to the clear weight of the evidence[.]") (citation omitted).

A.    It was Not Error to Reject Evidence of DFP's Naked Licensing Defense

DFP asserts that asking them to proffer evidence of their naked license defense in a motion in limine is reversible error. (Doc. No. 436-1 at 7.) Specifically, DFP contends that a motion in limine is not the proper vehicle for seeking a dispositive ruling on a claim. (*Id.*) The Court finds that DFP's arguments suffer from a glaring oversight. Most notably, that this defense was presented and analyzed in DFP's summary judgment motion and ultimately denied. Thus, DFP was provided the chance to properly support their naked license defense, but they failed to do so.

 "[N]aked licensing may result in the trademark ceasing to function as a symbol of quality and controlled source." *Barcamerica Int'l USA Trust v. Tyfield Imps., Inc.*, 289 F.3d 589, 596 (9th Cir. 2002) (citation and internal quotation marks omitted). Consequently, though a trademark owner may license the use of its trademark, "where the licensor fails to exercise adequate quality control over the licensee, a court may find that the trademark owner has abandoned the trademark, in which case the owner would be estopped from asserting rights to the trademark." *Id*. (citation and internal quotation marks omitted). The proponent of a naked license theory faces a stringent standard of proof. *See Taco Cabana Int'l, Inc. v. Two Pesos, Inc.*, 932 F.2d 1113, 1121 (5th Cir. 1991); *FreecycleSunnyvale v. Freecycle Network*, 626 F.3d 509, 514 (9th Cir. 2010).

Moreover, "[w]hether express or implied, a license is a contract governed by ordinary principles of state contract law." *Foad Consulting Grp., Inc. v. Azzalino*, 270 F.3d 821, 828 n.11 (9th Cir. 2001). Most relevant for the Court's purposes is that "[s]ilence in the face of an offer is not an acceptance, unless there is a relationship between the parties

14-cv-1865-AJB-JMA

or a previous course of dealing pursuant to which silence would be understood as acceptance." *S. Cal. Acoustics Co. v. C.V. Holder, Inc.*, 71 Cal. 2d 719, 722 (1969).

As noted above, DFP first brought this defense in their motion for summary judgment. ████████████████████████████████████████████████
█████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████
███████████████████████████████████████████████████████
██████████████████████████████████████████████████
█████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████
████████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
█████
In addition, DFP introduced several internal communications between SDCC employees. (Doc. No. 263 at 27–28.)

Taken cumulatively, the Court found that DFP had "failed to meet the 'stringent' standard required to prove abandonment of trademark rights" through a naked license. (*Id.* at 26–29.) Moreover, this Court also delineated that DFP had failed to demonstrate that ████████████████████████████████████████████████████████
████████████████████████████████ As a result, the Court denied DFP's motion for summary judgment on this subject. (*Id.* at 26–29.)

6

DFP was then granted a second chance to offer evidence of a naked license after the issue was presented at the pretrial conference. (Doc. No. 265 at 9:11–11:25.) The pertinent parts of that conversation with Mr. Sears are as follows:

> **The Court**: Okay. Then we've got the abandonment defense which I preserved or allowed to go forward . . . I mean, had the Plaintiff, frankly, set it up as an affirmative motion for judgment, and I was assured I had all the Defendants' side of it, I'd probably have granted it if this is all we've got. What I'm concerned about at this point --I mean, what I saw in the attempts to gain judgment on that was something far short of a license agreement having been reached. Is there going to be more evidence on that point for the jury? Because, if not, we're going to waste a lot of time and energy on something I don't think you're going to pass a rule fifty motion on.
> **Mr. Sears**: So the evidence consists of--the short answer is I'd have to go back and review the summary judgment papers to ensure everything was in there.
> . . .
> **The Court**: We could take it up as part of the in limine hearing, without it counting against anyone since I am pushing the issue.
> . . .
> **Mr. Sears:** If the Court is open to it, what we'd do is prepare a formal proffer document and submit that in advance of the MIL hearing.
> **The Court:** That would be very helpful in terms of making sure there is evidence to go to the jury[.]

(*Id.*)

The formal proffer document provided by DFP highlighted the same letters and emails referenced above. However, in an attempt to fortify their belief that a license was created, DFP argued that SDCC's silence on the heels of its "threatened immediate or vigorous enforcement," was "intentionally misleading," *Hottel Corp. v. Seaman Corp.*, 833 F.2d 1570, 1574 (Fed Cir. 1987), and thus gave SDCC a "duty to speak[,]" *Scholle Corp. v. Blackhawk Molding Co., Inc.*, 133 F.3d 1469, 1472 (Fed. Cir. 1998). (Doc. No. 344 at 6.) Further, DFP asserted that an "implied license may arise by … acquiescence; permission or lack of objection is …equivalent to … license[.]" (*Id.* (citing *I.A.E., Inc. v. Shaver*, 74 F.3d 768, 775 (7th Cir. 1996); *Winbond Elec. Corp. v. ITC*, 262 F.3d 1363, 1374 (9th Cir. 2001)).

Not surprisingly, DFP concocted the foregoing assertions by cherry-picking selective phrases from inapplicable cases in order to come to a conclusion that benefits their defense. The Court notes that the court in *Hottel Corp.*, was analyzing an intentionally misleading affirmative defense in a patent infringement context, 833 F.2d at 1574, and *Scholle Corp.*, dealt with an equitable estoppel defense in a patent infringement case, 133 F.3d at 1472. Moreover, *Shaver* was analyzing the aspects of the transfer of copyright ownership through an exclusive license, 74 F.3d at 774–75, and *Winbond* is a case dealing with an implied license for a patented invention, 262 F.3d at 1374. It is almost palpable how unpersuasive and inapplicable these cases are in the context of DFP's naked license defense.

In sum, the Court did not rule on DFP's defense in a motion in limine. Instead, the record demonstrates that DFP failed to provide sufficient evidence at the summary judgment stage and in their formal proffer document to persuade this Court that their naked license defense should be brought before the jury.

Additionally, the Court was in its discretion to ask DFP to make an "offer of proof" before heading to trial with this defense pursuant to Federal Rule of Evidence 103. *See* Fed. R. Evid. 103(a)(2) ("[I]f the ruling excludes evidence, a party informs the court of its substance by an offer of proof, unless the substance was apparent from the context."). Moreover, offers of proof in the motion in limine context are regularly used by courts in this circuit. *See e.g.*, *United States v. Williams*, 791 F.2d 1383, 1387 (9th Cir. 1986); *United States v. Dorrell*, 758 F.2d 427, 430 (9th Cir. 1985) ("Accordingly, we have in the past allowed the district court to determine the admissibility of the necessity defense by motions in limine."); *United States v. Contento-Pachon*, 723 F.2d 691, 693 (9th Cir. 1984).

Consequently, as explicitly delineated above, DFP's belief that they are entitled to a proper adjudication of their naked license defense is farcical when viewed in light of the record. Thus, DFP's motion for new trial in this regard is **DENIED**.

///

///

DFP requests that the Court retry genericness based on two points: (1) due to the Court's purported misinstruction to the jury; and (2) the Court's allegedly improper exclusion of testimony relating to third-party competitive use. (Doc. No. 436-1 at 8–10.)

### i.    The Court Did Not Misinstruct the Jury

DFP takes issue with the following jury instruction:

> When determining whether a mark is generic you may consider, in no particular order, the following: how the media uses it; how the plaintiff uses it; use by competitors; and consumer surveys. These are just examples of the types of evidence you may consider in evaluating how the term is understood by the consuming public.
> Third party use of a trademark would not, by itself, establish that a trademark is generic. This is because a trademark owner is not obligated to pursue enforcement measures against every infringing use of its trademark.

(Doc. No. 394 at 22.) DFP then points to the Court's following statement in regards to third-party use to determine genericness:

> I think [third-party use] can. I don't think it's a never and always, that it can never establish, or it can never establish a trademark is generic. Indeed, there would be circumstances where it could. I'm just thinking about structure and how the model forms tend to address these issues.

(Doc. No. 402 at 48:7–11.)

Putting the instruction together with the Court's own statement, DFP seeks to contend that the instruction communicated to the jury that competitive use is inadequate to establish genericness, which DFP argues the Court acknowledged is incorrect. (Doc. No. 436-1 at 9.) Moreover, DFP asserts that by commenting on the sufficiency of competitive use in a negative manner, the Court signaled to the jury that competitive use is weaker evidence of genericness than the rest. (*Id.*) The Court disagrees with DFP on both points.

Here, DFP wishes to piggyback off a statement the Court made while deliberating the exact phrasing of the foregoing jury instruction. However, these arguments miss the mark as they do not demonstrate that the instruction was erroneous. The Court notes that cases from this district, cases DFP have themselves cited to repeatedly, hold that third-

9

party use is but one factor in determining genericness. *See CG Roxane LLC v. Fiji Water Co. LLC*, 569 F. Supp. 2d 1019, 1027–28 (N.D. Cal. 2008) (determining a mark's genericness by not only analyzing competitors' use of the phrase, but also looking to the popular press' use of the mark); *see also Moroccanoil, Inc. v. Marc Anthony Cosmetics, Inc.*, 57 F. Supp. 3d 1203, 1212 (C.D. Cal. 2014) (highlighting that courts "look to a plaintiff's own use, dictionary definitions, use by competitors, media usage, trade usage, and customer surveys" to determine genericness) (citation omitted). DFP provides no case law to demonstrate the opposite.

Moreover, DFP's assertion that the instruction signaled to the jury that competitive use is a weaker element than the rest is neither supported by the record or case law. This assertion is simply a self-serving theory concocted by DFP.

Further, the final statement in the jury instruction—that lack of enforcement is irrelevant—is not an error of law in genericide cases. Defendants cite to *Horizon Mills Corp. v. QVC, Inc.*, 161 F. Supp. 2d 208, 214 (S.D.N.Y. 2001), to argue that a trademark owner's failure to police its mark, resulting in widespread usage by competitors, is one of the fundamental processes by which the public's appropriation of the mark is set in motion. (Doc. No. 436-1 at 9.) It is true that the Ninth Circuit holds that genericide can occur "as a result of a trademark owner's failure to police the mark, resulting in widespread usage by competitors[,]" which can then lead to a "perception of genericness among the public[.]" *Freecycle Network, Inc. v. Oey*, 505 F.3d 898, 905 (9th Cir. 2007) (citation omitted).

However, DFP mischaracterizes the Court's instruction. Here, the Court was articulating that a trademark holder in exercising its rights is not required by law to sue every single person or company that infringes on its mark. *See Fitbug Ltd. v. Fitbit, Inc.*, 78 F. Supp. 3d 1180, 1186 (N.D. Cal. 2015) (explaining that a "trademark holder is 'not required to constantly monitor every nook and cranny of the entire nation and to fire both barrels of [its] shotgun instantly upon spotting a possible infringer.'") (citation omitted); *see also Elizabeth Taylor Cosmetics Co., Inc., v. Annick Goutal*, 673 F. Supp. 1238, 1248 (S.D.N.Y. 1987) ("Because a trademark owner is not required to act against every

infringing use no matter how inconsequential at risk of losing his rights, the inconsequential infringement shown here does not strip Annick Goutal's Passion mark of its protectability.") (internal citation omitted); *Sara Lee Corp. v. Kayser-Roth Corp.*, 81 F.3d 455, 462 (4th Cir. 1996) (A trademark owner need not sue "until the likelihood of confusion looms large.") (citation and internal quotation marks omitted).

In sum, the Court finds the jury instruction at issue is a correct statement of the law.

### ii.    *Exclusion of Testimony Relating to Competitive Third-Party Use*

Next, DFP takes issue with the Court's decision that prohibited them from introducing third-party witness testimony that would have purportedly demonstrated that "Comic Con" refers to other conventions. (Doc. No. 436-1 at 9–10.) The relevant portions of the record that DFP refers to are from the cross-examination of Mr. Powers, which is as follows:

> By Mr. Sears:
> Q You lived for a while in New York?
> A Yes, I have lived in the New York metropolitan area since I graduated college in 2005.
> Q Have you ever attended the New York Comic-Con?
> A Yes.
> Q How many times?
> A Five times.
> Q Okay. And have you--while you've been at New York Comic-Con, have you heard New Yorkers referring to New York Comic-Con simply as Comic-Con?
> Ms. Herrera: Objection. Hearsay.
> The Court: Sustained.
> . . .
> Mr. Sears: Am I allowed to inquire as to what he has heard people say?
> The Court: Well, it's pretty broad as you've phrased it, so no.
> Mr. Sears: Am I allowed to inquire whether he's heard people refer to New York Comic-Con as Comic-Con?
> The Court: Not unless we can identify a source and they're subject to being called as witnesses. No, it's hearsay.

(Doc. No. 405 at 23:19–24:17.)

Inexplicably, DFP ignores the hearsay objection and instead their motion leaps to the conclusion that the exclusion of the above-mentioned testimony is "prejudicial error." (Doc. No. 436-1 at 10.) DFP's reply brief is equally unhelpful as it only argues that Mr. Powers' statement is not hearsay as DFP only sought to question Mr. Powers as to what he had himself heard. (Doc. No. 473 at 5.) Based off of the record and the question asked by defense counsel, the Court disagrees with DFP's characterization of their questioning. Accordingly, this argument is dead in its tracks.

Further, DFP asserts that Mr. Glanzer's testimony was improper. (*Id.*) Specifically, DFP argues that as Mr. Glanzer was able to testify as to why SDCC calls itself "Comic Con," they to should have been able to present third-party testimony about why they use "Comic Con." (*Id.*) However, the Court excluded this testimony. (*Id.*) Mr. Glazer testified that:

> Q. In the Mid-1980s, what was the official name of the convention?
> A. San Diego Comic Con.
> Q. In connection with the radio advertising that San Diego Comic Convention did in the Mid-To Late-1980s when you were involved, did you always refer to your convention as San Diego Comic Con?
> A. No.
> Q. How else did you refer to it?
> A. Comic Con.
> Q. Why?
> Mr. Katz: Objection.
> The Court: Overruled.
> The Witness: Because that's who we are. I mean, people called us Comic Con. We called ourselves Comic Con. It was Comic Con.
> Mr. Katz: Objection. Lacks Foundation.
> The Court: Overruled. This is within your personal knowledge?
> The Witness: Oh, Yeah. I mean yes.

(Doc. No. 381 at 66:18–67:12.)

The record demonstrates that the Court's so-called "exclusion" of Mr. Solberg was for the following reasons:

> **The Court:** No. I think the fact he has adopted that name and has been using it for 15 years in some form or fashion goes to the Defendants' genericness

case, as we stand here today. His whole thought process and so forth--He is going to say it's generic, and then we get into this hybrid of expert opinion. So he picked the name, he is using it. That's good enough.

**Mr. Veverka:** I was going to ask him to list the other comic cons that he is aware of.

**The Court:** We've already done that so many times. Is there something that he can list we haven't seen on the three lists or heard from the other six or seven witnesses?

**Mr. Veverka:** I think that he personally attended Chicago Comic Con and Motor City Comic Con when he was a young boy in the '90s.

**The Court:** I don't see how that is relevant. We all know they are out there. His personal experience really is related to he developed a convention and called it phoenix Comicon, one word . . . other than that, I don't see a whole lot of value. A lot of it would be cumulative, or cross into the expert opinions.

(Doc. No. 398 at 65:10–66:9.)

Similar to the arguments above, DFP makes no reference to the reasons Mr. Solberg's testimony was excluded. Instead, DFP resorts to a legally baseless argument: that since SDCC was allowed to testify about its use of the phrase "Comic Con," that they should have been able to as well. This argument falls flat when viewed in light of the record. Accordingly, the Court finds no error in excluding certain parts of Mr. Solberg's testimony based on relevance, lack of foundation, and finding it cumulative. In sum, as a whole, the Court disagrees that it was error for it to exclude testimony relating to competitive third-party use.

## C.   The Expert Linguist Was Properly Excluded

DFP also asserts that the Court's exclusion of expert linguist Jeffrey Kaplan was an abuse of discretion for the following reasons: (1) Mr. Kaplan's report was reliable; (2) Mr. Kaplan explained his "sound" methodology; and (3) the Court did not support or explain its ultimate conclusion. (Doc. No. 436-1 at 10–15.) SDCC mounts in opposition that Mr. Kaplan was properly excluded while also asserting that DFP's motion on this point is improper as they have not presented any new evidence and a motion for new trial is not the time to ask the Court to re-litigate old matters. (Doc. No. 467 at 20.) The Court agrees with

SDCC and finds this motion is really a motion for reconsideration. Nevertheless, for DFP's benefit, the Court reiterates why Mr. Kaplan was properly excluded.

Federal Rule of Evidence 702 governs the admissibility of expert testimony. It states:

> [a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: **(a)** the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; **(b)** the testimony is based on sufficient facts or data; **(c)** the testimony is the product of reliable principles and methods; and **(d)** the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. "The party offering the expert bears the burden of establishing that Rule 702 is satisfied." *Sundance Image Tech., Inc. v. Cone Editions Press, Ltd.*, No. 02 CV 2258 JM (AJB), 2007 WL 935703, at *4 (S.D. Cal. Mar. 7, 2007).

The first criterion of Section 702 is that the testimony must be based upon "sufficient facts or data[.]" Fed. R. Evid. 702(b). This criterion is generally a "quantitative rather than qualitative analysis" of the quantum of facts or data relied upon by the expert and must be sufficient to support the opinions expressed. *See* Fed. R. Civ. P. 702 advisory committee's note to 2000 amendment. "In addition to a sufficient quantity of data, the expert must obtain the right kind of data to support the conclusions drawn." *In re Canvas Specialty, Inc.*, 261 B.R. 12, 20 (C.D. Cal. 2001).

The Court first addresses DFP's assertion that the Court's criticisms of Dr. Kaplan's documentary record could not justify exclusion. (Doc. No. 436-1 at 12.) Courts have routinely held that a parties' involvement in the collection of evidence "impacts the weight of the evidence, but does not render [an] expert opinion inadmissible." *Stone v. Advance Am.*, 278 F.R.D. 562, 566–67 (S.D. Cal. 2011) (holding that an expert opinion was admissible despite the fact that the plaintiffs' counsel had extensive involvement in designing the research method that created a simplistic log form). However, DFP ignores the fact that the Court did not simply exclude Mr. Kaplan because the majority of the documents he utilized in his report were provided to him by DFP.

Instead, as the Court explicated in its Order, one of the reasons that warranted

exclusion was that Mr. Kaplan did not clearly explain the "methodology" he employed to justify his conclusions. DFP claims that Mr. Kaplan's report is "replete with explanation and justification." (Doc. No. 436-1 at 14.) For example, DFP points to the following statements:

1) "Below I offer linguistic evidence supporting my opinion that the expression 'comic con' was generic at the time the above-captioned law suit was filed, and is currently generic[.]" (Doc. No. 114-2 at 127:12–14.)

2) "If 'comic con' occurs in ways characteristic of common, but not proper, nouns, in the utterances of many 'speakers,' that is evidence for the common noun status of 'comic con.'" (*Id*. at 129:14–16.)

3) "Clippings are coined for economy, in informal speech and writing, when the longer word from which they are reduced is well-known and in frequent use. Sometimes the original word becomes forgotten, with the clipped form effectively replacing it." (*Id*. at 133:19–134:2.)

4) "Therefore, the capitalization evidence is useful only up to a point. One reliable general rule is that proper nouns must be capitalized. Common nouns generally are not, but there are plenty of exceptions, as well as variation across writers. Given the rule that proper nouns must be capitalized, it is no surprise that the comic con websites, advertising their event by name, all use upper case for 'Comic Con.'" (*Id*. at 146:20–24.)

From this small sampling, it is clear that Mr. Kaplan defines various rules, makes conclusions, and deduces several factors about common noun status, syntax, and capitalization of common nouns. However, how is the Court to determine that this methodology is sound? Moreover, how is the Court sure that Mr. Kaplan "utilized the methods and methodology that would generally and reasonably be accepted" by experts in trademark infringement cases dealing with genericide? *Daubert v. Merrell Dow Pharm., Inc.*, 43 F.3d 1311, 1316 (9th Cir. 1995); *see also United States v. Amaral*, 488 F.2d 1148, 1153 (9th Cir. 1973) (explaining that this circuit has outlined four criteria to determine the

helpfulness of expert testimony: "1. qualified expert; 2. proper subject; 3. conformity to a generally accepted explanatory theory; and 4. probative value compared to prejudicial effect."); *SMS Sys. Maintenance Servs., Inc. v. Digital Equip. Corp.*, 188 F.3d 11, 25 (1st Cir. 1999) ("Not only did Dr. Bleuel fail . . . but he failed to explain whether the information-gathering technique used in the DEC documents was valid, whether the data was sufficiently representative to permit him to draw any relevant conclusions, and whether the sampling methodology used to compile these documents corresponded to methods that might be considered legitimate in his discipline.").

Furthermore, though Mr. Kaplan concludes that "Comic-Con" denotes a type and is thus generic, he makes this conclusion without making any explicit reference to the primary significance test. It is without question that the Ninth Circuit employs the primary significance test in determining genericness. *Official Airlines Guides, Inc. v. Goss*, 6 F.3d 1385, 1391 (9th Cir. 1993). Notwithstanding this, Mr. Kaplan's report states that "plural use of 'comic con' is strong evidence" that it is a <u>common noun</u>, the use of "con" to mean "comic con" is strong evidence that use of "comic con" is as a <u>common noun</u>,[3] and that comic con being used after "the" to refer uniquely to different comic cons are co-occurrence facts that are substantial evidence for the <u>common noun</u> status of "comic con." (Doc. No. 91-2 at 9, 13, 19.) As the court in *Yellow Cab Co. of Sacramento v. Yellow Cab Co. of Elk Grove, Inc.*, No. CIV. S-02-0704 FCD DAD, 2006 WL 5516883, at *2 (E.D. Cal. Dec. 11, 2006), stated: "One of the jury's roles . . . is to determine, from the facts and evidence presented to them, whether the <u>relevant consuming public uses</u> the term [] in a generic sense." Mr. Kaplan's conclusions fail to assist the jury in this function.

Finally, the "general test for the admissibility of expert testimony is whether the jury can derive 'appreciable help' from such testimony. That determination, which necessitates balancing the probative value of the tendered testimony against its potential prejudicial

---

[3] The Court notes that Mr. Kaplan's separation of SDCC's mark "Comic-Con" in his report goes against Ninth Circuit precedent as discussed *infra* pp. 22–23.

effect, is committed to the broad discretion of the district court[.]" *United States v. Turner*, 528 F.2d 143, 166 (9th Cir. 1975). Mr. Kaplan himself states that the grammatical concepts he uses to analyze the data "are probably familiar to most readers" and that the semantic concepts and terminology are "straightforward." (Doc. No. 91-2 at 5, 6.) Taking this into consideration, the Court is unsure how his expert report would have been helpful to the jury in determining the primary significance of "comic con" to the relevant public. Additionally, in Mr. Kaplan's report, the defense had him examine a multitude of media references to comic conventions and then form his personal opinion that "Comic Con" is generic. Those same articles were produced at trial and the jury was asked to do the very same thing that Mr. Kaplan did. Thus, it required no expertise. As Bob Dylan says "you don't need a weatherman to know which way the wind blows."

In sum, at the outset, Mr. Kaplan's report is circumspect as he "cannot forgo his own independent analysis and rely exclusively on what an interested party tells him." *Orthoflex, Inc. v. ThermoTek, Inc.*, 986 F. Supp. 2d 776, 798 (N.D. Tex. 2013). Combining this finding with the fact that Mr. Kaplan's report fails to reference the primary significance test and that he does not explain how his methodology is generally accepted by professionals who deal with genericide in trademark cases, the Court again concludes that Mr. Kaplan's report is unreliable. *See Munoz v. Orr*, 200 F.3d 291, 301–02 (5th Cir. 2000) ("Finally, Dr. Benz relied on the plaintiffs' compilations of data, which gives rise to a 'common-sense skepticism' regarding the expert's evaluation, and did not seek to verify the information presented to him. Taken cumulatively, the problems with Dr. Benz' expert evidence indicate that his expert testimony could be unreliable.").

Accordingly, the Court **DENIES** DFP's motion for new trial so that genericness be retried with Mr. Kaplan as an expert. *See Daubert v. Merrell Dow Pharm.*, 509 U.S. 579, 597 (1993) ("We recognize that, in practice, a gatekeeping role for the judge, no matter how flexible, inevitably on occasion will prevent the jury from learning of authentic insights and innovations."); *see also Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999) ("Rather, we conclude that the trial judge must have considerable leeway in

deciding in a particular case how to go about determining whether particular expert testimony is reliable."); *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 982 (9th Cir. 2011) ("A trial court has broad latitude not only in determining whether an expert's testimony is reliable, but also in deciding how to determine the testimony's reliability."); *Sargon Enter., Inc. v. University of S. Cal.*, 55 Cal. 4th 747, 770 (2012) ("An expert opinion has no value if its basis is unsound. [] Matter that provides a reasonable basis for one opinion does not necessarily provide a reasonable basis for another opinion . . . a court must determine whether the matter that the expert relies on is of a type that an expert reasonably can rely on 'in forming an opinion *upon the subject to which his testimony relates.*'") (internal citation omitted) (emphasis in the original).

D.    Extensive Media Evidence

DFP's motion takes issue with the Court's decision to exclude the content of the various news articles they produced at trial to demonstrate that "Comic-Con" is generic. (Doc. No. 436-1 at 15–17.) At trial, only the titles of the articles were allowed to be presented to the jury. (*Id.*) In opposition, SDCC argues that the evidence was properly excluded under Rule 403. (Doc. No. 467 at 23–25.) Moreover, SDCC highlights that the content of some of those articles contained classic examples of hearsay. (*Id.*) The Court agrees with SDCC.

For clarity, the relevant portions of the record are as follows:

1)  "Hold on. Objection sustained. His understanding as to the contents is not coming into evidence. It would bring in the hearsay that's otherwise been ruled out. So we are looking at the effect upon the listener or upon the viewer of how the words comic con were used in the media at the time. To take the exhibit beyond that is not allowable." (Doc. No. 383 at 7:6–11.)

2)  "No. You can have the title for its effect upon Mr. Brandenburg at the time he viewed it, and just so we know who's talking or where it appeared, you can have the publication information. Content of the document is hearsay. And in

balance, I find that the contents, whether they may have some relevance, is outweighed by--under Rule 403 so—

. . .

The Court: Yeah, he may be. But he's not here to testify. He's not subject to cross-examination. I'm not going to allow this . . . These have a limited purpose for admission and that is effect upon the listener during the time he was considering having his own event as to how the press was conveying comic con, not the interviewees[.]" (*Id.* at 8:6–25.)

In their motion, instead of arguing that a certain exception to hearsay exists that would allow the introduction of their testimony, DFP focuses on arguing that media evidence is particularly strong evidence in support of genericness, that by limiting DFP to news article headlines the "Court left open to inference what the content would have made plain[,]" and that the media articles should have been admitted with redactions. (Doc. No. 436-1 at 15–17.) In light of the record, DFP's arguments are entirely futile. Moreover, the Court notes that DFP provided the jury an assemblage of article titles. (*See* Trial Exhibits 771–807, Doc. No. 392.) Thus, any further news articles would have been cumulative.

Accordingly, without more, DFP simply argues that the Court was wrong in its decision while relying on self-serving assumptions and conclusions rather than actual facts supported by evidence. Consequently, DFP's motion for new trial to admit the contents of the articles is **DENIED**.

E.    Genericness *Ab Initio* Should Not Have Been Introduced as a Defense

DFP argues that they should have been able to bring into evidence that "Comic-Con" was used pre-1970s to demonstrate that "Comic Con" is "generic ab initio." (Doc. No. 436-1 at 19–26.) Explicitly, DFP spends two pages arguing that the Court has changed its treatment and understanding of their generic ab initio defense. (*Id.* at 17–18.) The Court rejects every argument DFP presents.

As an initial matter, the Court elucidates that it has been DFP who has varied their treatment and use of this defense depending on what motions they were opposing or what

19

evidence they desired to exclude. It is unquestionable that DFP first brought up generic ab initio in their motion for summary judgment as an avenue to dispose of SDCC's Teflon survey. (*See* Doc. No. 244 at 23–25 ("But surveys are not needed to determine 'whether a term was generic before it was applied as a trademark to the products in question'—i.e., in a non-genericide case.").) Then during motion in limine proceedings, DFP changed course and sought to use their supposed pre-1970s evidence of genericness to argue that the Court should apply no temporal cutoff to genericness evidence or exclude all evidence on post-2013 genericness. (*See generally* Doc. No. 314-1.) Now, DFP resuscitates this defense to attempt to demonstrate that SDCC never should have gotten trademark rights in "Comic-Con" as the mark was generic before SDCC first used it. (Doc. No. 436-1 at 17–27.)

A sampling of the evidence DFP produces in their motion to illustrate that SDCC's trademarks are "generic ab initio" are: (1) The evidence of the 1964 New York Comicon; (2) that in the 1930s "con" came into use, especially among comic fans; (3) Worldcon which dates back to 1939; (4) SDCC publications that elaborate on the origin of comic cons and that comic con was coined by Bernie Bubnis in 1964; (5) evidence of "fanzines" called "The Comicollector," "The Comic Reader," and "Comicdom"; (6) the fanzines that "show that 'comic con' was already in circulation within comic fandom as a generic term before SDCC came along."; (7) A cross-country Greyhound bus called the "Traveling Comicon"; (8) issues of the Comic Reader titled "N.Y. COMIC CON-mitttee REPORT" and "To Be or Not To Be – The Comicon"; (9) an issue of the New Yorker that stated "and it was this organization that sponsored the convention, officially known as the second annual ComiCon, or Con."; and (10) the Oxford English Dictionary definition of "con"—"among enthusiasts of science fiction and role-playing games: a convention, an organized gathering of people with a shared interest." (Doc. No. 436-1 at 20–26.)

Despite the foregoing, the Court is still unpersuaded that Ninth Circuit precedent allows for a generic ab initio defense to an incontestable trademark. Additionally, even if the defense was proper for trial, the Court again finds that all of the evidence taken together is insufficient.

First, it is not clear in the statute and case law does not demonstrate that "generic ab initio" is a defense to an incontestable trademark registration. In *Pods Enterprises, Inc. v. U-Haul Int'l, Inc.*, No. 8:12-cv-0179-T-27MAP, 2015 WL 1097374, at *3 (M.D. Fla. Mar. 11, 2015), the court was presented with the generic ab intio defense. However, though the court in *Pods* recognized the issue, it also acknowledged the lack of circuit authority. *Id.* at *2. Ultimately, the court never explored the matter, arguing that even "assuming that an incontestable trademark can be cancelled on the ground it was generic when adopted" the defendant had failed to show that the evidence was legally insufficient for a jury to find for the plaintiff on the issue. *Id.*

At the motion hearing, DFP argued that the statutory interpretation of 15 U.S.C. § 1065(4) allows for cancellation of a trademark based on generic ab initio grounds. Specifically, DFP stated that in the case of an incontestable mark, there is a difference in the statutory treatment. (Unofficial Transcript of Motion Hearing at 31:1–3, May 31, 2018.) According to DFP, subdivision four prevents a generic ab initio mark from becoming incontestable to begin with. (*Id.* at 31:4–10.) Explicitly, DFP represented to the Court that § 1064 "allows for cancellation of a mark, quote, at any time if the registered mark becomes the generic name for the goods or services[.]" (*Id.* at 30:15–17.)

DFP mischaracterizes subdivision four of § 1065. Subdivision four states that "no incontestable right shall be acquired in a mark which is the generic name for the goods or services or a portion thereof, for which it is registered." 15 U.S.C. § 1065(4). Thus, despite DFP's assertions, the statute does not make a distinction between genericness and generic ab initio. Instead the statute simply repeats the well-established tenet that a trademark cannot become incontestable if it is the generic name for the goods or services.

Next, the most crucial defect is that DFP's pre-1970s evidence is neither relevant nor sufficiently demonstrates generic ab initio. What the Court finds most unavailing is that the evidence does not illustrate that a consumer seeing the mark "Comic-Con" in the 1960s would have thought that the trademark described a comic-convention—specifically a convention that resembles the nature of SDCC's "Comic-Con" brand. Instead, DFP

endeavors to divert the Court's attention to events called "Comicon," "Comicdom," "Traveling Comicon," and the 1968 New York Comicon. (Doc. No. 436-1 at 23–25.) However, though these phrases closely mirror the trademark at issue in this case, they do not demonstrate that "Comic-Con" was generic pre-1970. Moreover, DFP fails to provide any case law to successfully argue that a trademark may be deemed generic based on marks that closely resemble the trademark at issue. *See Pods Enter.*, 2015 WL 1087374, at *3 ("Particularly relevant evidence to claims of genericness *ab initio* includes dictionary definitions and <u>usage of the term</u> by the media, industry, competitors, and holder of the mark.") (emphasis added).

Furthermore, DFP advances this assertion based on a fundamental misunderstanding of trademark law. In the Ninth Circuit, when making a genericism analysis, the court should look at the entire mark rather than dissecting it into its smaller parts. *See Filipino Yellow Pages, Inc. v. Asian Journal Publ'ns., Inc.*, 198 F.3d 1143, 1149–50 (9th Cir. 1999); *see also Boston Duck Tours, LP v. Super Duck Tours, LLC*, 531 F.3d 1, 18–19 (1st Cir. 2008) (holding that a "complete phrase may signify something different than the sum of its parts[,]" thus, the district court erred by focusing on the separate terms "duck" and "tours" and not the entire phrase together); *Alpha Indus., Inc. v. Alpha Steel Tube & Shapes, Inc.*, 616 F.2d 440, 444 (9th Cir. 1980). Thus, DFP's evidence that demonstrates that "con" was used pre-1970s to refer to conventions is unconstructive within the context of this case.

DFP briefly claims that the Ninth Circuit expressly approves the use of dictionary definitions of "component parts of the mark." (Doc. No. 436-1 at 27.) However, DFP again sifts out and hand-picks statements from cases that benefit them without reading the entire case. In *Advertise.com, Inc. v. AOL Advertising, Inc.*, 616 F.3d 974, 977 (9th Cir. 2010), the case DFP cites to, DFP is correct that the court stated that "we are permitted to begin our inquiry by separately viewing the component parts of the mark." However, the Ninth Circuit emphasized that the inquiry does not end there. Instead "our cases establish that we look to the mark as a whole and that the combination of generic terms may, in some instances, result in a distinctive mark." *Id*. at 978. Thus, in the instant case, DFP's assertion

that the component parts of "Comic-Con" illustrates that the mark is generic goes against clear Ninth Circuit precedent.

Furthermore, though the presence or absence of a word in the dictionary, and its corresponding meaning(s), is evidence of how the public perceives a term, *see Surgicenters of Am., Inc. v. Med. Dental Surgeries, Co.*, 601 F.2d 1011, 1015 n.11 (9th Cir. 1979), it is only one of many factors to consider. The touchstone of the analysis remains the phrase's primary significance to the relevant public.

On a final note, the Court addresses DFP's claims that the Court's decision during motion in limine not to admit some of their pre-1970s evidence was in error. (Doc. No. 436-1 at 26.) Specifically, DFP takes issue with the Court's statement that "somebody with personal knowledge as to the methodology in collecting this, or the author or the spokesperson" was needed. (*Id.*)

The Court's entire statement during motion in limine was:

> **Mr. Sears:** The point is that the only evidence of usage among the relevant public in the 1960s is what we've put forward. So being told that because there is not more evidence--because plaintiffs have not put forward any evidence, we may not put in what evidence is available does not seem to be the right result, your honor. We do have evidence of how the relevant public was using the terminology in the 1960s. The jury should be allowed to see it.
>
> **The Court:** The problem is it's not going to get allowed unless we have somebody with personal knowledge as to the methodology in collecting this, or the author or the spokesperson. We are not just going to give them the magazines and say read. I can tell you that on motion in limine number whatever.
>
> Ancient documents isn't an admissions. It's an authentication issue. And you've got all the other rules of evidence. And if you want to debate that, we'll certainly do it.
>
> . . .
>
> I find that the whole business of the several events in the '60s, people's comments about them in periodicals and so forth, is likely to cause confusion on the issues, take up undue time and has little relevance when we start to look at the efforts comic con San Diego made to get the comic con secondary meaning they believe they have. And that the PTO or the trademark arm of that has now allowed registration for--in four separate iterations.

(Doc. No. 514 at 32:18–35:7.) Thus, in light of the record, the Court rejected the statements based on Federal Rules of Evidence 402, 403, 901, and hearsay.

In sum, despite DFP's efforts to ask this Court to reconsider its previous rulings under the guise of a motion for new trial, the Court is yet again unpersuaded that "generic ab intio" should have been a defense brought to trial. Thus, the Court **DENIES** DFP's motion for new trial in this respect.

### F. SDCC Did Not Provide a False and Legally Flawed Narrative

DFP endeavors to argue that SDCC cultivated a "fiction" that it had been the first to use "comic con" and that SDCC then gave "comic con" meaning through decades of investment. (Doc. No. 436-1 at 27–29.)

SDCC's statement that DFP attaches to is:

> Mr. Glanzer, Ms. Desmond, Mr. Rogers, and thousands upon thousands of employees and volunteers, spanning four decades, have invested their time, their talent, their hearts, and their souls building a brand that even 25 years ago people knew relatively nothing about: comic con.

(*Id*. at 28.)

The Court need not waste much time on this argument. The record does not illustrate that SDCC stated that it coined "Comic Con" or that it was the first to use the phrase. All the Court has is DFP's belief that SDCC "cultivated the fiction that it had been the first to put on a comic con[.]" (Doc. No. 436-1 at 27–28.) This is rank speculation. Moreover, DFP's assertion that their pre-1970s evidence demonstrates that "Comic Con" was already known to the relevant public is diametrically erroneous as already discussed *supra* pp. 20–23. Consequently, DFP's motion for new trial based on SDCC's purportedly false narrative is **DENIED**.

### G. The Jury's Validity Verdict is Not Against the Weight of the Evidence

DFP spends one paragraph arguing that their evidence of third-party use demonstrates that the jury verdict is against the weight of the evidence. (Doc. No. 436-1 at 29.) Thus, genericness should be retried. (*Id*.) However, DFP bases this argument on a distortion and misunderstanding of the cases they cite to. The Court illustrates that in each

case utilized by DFP, evidence of competitor use was but one factor in the court's final conclusion. *See Schwan's IP, LLC v. Kraft Pizza Co.*, 460 F.3d 971, 974–76 (8th Cir. 2006) (looking to competitors' use of the term "Brick Oven" and the use by media and restaurants to analyze genericness of the phrase); *see also CG Roxanne*, 569 F. Supp. 2d at 1026–30 (looking to competitors' use, usage by the press and media, and the trademark holder's own use of the mark in concluding that "bottled at the source" is generic); *Classic Foods Int'l Corp. v. Kettle Foods, Inc.*, 468 F. Supp. 2d 1181, 1189–90 (C.D. Cal. 2007) (looking to the media's treatment of a mark, extensive newspaper and magazine usage, use of the term by competitors, and opinions of leaders in the industry to determine that "Kettle" is a generic term).

Accordingly, without more, the Court disagrees that the jury's validity verdict is against the weight of the evidence—especially in light of SDCC's Teflon Survey that demonstrated that over 80% of consumers believed that "Comic Con" is a brand. (Doc. No. 468 at 11.) Thus, the Court **DENIES** DFP's motion for new trial on validity. *See Molski*, 481 F.3d at 729 (holding that a motion for new trial should be granted if there is "absolute absence of evidence to support the jury's verdict . . . .") (citation omitted).

H.    Infringement Should Not be Retried

Defendants spend a paragraph arguing that infringement should be retried if validity is retried. (Doc. No. 436-1 at 30.) Consequently, as the Court is denying DFP's motion for new trial based on validity, it also **DENIES** DFP's motion for new trial as to infringement.

## CONCLUSION

In sum, the Court finds that the verdict is not against the clear weight of the evidence, there were no errors in rejection of evidence, and no errors in the instructions given to the jury. Accordingly, DFP's motion for new trial is **DENIED** in its entirety.

**IT IS SO ORDERED**.

Dated:  August 23, 2018

Hon. Anthony J. Battaglia
United States District Judge

14-cv-1865-AJB-JMA